**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JAMES KAPPES, et al.,

     Plaintiffs

v.

FCA US LLC,

     Defendant.

_____/

Case No. 23-10259
Hon. Jonathan J.C. Grey
Mag. Judge Kimberly G. Altman

**OPINION AND ORDER GRANTING IN PART, DENYING IN PART, AND DENYING AS MOOT IN PART DEFENDANT'S MOTION TO DISMISS (ECF No. 15) AND CLARIFYING THE COURT'S PREVIOUS ORDER (ECF No. 25)**

## I.   INTRODUCTION

Plaintiff James Kappes and 35 other named plaintiffs, on behalf of themselves and others similarly situated, filed a complaint against Defendant FCA US LLC ("FCA") for selling an allegedly defective and unrepairable vehicle: the Chrysler Pacifica Plug-In Hybrid Electric Vehicle, Model Years 2017–2023 ("Class Vehicles"). (ECF No. 1.) This matter is before the Court on FCA's motion to dismiss plaintiffs' complaint and on plaintiffs' motion and FCA's request for the Court to clarify a prior ruling regarding the stay of some plaintiffs' claims pending

arbitration. (ECF Nos. 25–27.) This order clarifies the Court's prior ruling; and, therefore, the Court **GRANTS** the parties' motion and request to clarify. (ECF Nos. 26 and 27.) Further, for the reasons stated below, the Court **GRANTS IN PART**, **DENIES IN PART**, and **DENIES AS MOOT IN PART** FCA's motion to dismiss.

## II.   BACKGROUND

### A.   The Class Vehicles

The Chrysler Pacifica Plug-In Hybrid, also known as Pacifica PHEV, is a hybrid vehicle that runs on both gasoline and battery power. (ECF No. 1, PageID.56 ¶ 79.) FCA produced these Class Vehicles from August 12, 2016 to January 9, 2023. (ECF No. 1-2, PageID.331.) Unlike a traditional gas-powered vehicle, the Pacifica PHEV contains a transmission that consists of two electric motors which provide motive power when the vehicle is running on electricity, and which control the gear ratio when the vehicle is running on gasoline. (ECF No. 1, PageID.60 ¶ 88.) Plaintiffs allege that the Pacifica PHEV features a defect that can cause the vehicle to shut down while in transit. (ECF No. 1, PageID.14 ¶ 3.) The Class Vehicles have an internal transmission wiring connector which could short, resulting in an unexpected engine shutdown under

certain conditions. (ECF No. 1-2, PageID.331; ECF No. 1-3, PageID.335.) Plaintiffs dub this defect the "Spontaneous Shutdown Risk" and allege that it plagues at least 67,118 Class Vehicles. (ECF No. 1, PageID.79 ¶ 108; *see also* ECF No. 1-2, PageID.331.)

### B.   Complaints about the Alleged Defect

Some Class Vehicle owners, but not plaintiffs, experienced symptoms of the alleged shutdown defect. As of January 9, 2023, FCA was aware of 242 warranty claims, 59 field reports, and 6 customer assistance records which potentially relate to the alleged shutdown defect. (ECF No. 1-2, PageID.332.) FCA received these warranty claims, field reports, and customer assistance records from February 17, 2018 to November 1, 2022. (*Id.*) Various Class Vehicle owners have complained about their Pacifica PHEV and/or the alleged defect to the National Highway Traffic Safety Administration ("NHTSA"). (ECF No. 1, PageID.60–69.)

### C.   FCA's Investigation and Its Response to the Alleged Defect

On August 16, 2022, FCA began investigating the Class Vehicles' loss of motive power. (ECF No. 1-2, PageID.332.) FCA analyzed loss of motive power reports and vehicle history and determined that some of

3

the Class Vehicles reported unexpected engine shutdowns under certain conditions. (*Id.*) As of January 9, 2023, FCA was not aware of any accidents or injuries potentially related to the alleged defect. (ECF No. 1-2, PageID.332.) On January 9, 2023, FCA decided to conduct a voluntary safety recall of the Class Vehicles. (*Id.* at PageID.333.) FCA planned on notifying dealers and owners of the recall on March 8, 2023. (*Id.*) FCA made the details of its investigation and recall schedule known to NHTSA on January 17, 2023 by submitting a Part 573 Safety Recall Report. (ECF No. 1-2.) One week later, FCA sent out a notification to dealers in advance of its recall. (ECF No. 1, PageID.18 ¶ 13 n.5; ECF No. 1-3.)

To remedy the defect, FCA planned on updating the power inverter module software and, depending on the model year, the instrument panel cluster software in the Class Vehicles. (ECF No. 1-2, PageID.333.) The software updates would provide "messaging to the customer and sufficient drive time to exit traffic." (*Id.*)

### D.    The New Vehicle Limited Warranty

FCA shipped the model year 2017 and 2018 Pacifica PHEVs with a New Vehicle Limited Warranty which includes the Basic Limited

4

Warranty and the Powertrain Limited Warranty. (ECF No. 15-2, PageID.599; ECF No. 15-3, PageID.636.) The Basic Limited Warranty covers the cost of all parts and labor that FCA needs to repair any original item on the Pacifica PHEV that is defective in material, workmanship, or factory preparation. (ECF No. 15-2, PageID.603; ECF No. 15-3, PageID.640.) The Basic Limited Warranty lasts for 36 months or 36,000 miles, whichever occurs first. (ECF No. 15-2, PageID.604; ECF No. 15-3, PageID.641.)

The Powertrain Limited Warranty covers the cost of all parts and labor that FCA needs to repair certain powertrain components that are defective in workmanship and materials, including the transmission case and all internal parts, transmission range switch, speed and pressure sensors, and transmission control module. (ECF No. 15-2, PageID.606–607; ECF No. 15-3, PageID.643–644.) The Powertrain Limited Warranty lasts for 5 years or 60,000 miles, whichever occurs first. (ECF No. 15-2, PageID.606; ECF No. 15-3, PageID.644.)

### E.    Procedural History

Plaintiffs filed their complaint on February 1, 2023. (ECF No. 1.) Two days before filing, plaintiffs allegedly sent FCA written notice of

violations of the California Consumer Legal Remedies Act, the Song-Beverly Consumer Warranty Act, the Georgia Fair Business Practices Act, and the Texas Deceptive Trade Practices Act. (ECF No. 1, PageID.104 ¶ 207; PageID.112 ¶ 238; PageID.147 ¶ 388; PageID.299 ¶ 1019.)

On May 1, 2023, FCA moved to compel arbitration and mediation and moved to dismiss the complaint. (ECF Nos. 14, 15.) On September 27, 2024, the Court granted FCA's motion to compel and stayed the case pending arbitration of the following plaintiffs' claims: Andrew Berzanskis, Margaret Wilensky, Michael Christie, Christopher Dorn, Chad Fong, Ruth Hoffman, James Kappes, Alicia Kappes, Michael Keeth, Alexander Shusta, John Spruance, Andrew Ventura, and Spence Voss. (ECF No. 25, PageID.848.) In the same order, the Court denied FCA's motion to dismiss, finding that "the limited circumstances that might allow for dismissal do not apply here." (*Id.* at PageID.847–848.)

On October 4, 2024, the parties requested that the Court clarify its September 2024 order. Both the motion to dismiss and the requests for clarification are fully briefed. (ECF Nos. 15, 19, 21; ECF Nos. 26–29.)

6

### III.   MOTION FOR CLARIFICATION

Plaintiffs seek clarification regarding whether the stay is limited to the plaintiffs listed in the order or whether the stay applies to the entire matter. (ECF No. 26, PageID.852–853.) FCA seeks clarification regarding whether the Court denied its motion to dismiss without prejudice, allowing it to refile as appropriate when the Court lifts the stay. (ECF No. 27, PageID.860.) The Court **GRANTS** the requests for clarification and provides the following clarity.

Regarding the stay, the title of the order indicated that the matter was stayed for 13 plaintiffs whereas the substance of the order signaled an intent to stay the entire case. (*Compare* ECF No. 25, PageID.839, *with*, PageID.847–848.) To clarify, this matter is stayed pending arbitration only with respect to the 13 plaintiffs listed in the order. In other words, this matter is paused with respect to Berzanskis, Wilensky, Christie, Dorn, Fong, Hoffman, James and Alicia Kappes, Keeth, Shusta, Spruance, Ventura, and Voss. This matter is not stayed with respect to the other 23 plaintiffs. The parties provided arguments on whether the Court should stay the entire matter or stay this matter with respect to

the 13 plaintiffs who are subject to arbitration. (*See* ECF Nos. 28, 29.) However, there is no motion to stay before the Court, only motions to clarify. (ECF Nos. 26, 27.) Therefore, the Court need not weigh in on the merits of staying the entire matter as opposed to staying the matter for the 13 plaintiffs subject to arbitration.

Regarding the motion to dismiss, this order addresses the substance of the motion as to the 23 plaintiffs whose claims are not subject to arbitration. That includes Scott Carney, Sean Clancy, Kelsey and Peter Keefe, John Latacki, Devlin Su, Tim Banas, Salyi Vu, Alicia and David Maltz, Lauren Huntington, Elizabeth Niemioja, R. Scott Perry, Matthew Bergantino, Nicole and Stephen Costa, Jared Gadomski Littleton, Joseph Ohodnicki, Helen Bartek, Michael Carbajales-Dale, Shawn Sheehan, Richard Golland, and Ami Benzur. FCA may refile its motion to dismiss as to the 13 plaintiffs whose claims are subject to arbitration when appropriate.

## IV.   MOTION TO DISMISS – LEGAL STANDARD

### A.   Motion to Dismiss for Lack of Subject-Matter Jurisdiction

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the Court's subject-matter jurisdiction. Fed. R. Civ.

P. 12(b)(1). "A challenge to a party's Article III Standing is properly addressed as a challenge to subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *Van Vleck v. Leikin, Ingber, & Winters, P.C.*, No. 22-1859, 2023 WL 3123696, at *3 (6th Cir. Apr. 27, 2023). A motion to dismiss for lack of subject-matter jurisdiction can come in the form of a facial attack or a factual attack. *Miller v. Collins*, No. 23-3191, 2023 WL 7303305, at *2 (6th Cir. Nov. 6, 2023) (citing *Gentek Bldg. Prods., Inc. v. Sherman-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007)). In the context of standing, a facial attack "challenges whether the complaint adequately pleads standing even accepting its facts as true." *Id.* (citation omitted). A factual attack "challenges whether the facts in the record, including outside pleadings, support the existence of standing." *Id.* (citation omitted).

### B.  Motion to Dismiss for Failure to State a Claim

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a plaintiff's complaint. Accepting all factual allegations as true, the Court will review the complaint in the light most favorable to the plaintiff. *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). To survive a motion to dismiss under Rule 12(b)(6),

a plaintiff must comply with Rule 8(a)(2), which requires a short and plain statement of the claim showing that the pleader is entitled to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must state sufficient "facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Claims comprised of "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must demonstrate more than a sheer possibility that the defendant's conduct was unlawful. *Id.* Although a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true." *Id.* (citations omitted); *Doe v. Mich. State Univ.*, 989 F.3d 418, 425 (6th Cir. 2021). The Court will typically only rely on the facts stated in the complaint. *Rondigo, L.L.C. v. Township of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011) (citations omitted). The Court can consider exhibits

10

attached to the complaint or to the defendant's motion if the exhibits are referred to in the complaint and are central to the claims. *Rondigo*, 641 F.3d at 680–681.

## V.   MOTION TO DISMISS – ANALYSIS

### A.   Standing Challenges

#### 1.   Standing to assert claims generally

At issue is whether plaintiffs have standing to bring any of their claims. FCA first argues that plaintiffs lack standing to bring their claims because they have not suffered an injury in fact. (ECF No. 15, PageID.576–577.) FCA contends that none of the plaintiffs have experienced the alleged shutdown defect and thus only aver a concern over an engine shutdown that may never happen. (*Id.* at PageID.577.) Plaintiffs argue that their allegations of overpaying for a vehicle with a defect suffice to establish an injury in fact. (ECF No. 19, PageID.725.) FCA counters, arguing that overpayment does not establish an injury in fact because plaintiffs only identify 16 incidents "with a tenuous-at-best connection to their claims." (ECF No. 21, PageID.825.) The Court disagrees with FCA.

11

FCA challenges whether plaintiffs adequately plead standing, so the Court treats this as a facial attack on standing. Accordingly, the Court accepts the allegations in the complaint as true. *Van Vleck*, 2023 WL 3123696, at \*3 (quoting *Hale v. Morgan Stanley Smith Barney LLC*, 982 F.3d 996, 997 (6th Cir. 2020)).

A plaintiff bears the burden of establishing Article III standing for each claim that they assert. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *DaimlerChrysler Corp v. Cuno*, 547 U.S. 332, 352 (2006). To establish standing, a plaintiff must show that they (1) "suffered an injury in fact that is concrete, particularized, and actual or imminent;" (2) "that the injury was likely caused by the defendant;" and (3) "that the injury would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423. At the pleading stage, a plaintiff must clearly allege facts demonstrating each element of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S.

12

555, 560 (1992)). An injury is particularized if it affects the plaintiff in a personal and individual way. *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560 n.1). An injury is concrete if it "actually exists" and is real, not abstract. *Id.* at 340 (citations omitted). Certain harms readily qualify as concrete injuries under Article III, including monetary harms. *TransUnion*, 594 U.S. at 425.

Here, plaintiffs bring claims for common law and statutory fraud, breach of express and implied warranties, and unjust enrichment, all stemming from FCA's sale of—and plaintiffs' purchase of—the Class Vehicles. (ECF No. 1, PageID.4–14.) Each plaintiff alleges that, through exposure and interaction with Chrysler, they were aware of "uniform and pervasive marketing messages of dependability and safety" and of the ability to drive the Pacifica PHEV in electric mode or as a hybrid. (*See, e.g.,* ECF No. 1, PageID.23 ¶ 23.) Plaintiffs further claim that the vehicles contain a faulty wiring harness in the transmission that causes the transmission to fail, resulting in a loss of both gasoline and battery motive power. (ECF No. 1, PageID.60 ¶ 88; ECF No. 1-2, PageID.331–332.) Each plaintiff alleges that Chrysler and its agents, dealers, and other representatives did not disclose the alleged defect and associated

13

risk. (*See, e.g.,* ECF No. 1, PageID.24 ¶ 25.) All plaintiffs allege that they would not have purchased the Pacifica PHEV had they known about the defect. (*See, e.g.,* ECF No. 1, PageID.34–35 ¶ 40.) An additional 15 plaintiffs also allege that they either would have paid less or would have purchased the non-hybrid version of the vehicle had they known about the defect. (*See, e.g.,* ECF No. 1, PageID.27–28 ¶ 30.) Finally, the plaintiffs who assert breach of warranty claims allege that the warranties formed the basis of their bargain when they purchased the vehicles and that FCA cannot repair the defect in the Class Vehicles. (*See, e.g.,* ECF No. 1, PageID.122 ¶ 282; PageID.18–19 ¶ 13.) Taking these allegations as true, plaintiffs have plausibly alleged that they suffered a monetary harm in the form of purchasing or overpaying for vehicles that they thought were safe, dependable, operable as hybrids or on battery power, and that had effective warranties.

Further, plaintiffs allege facts demonstrating that their monetary harm is an injury in fact. Their injury is particularized; plaintiffs purchased or paid a premium for allegedly defective vehicles, so they each allegedly sustained a monetary loss. Further, their injury is concrete; plaintiffs paid the purchase price without knowledge of the alleged

14

defect, and a defective car is worth less than a non-defective car. *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1163 (C.D. Cal. 2011). As mentioned, the Supreme Court recognizes that monetary harms readily qualify as concrete injuries. *TransUnion*, 594 U.S. at 425. Therefore, plaintiffs have plausibly alleged that they suffered an injury in fact.

FCA resists this conclusion by citing to a case in this district for the proposition that an overpayment theory of injury is too speculative where no plaintiff: (1) actually sold a vehicle for a reduced price; (2) alleged the amount of damages; and (3) experienced the alleged defect. (ECF No. 21, PageID.825 (citing *Uzelac v. Mercedes-Benz USA, LLC*, No. 20-CV-10118, 2020 WL 13577557, at *3–4 (E.D. Mich. Apr. 27, 2020)).) *Uzelac* does not persuade the Court to change its conclusion.

For context, *Uzelac* involved a plaintiff who drove an allegedly defective vehicle without incident for the entirety of her 36-month lease and turned the vehicle in at the end of the lease. *Uzelac*, 2020 WL 13577557, at *1. Shortly before plaintiff turned in her vehicle, NHTSA issued a statement that there was a defect in some production batches of plaintiff's vehicle, and the manufacturer recalled the vehicles. *Id.* at *1– 2. Plaintiff alleged that she suffered a monetary loss in the form of

15

diminution in value of her car; she believed that the safety recall reduced the value of the car, preventing her from buying the car at the end of her lease and reselling it. *Id.* at *3. The court held that plaintiff failed to state a cognizable injury because she only sought damages for economic losses in the absence of: (1) a physical manifestation of the alleged defect; and (2) allegations suggesting a likelihood that the defect would manifest during the useful life of the vehicle, posing a serious risk of injury or death. *Uzelac*, 2020 WL 13577557, at *6. The court noted that the cases that did not require a manifest defect to maintain a claim were "limited to situations where there [was] a probability that the latent defect [would] manifest itself during the useful life of the vehicles, and other drivers have been injured or killed as a result of the latent defect." *Id.* at *4.

*Uzelac* does not compel the Court to dismiss the complaint for lack of standing. First, unlike the complaint in *Uzelac*, the complaint here suggests that there is a likelihood that the alleged defect can develop during the useful life of the vehicle and pose a serious risk of injury or death. The Part 573 Safety Recall Report indicates that as of January 9, 2023, FCA was aware of 242 warranty claims, 59 field reports, and 6

16

customer assistance records potentially related to the alleged defect with dates of receipt ranging from February 17, 2018 to November 1, 2022. (ECF No. 1-2, PageID.332.) FCA produced the Class Vehicles between August 12, 2016 and January 9, 2023. (ECF No. 1-2, PageID.331.) The existence of 307 potentially relevant datapoints that started originating less than two years after production began and continued to accumulate for the next four-plus years suggests that the defect can manifest during the useful life of the vehicle.

Further, the complaint contains reproductions of grievances that NHTSA received about the class vehicles. One owner experienced repeated stalls with only 200 miles on the vehicle. (ECF No. 1, PageID.61.) Another experienced a stall and reduced speed with only 300 miles on the vehicle. (*Id.* at PageID.66.) A third owner experienced a loss of engine power and the need for a new power inverter module only two weeks into ownership of a new Pacifica PHEV. (*Id.* at PageID.64.) A fourth owner experienced a loss of motive power and a need for a new power inverter module with only 3,100 miles on the vehicle. (*Id.* at PageID.69.) Considering that the Basic Limited Warranty covers the vehicles for 36 months or 36,000 miles, whichever comes first (ECF No.

17

15-2, PageID.604; ECF No. 15-3, PageID.641), those owners' experiences within the warranty period further suggest that the defect can manifest during the useful life of the vehicle.

Moreover, the recall report acknowledges that an "unexpected engine shut down resulting in a loss of motive power can cause a vehicle crash without prior warning." (ECF No. 1-2, PageID.331.) That no one has crashed due to the defect does not reduce the seriousness of the risk of injury or death stemming from the defect. *See Miller v. Gen. Motors, LLC*, 773 F. Supp. 3d 461, 506 (E.D. Mich. 2025) (finding that a defect that caused a hybrid vehicle to lose propulsion and not start was "serious and life-threatening because of the harm it could cause," even though the defect had not caused accidents or injuries).

Second, *Uzelac* does not address Sixth Circuit case law finding that pure economic losses are sufficient to establish Article III standing. *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 524 (6th Cir. 2015); *Loreto v. Procter & Gamble Co.*, 515 F. App'x 576, 581 (6th Cir. 2013). In both cases, plaintiffs alleged that defendant marketed a product as providing benefits that the product did not provide. *Rikos*, 799 F.3d at 502–503; *Loreto*, 515 F. App'x at 577–578. The *Rikos* plaintiffs alleged that they

18

suffered an injury in fact and lost money when they purchased a probiotic that did not provide the advertised digestive benefits. *Rikos*, 799 F.3d at 503. The *Loreto* plaintiffs alleged that they would have purchased a lower-priced competing product but-for defendant's false and misleading statements that vitamin C could alleviate cold symptoms. *Loreto*, 515 F. App'x at 578. In both cases, the Sixth Circuit rejected defendant's standing challenge, finding that plaintiffs suffered a cognizable injury in the form of monetary loss from purchasing a product based on misrepresentations. *Rikos*, 799 F.3d at 524; *Loreto*, 515 F. App'x at 581.

Here, plaintiffs similarly allege that they purchased the Class Vehicles based on FCA's messaging that the vehicles were safe and dependable hybrid vehicles. (*See, e.g.,* ECF No. 1, PageID.27 ¶ 30.) Plaintiffs allege that instead of receiving a safe and dependable hybrid vehicle, they received a defective car that can lose power and that is unrepairable. (ECF No. 1, PageID.18–19 ¶ 13, PageID.60 ¶ 88; ECF No. 1-2, PageID.331–332.) Even though *Rikos* and *Loreto* involve over-the-counter medication and supplements, the Court finds that their reasoning can extend to pure, point-of-sale economic loss injuries for other goods.

19

Third, a number of other courts in this district have found that pure economic losses resulting from the purchase of a defective vehicle are cognizable injuries for purposes of standing. *Chapman v. Gen. Motors, LLC*, 531 F. Supp. 3d 1257, 1275 (E.D. Mich. 2021) (Berg, J.); *Raymo v. FCA US LLC*, 475 F. Supp. 3d 680, 695 (E.D. Mich. 2020) (Berg, J.); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-md-02744, 2017 WL 1382297, at *4 (E.D. Mich. Apr. 18, 2017) (Lawson, J.); *Crawford v. FCA US LLC*, No. 20-cv-12341, 2021 WL 3603342, at *2–3 (E.D. Mich. Aug. 13, 2021) (Murphy, J.). The Court finds these decisions persuasive, especially *Crawford*, which involved similar allegations of injury at the point of sale for paying a premium for an allegedly defective vehicle that never manifested a defect. *Crawford*, 2021 WL 3603342, at *2 (citing *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013)).

Accordingly, the Court finds that plaintiffs have clearly alleged facts to demonstrate that they have suffered an injury in fact. FCA does not challenge the other elements of standing, and the Court finds that plaintiffs have clearly alleged facts to demonstrate the other elements. Plaintiffs' purchases of the Class Vehicles triggered the alleged injury

(ECF No. 1, PageID.71 ¶ 94) and judicial relief can likely redress the alleged injury in the form of damages. Therefore, plaintiffs have plausibly alleged that they have standing to bring this action.

### 2.   Standing to assert claims on behalf of a nationwide class

Plaintiffs bring this action on behalf of a nationwide class and 18 state-specific sub-classes. (ECF No. 1, PageID.4–13.) There are four nationwide claims: one for a violation of the Magnuson-Moss Warranty Act ("MMWA"), one for fraudulent concealment, one for fraudulent omission, and one for unjust enrichment. (*Id.* at PageID.4.) FCA argues that plaintiffs "do not aver injuries in states other than those where they purchased their vehicles, and they do not plead viable claims under the laws of all fifty states." (ECF No. 15, PageID.577.) Thus, FCA argues, plaintiffs lack standing to bring claims on behalf of a nationwide class. (*Id.* at PageID.577–578.) Plaintiffs contend that the Court should wait until the class certification stage to address this issue. (ECF No. 19, PageID.726.) The Court agrees with FCA.

FCA again challenges whether plaintiffs have adequately pleaded standing, so the Court treats this as a facial attack and accepts the

21

allegations in the complaint as true. *Van Vleck*, 2023 WL 3123696, at *3 (quoting *Morgan Stanley*, 982 F.3d at 997).

The Court recently addressed this issue in a different auto-defect case at the motion to dismiss stage. *See Miller*, 773 F. Supp. 3d at 490–493. In *Miller*, the Court held that plaintiffs lacked standing to sue under the laws of states where they neither resided nor suffered an injury. 773 F. Supp. 3d at 492. The Court also rejected plaintiffs' argument that the Court should defer standing analysis to the class certification stage. *Id.* The Court relied on the Sixth Circuit's statement in *Fox v. Saginaw County* that "[n]amed plaintiffs are parties from the start" and thus a court "must immediately concern itself with their standing because jurisdictional issues precede the merits." *Id.* at 492 (quoting *Fox v. Saginaw County*, 67 F.4th 284, 297 (6th Cir. 2023)). The Court acknowledged the factual differences between *Fox* and *Miller* but concluded that "*Fox* is at least instructive on when the Court should address the standing of named plaintiffs." *Id.* at 493. The Court also cited two opinions from another court in this district that "interpreted *Fox* to require courts to address the issue of standing at the motion to dismiss stage rather than at class certification." *Id.* (citing *Norman v. FCA US,*

22

*LLC*, 696 F. Supp. 3d 359, 374–375 (E.D. Mich. 2023) (Berg, J.) and

*Chapman v. Gen. Motors LLC*, No. 19-CV-12333, 2024 WL 698789, at *9–

10 (E.D. Mich. Feb. 14, 2024) (Berg, J.)). Finally, the Court discussed why

one court's finding that *Fox* did not compel the conclusion that a named

plaintiff lacks Article III standing to assert claims on behalf of a

nationwide class under the laws of different states. *Miller*, 773 F. Supp.

3d at 493 n.3. The Court concluded that said finding did not alter the

Court's decision. *Id.*

The only recent case that gives the Court pause is *Shelor v. Jaguar*

*Land Rover North America LLC*, No. 23-cv-908-WGY-PDB, 2025 WL

1580834, at *10 (M.D. Fla. Jan. 31, 2025), *report and recommendation*

*adopted,* ECF No. 88 (M.D. Fla. May 1, 2025). In *Shelor*, the court

rejected defendant's argument that, under *Fox*, plaintiffs lacked standing

to bring claims on behalf of those who purchased vehicles outside of the

states where plaintiffs bought their vehicles. *Id.* The court found that

plaintiffs had standing to bring their own claims and that whether they

could represent persons in other states "may or may not concern

standing." *Id.* The court declined to decide the issue at the motion to

dismiss stage—in part because the court recommended dismissal of the

23

complaint—but it also discussed why deferring the issue was not "problematic from a jurisdictional standpoint." *Id.*

This Court views plaintiffs' ability to maintain nationwide claims as a standing issue. As discussed in *Miller*, the nationwide claims are rooted in state law, even the MMWA claim. *Miller*, 773 F. Supp. 3d at 491. The Court questions whether plaintiffs can show that they suffered an injury under the laws of the states where they neither reside nor purchased their vehicles. Other courts in this district view the issue similarly. *See Norman v. FCA US, LLC*, 696 F. Supp. 3d 359, 375 (E.D. Mich. 2023) (Berg, J.); *Withrow v. FCA US LLC*, No. 19-13214, 2021 WL 2529847, at \*9–11 (E.D. Mich. June 21, 2021) (Michelson, J.); *Ambrose v. Gen. Motors LLC*, No. 19-13449, 2022 WL 3701946, at \*8 (E.D. Mich. Aug. 26, 2022) (Cox, J.). While some courts in this district do not view the issue as one of standing, (*Fisher v. FCA US LLC*, 712 F. Supp. 3d 930, 938–939 (E.D. Mich. 2024) (Leitman, J.); *Reynolds v. FCA US LLC*, 546 F. Supp. 3d 635, 647 (E.D. Mich. 2021) (Tarnow, J.)), the Court chooses to take the same approach as the *Norman*, *Withrow*, and *Ambrose* courts.

The Court adheres to its reasoning in *Miller* and finds that: (1) the Court must concern itself with the standing of named plaintiffs at this

24

stage; and (2) the named plaintiffs lack standing to assert claims under the laws of states where they neither purchased their vehicles nor reside. Therefore, the Court **GRANTS** FCA's motion to dismiss the nationwide claims for lack of standing. Plaintiffs may only assert Counts I, II, III, IV, and all other Counts on behalf of themselves and their respective state subclasses.

### B.      Fraud-Based Claims

#### 1.      Rule 9(b) Pleading Standard and Presale Knowledge

FCA argues that plaintiffs' allegations of fraudulent omission and concealment do not satisfy Federal Rule of Civil Procedure 9(b)'s pleading standard. (ECF No. 15, PageID.580–581.) FCA also argues that plaintiffs cannot maintain their fraud-based claims because they fail to plausibly allege that FCA knew of the alleged defect before it sold the Class Vehicles. (*Id.* at PageID.581–582.) Plaintiffs contend that they have satisfied Rule 9(b) and that they have plausibly alleged presale knowledge of the alleged defect based on consumer complaints to NHTSA, the customer assistance records, warranty claims, and field reports of which FCA is aware, FCA's pre-launch testing of the Class Vehicles, and FCA's investigation into the Class Vehicles. (ECF No. 19,

PageID.727–731; ECF No. 1, PageID.18 ¶ 12.) The Court finds that plaintiffs do not adequately plead FCA's presale knowledge of the alleged defect, which means that plaintiffs also fail to satisfy Rule 9(b).

Federal Rule of Civil Procedure 9(b) establishes the pleading requirements for fraud claims. Plaintiffs argue that their fraud claims rest on a theory of omission and concealment, not affirmative misrepresentation. (ECF No. 19, PageID.727.) For fraudulent concealment/omission claims, Rule 9(b) requires plaintiffs to plead "(1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [FCA] obtained as a consequence of the alleged fraud." *Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012) (citation omitted). In other words, plaintiffs "must specify the 'who, what, when, where, and how' of the alleged omission." *Id.* (quoting *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006)). A complaint for fraudulent omission may satisfy Rule 9(b) if it "alleges that a manufacturer knew of a defect before sale, the various venues the manufacturer used to sell the product failed to disclose the defect, and that the plaintiffs would not have purchased

26

the product or would have paid less for it had they known of the defect." *Wozniak v. Ford Motor Co.*, No. 17-cv-12794, 2019 WL 108845, at *3 (E.D. Mich. Jan. 4, 2019) (citation omitted). A plaintiff may plead knowledge of a defect "generally." *In re Chevrolet Bolt EV Battery Litigation*, 633 F. Supp. 3d 921, 956 (E.D. Mich. 2022) (quoting *Persad v. Ford Motor Co.*, No. 17-12599, 2018 WL 3428690, at *3 (E.D. Mich. July 16, 2018)); Fed. R. Civ. P. 9(b).

While the parties separate the Rule 9(b) and presale knowledge analyses, the Court groups the topics because, as plaintiffs indicate, they must allege that FCA knew of the defect to show the "what" of the alleged fraudulent omission. (*See* ECF No. 19, PageID.729 ("Plaintiffs allege . . . the 'what' (FCA's failure to disclose the Spontaneous Shutdown Risk despite knowing about it prior to sale) . . . .").)

Plaintiffs cite the Part 573 Safety Recall Report, which indicates that as of January 9, 2023, FCA was aware of 242 warranty claims, 59 field reports, and 6 customer assistance records potentially related to the alleged defect "with dates of receipt ranging from February 17, 2018 to November 1, 2022." (ECF No. 19, PageID.730 (quoting ECF No. 1-2, PageID.332).) Plaintiffs also cite 16 complaints that consumers

27

submitted to NHTSA which date back to April 2018. (*Id.* at PageID.730–731 (citing ECF No. 1, PageID.60–69 ¶ 90).) However, the warranty claims, field reports, customer assistance records, and consumer complaints are insufficient to support an inference of presale knowledge.

Customer complaints and warranty claims made before a plaintiff first purchased their vehicle and/or before a plaintiff's vehicle was first sold might support an inference of presale knowledge. *See Johnson v. FCA US LLC*, 555 F. Supp. 3d 488, 508–509 (E.D. Mich. 2021) (finding that customer complaints and warranty claims did not establish presale knowledge because: (1) nearly all of the complaints were made after plaintiffs purchased their vehicles and/or after plaintiffs' vehicles were first sold; and (2) the warranty claims said little about when defendant acquired knowledge of the defect). But here, Plaintiffs Nicole Costa, Stephen Costa, and Matthew Bergantino purchased their vehicles in 2017. (ECF No. 1, PageID.42–43 ¶¶ 53–54.) Further, Plaintiff Elizabeth Niemioja does not allege when she purchased her vehicle, and there is not enough information in the complaint to reasonably infer that she purchased her vehicle between 2018 and 2022. (*See id.* at PageID.39–40 ¶ 49.) Therefore, Nicole and Stephen Costa, Bergantino, and Niemioja

28

cannot rely on these warranty claims, field reports, customer assistance records, and consumer complaints to support an inference of presale knowledge.

Neither can the other plaintiffs. To support an inference of presale knowledge, customer complaints and warranty claims must both inform the manufacturer about the safety implications of the defect and be frequent enough that they are not "lost in a sea of complaints and repairs amassing by the dozens each day." *Smith v. Gen. Motors LLC*, 988 F.3d 873, 885 (6th Cir. 2021) (citing *Roe v. Ford Motor Co.*, No. 18-cv-12528, 2019 WL 3564589, at *7 (E.D. Mich. Aug. 6, 2019)).

Here, plaintiffs do not plausibly allege that FCA was aware of the complaints that consumers submitted to NHTSA. Plaintiffs generally claim that FCA was aware of the complaints. (*See, e.g.,* ECF No. 1, PageID.119 ¶ 271.) However, plaintiffs' allegations lack any supporting facts, rendering their allegations speculative. *Smith*, 988 F.3d at 885.

Even assuming that FCA was aware of the 16 customer complaints, the Court reaches the same conclusion. The sum of the 16 customer complaints, 242 warranty claims, 59 field reports, and 6 customer assistance records is 323. FCA received the 323 claims, complaints,

reports, and records between February 17, 2018 and December 24, 2022—roughly 4 years and 10 months—which predates when plaintiffs purchased their vehicles.[1]  One view is that FCA received an average of approximately 67 pieces of information potentially relevant to the alleged defect per year. However, there is nothing in the complaint that allows the Court to reasonably infer that FCA did receive 67 claims, complaints, reports, or records per year. But even if FCA did, considering the alleged defect potentially involves 67,118 Pacifica PHEVs that FCA produced between August 2016 and January 2023, the 323 complaints, warranty claims, field reports, and customer assistance records do not appear to be

---

[1] Scott Carney purchased a 2018 Pacifica PHEV in August 2018. (ECF No. 1, PageID.23 ¶ 23.) Sean Clancy purchased a 2018 Pacifica PHEV in October 2018. (*Id.* at PageID.24 ¶ 25.) Kelsey and Peter Keefe purchased their 2018 Pacifica PHEV in April 2019. (*Id.* at PageID.27 ¶ 30.) John Latacki purchased a 2018 Pacifica PHEV in August 2018. (*Id.* at PageID.28 ¶ 31.) Devlin Su purchased a 2018 Pacifica PHEV in February 2022. (*Id.* at PageID.31 ¶ 37.) Tim Banas purchased a 2018 Pacifica PHEV in December 2019. (*Id.* at PageID.33 ¶ 39.) Salyi Vu purchased a 2018 Pacifica PHEV in September 2019. (*Id.* at PageID.34 ¶ 40.) Alicia and David Maltz purchased their 2018 Pacifica PHEV in September 2018. (*Id.* at PageID.37 ¶ 45.) Lauren Huntington purchased a 2018 Pacifica PHEV in March 2019. (*Id.* at PageID.38–39 ¶ 47.) R. Scott Perry purchased a 2017 Pacifica PHEV in February 2019. (*Id.* at PageID.40–41 ¶ 51.) Jared Gadomski Littleton purchased a 2018 Pacifica PHEV in October 2021. (*Id.* at PageID.44 ¶ 56.) Joseph Ohodnicki purchased a 2018 Pacifica PHEV in May 2019. (*Id.* at PageID.46–47 ¶ 59.) Helen Bartek purchased a 2018 Pacifica PHEV in January 2019. (*Id.* at PageID.47–48 ¶ 61.) Michael Carbajales-Dale purchase da 2018 Pacifica PHEV in June 2018. (*Id.* at PageID.48 ¶ 62.) Shawn Sheehan purchased a 2017 Pacifica PHEV in September 2020. (*Id.* at PageID.49 ¶ 63.) Richard Golland purchased a 2018 Pacifica PHEV in July 2019. (*Id.* at PageID.50–51 ¶ 65.) Ami Benzur purchased a 2018 Pacifica PHEV in September 2018. (*Id.* at PageID.52–53 ¶ 69.)

more than a blip on FCA's complaints and repairs radar. *Smith*, 988 F.3d at 885 (quoting *Roe*, 2019 WL 3564589, at \*7).

Even if the Court considered the warranty claims separately, 242 potentially relevant warranty claims between February 17, 2018 and November 1, 2022—a period of nearly four years and eight-and-a-half months—are insufficient to establish that FCA had presale knowledge of the defect. *See Sulligan v. Ford Motor Co.*, No. 22-11668, 2023 WL 5180330, at \*12 (E.D. Mich. Aug. 11, 2023) (citation omitted) (holding that 286 warranty claims received in less than a year for 48,924 class vehicles sold was "far from sufficient to show, or even allege, that Ford had the requisite knowledge of the defect"). *See also Johnson*, 555 F. Supp. 3d at 509 ("The fact that at some unidentified point after FCA began selling the Class Vehicles, certain parts became backordered and/or warranty claims increased says little about when FCA acquired knowledge of the Panel Defect, and . . . whether that knowledge was obtained prior to any of the named Plaintiffs buying their vehicles.").

Plaintiffs fare no better if the Court considers just the 59 field reports and 16 consumer complaints that FCA received over a period of 4 years and 10 months. *See Miller*, 773 F. Supp. 3d at 502–503 (citing

31

*Smith*, 988 F.3d at 885) (finding that 61+ complaints and field reports over a 6-year period were not more than a blip on General Motors' complaints and repairs radars). Accordingly, the consumer complaints, warranty claims, field reports, and customer assistance records are insufficient to support an inference of presale knowledge.

Relatedly, plaintiffs argue that pre-launch testing would have revealed the alleged defect because some consumers experienced the defect "soon after purchase and with as little as a couple hundred miles on their vehicles." (ECF No. 19, PageID.731.) These allegations are also insufficient to support an inference of presale knowledge; the defect never manifested in plaintiffs' vehicles, so the argument that pre-release testing would reveal the existence of the defect is not compelling. *See Smith*, 988 F.3d at 886 (citing *Burdt v. Whirlpool Corp.*, No. 15-01563, 2015 WL 4647929 (N.D. Cal. Aug. 5, 2015)) (holding that plaintiffs could not "rely on pre-production testing and post-hoc complaints to show knowledge of a defect that only arose after" plaintiffs drove their cars for tens or hundreds of thousands of miles over many years).

Granted, plaintiffs' argument in this case is stronger than the allegations in *Smith*. In *Smith*, plaintiffs alleged that (1) General Motors

32

followed industry-approved engineering and quality standards every time it made a change to its cars, so (2) General Motors must have performed tests when it made a change to the class vehicles, which (3) would have revealed the alleged defect in the vehicles. *Smith*, 988 F.3d at 884. Here, plaintiffs argue that the early-ownership complaints suggest that FCA's pre-release testing would have revealed the defect. (ECF No. 19, PageID.731.) However, plaintiffs only point to five early-ownership complaints about a vehicle of which FCA produced tens of thousands. (*Id.*; ECF No. 1, PageID.331.)[2] Further, plaintiffs suggest that FCA's pre-launch testing was inadequate, which undercuts the argument that pre-launch testing would have revealed the alleged defect. (*See* ECF No. 1, PageID.20 ¶ 16 ("If FCA had conducted adequate pre-launch testing of the hybrid propulsion in the Pacifica Hybrids . . . it would have learned of the unreasonable risks posed by the faulty wiring harnesses and the related components meant to enable the safe operation of the

---

[2] To be clear, three of the complaints do not specify the model year of the Pacifica PHEV at issue, and the customers submitted the complaints between February 2018 and January 2019. (ECF No. 1, PageID.61, 63, 64.) These three complaints could be based on experiences with the 2017, 2018, or 2019 Pacifica PHEV. In the other two complaints, the customers identify the 2018 Pacifica PHEV. (*Id.* at PageID.61, 66.)

Pacificas."). Therefore, plaintiffs' allegations of pre-release testing are insufficient to support an inference of presale knowledge.

Plaintiffs resist this conclusion by citing *Bossart v. General Motors LLC*, No. 20-CV-11057, 2021 WL 5278191, at *10–11 (E.D. Mich. May 19, 2021). (ECF No. 19, PageID.731.) In *Bossart*, the court concluded that plaintiffs sufficiently pleaded presale knowledge "[g]iven the number and nature of the consumer complaints catalogued by plaintiffs, combined with the general allegations regarding GM's testing and data gathering process." 2021 WL 5278191, at *11. The complaint included reproductions of 44 complaints that consumers submitted about the allegedly defective vehicle to third-party forums and the NHTSA website, and it included a review from a prominent vehicle magazine. *Id.* at *10. The *Bossart* plaintiffs also alleged that: (1) GM conducted tests, including pre-sale durability testing, to verify that parts were not defective and aligned with GM's specification; (2) GM's customer relations department collected and analyzed field data, including repair requests, technical reports, parts sales reports, and warranty claims; and (3) GM's warranty department analyzed and collected dealership-submitted data to identify trends in vehicles. *Bossart*, 2021 WL 5278191, at *10.

However, the Court is not persuaded by *Bossart*. The *Bossart* case did not consider the language in *Smith* that complaints must be "frequent enough that they are not lost in a sea of complaints and repairs amassing by the dozens each day." *Smith*, 988 F.3d at 885 (internal quotation marks omitted) (quoting *Roe*, 2019 WL 3564589, at *7). Nor did the *Bossart* court consider *Smith*'s conclusion that plaintiffs cannot rely on allegations of pre-release testing to show presale knowledge where the defect does not manifest until after tens or hundreds of thousands of miles and many years of use. *Smith*, 988 F.3d at 886.[3] A review of the *Bossart* docket reveals that the parties concluded briefing one month before the Sixth Circuit issued *Smith* and did not file a notice of supplemental authority. (*See Bossart v. General Motors LLC*, No. 20-cv-11057, ECF Nos. 20, 27, 28.) Further, there is no indication that the *Bossart* court considered *Smith*. *Smith* is binding on courts in this district, and *Bossart* did not address *Smith* Therefore, *Bossart* is not persuasive.

---

[3] To be fair, *Bossart* may not have needed to consider this language in *Smith*. The *Bossart* plaintiffs may have experienced the alleged defect much sooner than the *Smith* plaintiffs, but *Bossart* does not explicitly state when plaintiffs experienced the alleged defect.

Finally, plaintiffs cite to FCA's investigation into the alleged defect to establish presale knowledge. (ECF No. 1, PageID.18 ¶ 12.) However, FCA began its investigation in August 2022, which postdates: (1) Bergantino's, Nicole and Stephen Costas', and Carbajales-Dale's purchases by over four years; (2) Carney's, Clancy's, Latacki's, Alica and David Maltzs', and Benzur's purchases by four or nearly four years; (3) Kelsey and Peter Keefes', Huntington's, Perry's, Ohodnicki's, Bartek's, and Golland's purchases by over three years; (4) Vu's purchase by nearly three years; (5) Banas' purchase by over two years; (6) Sheehan's purchase by nearly two years; (7) Littleton's purchase by nearly one year; and (8) Su's purchase by six months. (*See* ECF No. 1-2, PageID.332; n.1, *supra*.) Therefore, FCA's investigation into the alleged defect does not support an inference of presale knowledge. *See Miller*, 773 F. Supp. 3d at 500 n.4 (concluding that a plaintiff who purchased a vehicle six months before a manufacturer released a service bulletin addressing the alleged defect could not rely on the bulletin to support an inference of presale knowledge because he purchased the vehicle too long before the manufacturer published the bulletin). *See also Fisher*, 712 F. Supp. 3d at

36

944 n.3 (same for a plaintiff who purchased a vehicle seven months before publication of a service bulletin describing the defect).

Plaintiffs have not plausibly alleged that FCA had pre-sale knowledge of the alleged defect, which means they have also not plausibly alleged the "what" of the alleged fraudulent omission or concealment. Accordingly, the Court **DISMISSES** the common law fraudulent concealment and omission claims of the non-stayed plaintiffs under the laws of California, Connecticut, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Ohio, Minnesota, Missouri, New Hampshire, Pennsylvania, Rhode Island, South Carolina, Texas, Virginia, and Washington (Counts II and III). The Court further **DISMISSES** the claims that the non-stayed plaintiffs brought under the California Consumer Legal Remedies Act ("CCLRA," Count VII), California Unfair Competition Law (Count VIII), California False Advertising Law ("FAL," Count IX), Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA," Count XXV), Iowa Private Right of Action for Consumer Frauds Act ("Private Right Act," Count XXVII), Kansas Consumer Protection Act ("KCPA," Count XXIX), Chapter 93A of Massachusetts law ("Chapter 93A," Count XXXV), Minnesota Consumer Fraud Act

37

("MCFA," Count XL), Minnesota Uniform Deceptive Trade Practices Act ("MUDTPA," Count XLI), Missouri Merchandising Practices Act ("MMPA," Count XLIV), Pennsylvania Unfair Trade Practices & Consumer Protection Act ("PUTPCPL," Count LIV), Rhode Island Deceptive Trade Practices Act ("RDTPA," Count LVII), Texas Deceptive Trade Practices Act (Count LXI), Virginia Consumer Protection Act ("VCPA," Count LXIV), and the Washington Consumer Protection Act ("WCPA," Count LXVII) for failure to satisfy Rule 9(b). *See Squeo v. Campbell Soup Co.*, No. 24-cv-02235, 2024 WL 4557680, at \*3 (N.D. Cal. Oct. 22, 2024) (finding that Rule 9(b) applies to CCLRA claims that sound in fraud); *Smith v. Ditech Fin. LLC*, No. EDCV 18-1411 JGB (SHKx), 2018 WL 6431405, at \*9 (C.D. Cal. Nov. 5, 2018) (citations omitted) ("The heightened particularity requirements of Rule 9(b) apply to claims under California's Unfair Competition Law."); *See In re Outlaw Lab'y, LLP*, 463 F. Supp. 3d 1068, 1085 (S.D. Cal. 2020) (citation omitted) ("Claims pursuant to the FAL are subject to the heightened pleading requirements of Rule 9(b)."); *O'Connor v. Ford Motor Co.*, 477 F. Supp. 3d 705, 718 (N.D. Ill. 2020) ("Where an ICFA claim rests on allegations of deceptive conduct, Rule 9(b) applies and the plaintiff must plead with particularity

38

the circumstances constituting fraud."); *Moeller v. Samsung Elecs. Am., Inc.*, 623 F. Supp. 3d 978, 986 (S.D. Iowa 2022) (concluding that a Private Right Act claim that sounded in fraud was subject to Rule 9(b)); *Thompson v. Jiffy Lube Int'l, Inc.*, 505 F. Supp. 2d 907, 932 (D. Kan. 2007) (applying Rule 9(b) to one plaintiff's KCPA claims because they sounded in fraud); *Berezin v. FCA US, LLC*, No. 21-10852, 2022 WL 488411, at *6 (D. Mass. Feb. 17, 2022) (citations omitted) ("A chapter 93A claim that involves fraud is subject to the heightened pleading requirement of Fed. R. Civ. P. 9(b)."); *Baker v. Best Buy Stores, LP*, 812 N.W.2d 177, 182 (Minn. Ct. App. 2012) (quoting Minn. R. Civ. P. 9.02) (noting that parties alleging fraud under the MCFA must "state with particularity" the "circumstances constituting fraud"); *Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916, 930 (D. Minn. 2024) (citations omitted) ("The Rule 9(b) standard applies to MUDPTA [sic]."); *Hennessey v. Gap, Inc.*, 86 F.4th 823, 827 (8th Cir. 2023) (citation omitted) ("Claims alleging deceptive practices under the MMPA sound in fraud and are subject to Rule 9(b)'s heightened pleading standard."); *Dolan v. PHL Variable Ins. Co.*, No. 15-cv-01987, 2016 WL 6879622, at *5 (M.D. Pa. Nov. 22, 2016) (concluding that plaintiffs' PUTPCPL claims that sounded in fraud were

39

subject to Rule 9(b)); *Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 978, 985–986 (N.D. Cal. 2016) (applying Rule 9(b) to claims that sounded in fraud, including an RDTPA claim); *Omni USA, Inc. v. Parker-Hannifin Corp.*, 798 F. Supp. 2d 831, 836 (S.D. Tex. 2011) (internal quotation marks omitted) (quoting *Frith v. Guardian Life Ins. Co. of Am.*, 9 F. Supp. 2d 734, 742–743 (S.D. Tex. 1998)) ("Claims alleging violations of the Texas . . . Deceptive Trade Practices Act . . . are subject to the requirements of Rule 9(b)."); *Murphy v. Capella Educ. Co.*, 589 F. App'x 646, 656–658 (4th Cir. 2014) (applying Rule 9(b) to VCPA that were premises on false statements and material omissions); *King County v. Viracon, Inc.*, No. 19-cv-508, 2019 WL 12043501, at *5 (W.D. Wash. Dec. 4, 2019) (applying Rule 9(b) to a WCPA claim based on an alleged fraudulent omission and misrepresentation).

The Court further **DISMISSES** the Connecticut Unfair Trade Practices Act claim ("CUTPA," Count XIV), the Florida Deceptive and Unfair Trade Practice Act claim ("FDUTPA," Count XVI), the New Hampshire Consumer Protection Act claim ("NHCPA," Count XLVI), and the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act (Count LIX) for failure to allege presale knowledge. *See*

*Hudson River Cruises, Inc. v. Bridgeport Drydock Corp.*, 892 F. Supp. 380, 387 (D. Conn. 1994) (finding that plaintiff's allegation that defendant violated CUTPA by failing to advise of the need for subcontractors was without merit because defendant did not, at the time, realize the need for subcontractors); *Nehme v. Smithkline Beecham Clinical Lab'ys, Inc.*, 863 So.2d 201, 205–207 (Fla. 2003) (noting, in the context of fraudulent concealment exception to the statute of repose, that "[o]ne cannot conceal what one does not know"); *Kelton v. Hollis Ranch, LLC*, 927 A.2d 1243, 1246 (N.H. 2007) ("The trial court properly construed the legislature's use of the words 'deceptive' and 'unfair' [in the NHCPA] as requiring a degree of knowledge or intent."); *Brockman v. Am. Suzuki Motor Corp.*, No. 11-3381, 2012 WL 3264995, at *6 (D.S.C. 2012) (finding that defendant engaged in false or misleading advertising in violation of the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act where plaintiffs alleged that defendant knew or should have known that its marketing campaign was deceptive, misleading, and/or fraudulent).[4]

---

[4] Because the Court dismisses the fraud-based claims on these grounds, it need not and does not consider FCA's other arguments in favor of dismissal, including whether FCA had a duty to disclose and several individual grounds for dismissing the statutory claims. (*See* ECF No. 15, PageID.584–589.)

41

## C.    Unjust Enrichment Claims

### 1.    Applicability of Rule 9(b)

FCA first argues that the Court should dismiss the unjust enrichment claims for failure to satisfy Rule 9(b) because the claims depend "on the same averments" as the fraud claims. (ECF No. 15, PageID.588.) Plaintiffs do not respond to this argument. Nevertheless, the Court does not find that the unjust enrichment count is subject to Rule 9(b).

First, Plaintiffs plead the unjust enrichment count in the alternative to their contract-based claims. (ECF No. 1, PageID.94 ¶ 156.) All of the express warranty claims and all but one of the implied warranty claims are contract claims.[5] The warranty claims are not contingent on whether FCA knew the vehicle was defective at the time of sale. The implied warranty claims rest on whether the vehicle was merchantable at the time of sale, and the express warranty claims rest on whether FCA honored (or could honor) the terms of its repair-and-replace warranties.

---

[5] Gadomski Littleton and Huntington bring the Ohio implied warranty claim under tort law. (ECF No. 1, PageID.255.)

42

Second, the allegations within the unjust enrichment count are too ambiguous for the Court to find that the count is subject to Rule 9(b). The complaint alleges that: (1) "FCA has benefitted from selling, leasing, and distributing the [Class] Vehicles for more than they were worth as a result of FCA's conduct;" (2) "Plaintiffs and Nationwide Shutdown Risk Class members have overpaid for the Pacifica Hybrids and been forced to pay other costs;" and (3) "Plaintiffs and the Nationwide Shutdown Risk Class were not aware of the true facts about the Pacifica Hybrids and did not benefit from FCA's conduct." (*Id.* at ¶¶ 158, 161.) One reading of these allegations suggests that plaintiffs unjustly enriched FCA by purchasing cars that FCA knew were defective. This reading is in line with FCA's theory that the unjust enrichment claims sound in fraud. Although, an equally plausible reading suggests that plaintiffs unjustly enriched FCA by overpaying for defective vehicles with, as discussed below, warranties that FCA cannot honor, irrespective of FCA's knowledge of the defect or knowledge of its inability to honor its warranties.

The allegations here are unlike the allegations in cases where courts have applied Rule 9(b) to unjust enrichment claims. In *Smith v. Bank of America Corp.*, plaintiffs unsuccessfully attempted to modify

43

their mortgage and subsequently lost their home in a foreclosure sale. *Bank of Am.*, 485 F. App'x 749, 751 (6th Cir. 2012). The Sixth Circuit found that plaintiffs' unjust enrichment claim was grounded in fraud because it was "inextricably tied to what the Smiths say was the Bank's 'unified course of fraudulent conduct' concerning the loan modification." *Id.* at 755 (quoting *Hennigan v. Gen. Elec. Co.*, No. 09-11912, 2010 WL 3905770, at *14 (E.D. Mich. Sept. 29, 2010)). Plaintiffs alleged that: (1) defendant "intentionally designed to preclude" them from entering into a loan modification; (2) defendant "knew or should have known" or had "actual or imputed knowledge" of their situation; (3) defendant "assured" them and their representative that it would reschedule the foreclosure sale so plaintiffs "would not lose their home;" and (4) defendant's assurance led to defendant's unjust enrichment. *Id.* at 754–755 (internal quotation marks omitted). Here, allegations of intent, knowledge, and assurances are absent from plaintiffs' unjust enrichment count, even though plaintiffs "reallege and incorporate by reference all paragraphs as though fully set forth herein" in the unjust enrichment count. (ECF No. 1, PageID.93 ¶ 154.)

In *Kondash v. Kia Motors America, Inc.*, plaintiffs brought an unjust enrichment claim against defendant based on plaintiffs' purchase of vehicles with a sunroof that had a propensity to shatter spontaneously. No. 15-cv-506, 2016 WL 11246421, at *1 (S.D. Ohio June 24, 2016). The court found that plaintiffs' unjust enrichment claim sounded in fraud and was subject to Rule 9(b). *Id.* at *11. The *Kondash* plaintiffs alleged that: (1) "[a]s a result of its fraudulent acts and omissions related to the defect sunroofs, Kia obtained monies which rightfully belong to Plaintiffs and the class members to the detriment of Plaintiffs and the proposed class members;" and (2) plaintiffs conferred benefits to Kia by purchasing or overpaying for a defective vehicle without knowledge of the defect. *Id.* (internal quotation marks omitted) (alteration in original). The court found that the crux of the unjust enrichment claim was Kia's fraudulent concealment of information from purchasers. *Id.*

Here, plaintiffs allege that they did not know the "true facts" about the Pacifica PHEVs. (ECF No. 1, PageID.94 ¶ 161.) However, plaintiffs do not expressly allege, in the unjust enrichment count, that FCA obtained monies that rightfully belong to plaintiffs because FCA engaged in fraudulent acts and omissions related to the alleged defect. Therefore,

the Court declines to dismiss the unjust enrichment count on Rule 9(b) grounds.

## 2. Pleading in the Alternative

FCA next argues that plaintiffs cannot maintain their unjust enrichment claims where, as here, an express warranty exists and defines the parties' rights and expectations. (ECF No. 15, PageID.588.) Plaintiffs contend that they may plead unjust enrichment in the alternative to their contract claims. (ECF No. 19, PageID.740; ECF No. 1, PageID.94 ¶ 156.) FCA disagrees, arguing that alternative pleading is allowed only when a defendant explicitly disclaims the availability of a contractual remedy. (ECF No. 21, PageID.828–829.) While FCA's statement of the law is correct, the Court finds that FCA has disclaimed the availability of a contractual remedy.

"[C]ourts 'have regularly dismissed unjust enrichment claims filed against automobile manufacturers where a valid, enforceable express warranty covers the same subject matter as plaintiffs' unjust enrichment claims.'" *Bolt*, 633 F. Supp. 3d at 982 (quoting *In re GM Air Conditioning Mktg. & Sales Pracs., Litig.*, 406 F. Supp. 3d 618, 634 (E.D. Mich. 2019)). Conversely, Federal Rule of Civil Procedure 8(a)(3) permits pleading in

46

the alternative "when, for instance, there is a dispute between the parties as to whether an express agreement exists." *Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 796 (6th Cir. 2016) (quoting *Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, 32 F. Supp. 3d 824, 833–834 (E.D. Mich. 2014)). Alternative pleading is appropriate where a defendant explicitly disclaims the availability of a contractual remedy, which includes "vigorously asserting" a warranty coverage defense. *Francis v. Gen. Motors, LLC*, 504 F. Supp. 3d 659, 694 (E.D. Mich. 2020) (citing *Solo*, 819 F.3d at 797 and *Johnston v. PhD Fitness, LLC*, No. 16-cv-14152, 2018 WL 646683, at *6 (E.D. Mich. Jan. 31, 2018)).

Here, the Class Vehicles are the subject of both plaintiffs' unjust enrichment claims and the Basic Limited Warranty. However, the parties vigorously dispute whether the Basic Limited Warranty covers the alleged defect. FCA argues that the alleged defect is a design defect and thus is not covered by the Basic Limited Warranty. (ECF No. 15, PageID.591.) Plaintiffs disagree. (ECF No. 19, PageID.745–746.) Therefore, the Court declines to dismiss the unjust enrichment claim on this ground. This decision is in line with case law. *See Francis*, 504 F. Supp. 3d at 672, 694 (allowing plaintiffs to plead unjust enrichment in

47

the alternative where defendant claimed that the alleged defect was a design defect and not covered by the express warranty).[6]

### 3.   Direct Benefit

FCA argues that plaintiffs cannot maintain their unjust enrichment claims because they do not allege that they conferred a benefit directly on FCA or had any direct interaction with FCA. (ECF No. 15, PageID.588–589.) Plaintiffs point to the allegations in the complaint and argue that courts reject the argument that there must be a direct benefit. (ECF No. 19, PageID.741.) The Court largely agrees with plaintiffs except for the Ohio unjust enrichment claim.

The parties do not adequately brief this question, instead devoting a collective five sentences and four case citations to an issue involving

---

[6] Relatedly, FCA argues that plaintiffs must allege that their legal remedies are inadequate to maintain an unjust enrichment claim. (ECF No. 15, PageID.589.) FCA's argument is severely underdeveloped. *Duffie v. Michigan Group, Inc. – Livingston*, the one case that FCA cites, does not set forth a pleading requirement for unjust enrichment claims. No. 14-cv-14148, 2016 WL 8259511, at *1 (E.D. Mich. Jan. 15, 2016). Instead, *Duffie* relies on a Michigan Court of Appeals case for the proposition that "[w]hen a plaintiff has set forth both legal and equitable claims seeking identical relief and covering the same subject matter, the proper course is generally dismissal of the equitable claim." *Duffie*, 2016 WL 8259511, at *1 (alteration in original) (internal quotation marks omitted) (quoting *Romeo Inv. Ltd. v. Mich. Consol. Gas Co.*, No. 260320, 2007 WL 1264008, at *9 (Mich. Ct. App. May 1, 2007)). *Romeo* indicates that "an independent action for equitable relief will not lie when there is a full, complete, and adequate remedy at law," but, as discussed, the parties dispute whether there is a "full, complete, and adequate" remedy at law. *Romeo*, 2007 WL 1264008, at *9.

the laws of 18 states. (ECF No. 15, PageID.588–599; ECF No. 19, PageID.741; ECF No. 21, PageID.829.) Based on the Court's own research, there seem to be three ways that the relevant states approach this issue.

### a.      Direct Benefit is Not Required

First, there are states that explicitly do not require a direct benefit, including California, Connecticut, Illinois, and Iowa. *See Hirsch v. Bank of Am.*, 132 Cal. Rptr. 2d 220, 229 (Cal. Ct. App. 2003) (citation omitted) ("To confer a benefit, it is not essential that money be paid directly to the recipient by the party seeking restitution."); *Geriatrics, Inc. v. McGee*, 208 A.3d 1197, 1211 (Conn. 2019) (quoting *Town of New Hartford v. Conn. Res. Recovery Auth.*, 970 A.2d 592, 618 (Conn. 2009) ("Although unjust enrichment typically arises from a plaintiff's direct transfer of benefits to a defendant, it also may be indirect, involving, for example, a transfer of a benefit from a third party to a defendant when the plaintiff has a superior equitable entitlement to that benefit."); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989) (noting that unjust enrichment usually involves situations where a plaintiff seeks to recover a benefit that they directly conferred on defendant but that it can

involve situations where plaintiff seeks to recover a benefit that plaintiff transferred to defendant via a third party); *State, Dept. of Hum. Serv. ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 155 (Iowa 2001) (citation omitted) (noting that for unjust enrichment claims, "benefits can be direct or indirect, and can involve benefits conferred by third parties"). Under the laws of those states, a plaintiff must generally show three elements to state a claim for unjust enrichment: (1) defendant received a benefit, (2) defendant unjustly retained the benefit, and (3) unjust retention came at plaintiff's expense/was to plaintiff's detriment. *Lectrodryer v. SeoulBank*, 91 Cal. Rptr. 2d 881, 883 (Cal. Ct. App. 2000) (citing *First Nationwide Sav. v. Perry*, 15 Cal. Rptr. 2d 173, 176 (Cal. Ct. App. 1992)); *Geriatrics*, 208 A.3d at 1211 (quoting *Horner v. Bagnell*, 154 A.3d 975, 983 (Conn. 2017)); *Thomas v. U.S. Bank Tr., N.A. as Tr. for LSF 10 Master Participation Tr.*, 258 N.E.3d 951, 957 (Ill. App. Ct. 2025) (quoting *HPI Health Care*, 545 N.E.2d at 679); *MidWestOne Bank v. Heartland Co-op*, 941 N.W.2d 876, 886 (Iowa 2020) (citing *Behm v. City of Cedar Rapids*, 922 N.W.2d 524, 577 (Iowa 2019)). Here, Carney and Clancy (California), Kelsey and Peter Keefe (Connecticut), Su (Illinois), and Banas (Iowa) allege that FCA benefited by selling, leasing, and

50

distributing the Class Vehicles for more than they were worth. (ECF No. 1, PageID.94 ¶ 158.) Plaintiffs further allege that FCA has retained the benefit from its sales and that retention is unjust. (*Id.* at ¶ 160.) Finally, plaintiffs allege that the unjust retention came at their expense as they personally overpaid for the vehicles. (*Id.* at ¶ 158.) Accordingly, FCA's motion to dismiss Carney's, Clancy's, Kelsey and Peter Keefe's, Su's and Banas' unjust enrichment claim fails on this ground.

### b.   Direct Benefit is Required

Second, there are states that explicitly require a direct benefit. Those states include Florida and Ohio. *See* Kopel *v. Kopel*, 229 So. 3d 812, 818 (Fla. 2017) (citing *Peoples Nat'l Bank of Com. v. First Union Nat'l Bank of Fla. N.A.*, 667 So. 2d 876, 879 (Fla. Dist. Ct. App. 1996)) ("The Third District is correct that to prevail on an unjust enrichment claim, the plaintiff must directly confer a benefit to the defendant."); *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 799 (Ohio 2005) ("The rule of law is that an indirect purchaser cannot assert a common-law claim for restitution and unjust enrichment against a defendant without establishing that a benefit has been conferred upon that defendant by the purchaser.").

### i.    Ohio

To state a claim for unjust enrichment, a plaintiff must allege that (1) they conferred a benefit on defendant, (2) defendant knew of the benefit, and (3) defendant's retention of the benefit without payment would be unjust under the circumstances. *Nationwide Heating & Cooling, Inc. v. K&C Const., Inc.*, No. 87AP-129, 1987 WL 16802, at *2 (Ohio Ct. App. Sept. 10, 1987) (citing *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984)).

The weight of authority applying Ohio law favors dismissing the Ohio unjust enrichment claims because Huntington and Gadomski Littleton, the Ohio plaintiffs, do not allege that they purchased directly from FCA. *See Airko Inc. v. Gen. Motors LLC*, No. 20-CV-02638, 2021 WL 12130722, at *16 (N.D. Ohio July 7, 2021) (finding that plaintiffs' allegations were insufficient to establish that they conferred a benefit on General Motors where they admitted purchasing from Ohio dealerships—Pat O'Brien Chevrolet and Coughlin GM of Marysville— and not General Motors itself); *Marlowe v. Nature's Bounty Co.*, No. 17 CV 332, 2017 WL 2291683, at *3 (N.D. Ohio May 25, 2017) (finding that plaintiff's unjust enrichment claim failed where plaintiff alleged that he

52

purchased defendants' product from CVS and did not allege a direct economic transaction between himself and defendants); *Young v. Carrier Corp.*, 14CV0974, 2014 WL 6617650, at \*7 (N.D. Ohio Nov. 21, 2014) (finding that plaintiff's claim for unjust enrichment failed, in part, because she did not allege that she purchased her air conditioning unit from defendant manufacturer directly). *But see Paikai v. Gen. Motors Corp.*, No. CIV. S-07-892 FCD GGH, 2009 WL 275761, at \*6 (E.D. Cal. Feb. 5, 2009) (denying defendant's motion to dismiss the Ohio unjust enrichment claim on the ground that plaintiff did not purchase directly from General Motors because plaintiff alleged that he purchased his car from an authorized General Motors dealer).

The Court is most persuaded by a 2015 case from the Ohio Court of Appeals. In *Caterpillar Financial Services Corporation v. Harold Tatman & Son's Enterprises, Inc.*, third-party plaintiff Tatman & Son's purchased a Vermeer-brand horizontal grinder from Vermeer Heartland, Incorporated, formerly doing business as Vermeer of Southern Ohio. 50 N.E.3d 955, 958 (Ohio Ct. App. 2015). Tatman & Son's financed the purchase through Vermeer Midwest, Incorporated, which later assigned its rights under the financing contract to Caterpillar Financial Services

Corporation. *Caterpillar Fin. Servs. Corp.*, 50 N.E.3d at 958. Caterpillar Financial Services Corporation brought a complaint against Tatman & Son's for breach of contract, alleging default under the financing contract. *Id.* Tatman & Son's brought a third-party complaint against Vermeer, the grinder's manufacturer, for unjust enrichment and other claims. *Id.* at 959. The court of appeals applied *Johnson v. Microsoft* and affirmed the trial court's dismissal of the unjust enrichment claim because Tatman & Son's did not purchase the grinder directly from Vermeer. *Caterpillar Fin. Servs. Corp.*, 50 N.E.3d at 967.

Here, Huntington and Gadomski Littleton both allege that they interacted with an authorized FCA dealer at the point of sale. (ECF No. 1, PageID.71 ¶ 94.) Huntington alleges that she purchased her Pacifica PHEV from "Cole Chrysler," and Gadomski Littleton alleges that he purchased his vehicle from the "Terry Henricks Chrysler Dodge Jeep Ram" dealership. (ECF No. 1, PageID.38–39 ¶ 47, PageID.44 ¶ 56.) As in *Caterpillar Fin. Servs. Corp.*, these names appear like FCA-affiliated dealerships, but that is not enough. Plaintiffs do not allege that they purchased from FCA directly, so the Court **DISMISSES** their unjust enrichment claims.

### ii. Florida

To state a claim for unjust enrichment under Florida law, a plaintiff must allege: (1) plaintiff conferred a benefit on defendant, who has knowledge thereof; (2) defendant voluntarily accepted and retained the benefit; and (3) defendant's retention of the benefit without payment to plaintiff would be unjust under the circumstances. *Peoples Nat'l Bank*, 667 So. 2d at 879 (quoting *Hillman Const. Corp. v. Wainer*, 636 So. 2d 576, 577 (Fla. Dist. Ct. App. 1994)).

Courts applying Florida law have taken different approaches to the direct benefit requirement. In *Shelor v. Jaguar Land Rover North America LLC*, the district court discussed five cases from Florida appellate courts to predict how the Florida Supreme Court would decide the following issue: "whether a plaintiff who buys a vehicle from an exclusive dealer directly confers a benefit on the vehicle's distributor, or more broadly, whether a plaintiff directly confers a benefit on a defendant when the benefit passes through an 'intermediary.'" No. 23-cv-908-WGY-PDB, 2025 WL 1580834, at *46–51 (M.D. Fla. Jan. 31, 2025), *report and recommendation adopted*, No. 23-cv-908-WGY-PDB, ECF No. 88 (M.D. Fla. May 1, 2025). The court ultimately predicted that "the Florida

Supreme Court would hold that a plaintiff may directly confer a benefit on a defendant through an 'intermediary,' but, like in *Cape [, LLC v. Och-Ziff Real Est. Acquisitions LP*, 370 So. 3d 1010 (Fla. Dist. Ct. App. 2023)], the benefit must be 'fully and directly' traceable from the plaintiff to the defendant." *Shelor*, 2025 WL 1580834, at \*51 (quoting *CFLB P'ship, LLC v. Diamond Blue Int'l, Inc.*, No. 3D21-1335, 2022 WL 19864624, at \*2 (Fla. Dist. Ct. App. Nov. 21, 2022)) (Bokor, J., dissenting). However, the *Shelor* court found that plaintiffs failed to plausibly allege that they directly conferred a benefit on the automotive manufacturer defendants. *Id.* Plaintiffs alleged that they purchased their vehicles from manufacturers' exclusive dealers, but the court did not consider allegations that it deemed were legal conclusions: that (1) the manufacturer sold vehicles through agents or intermediaries; (2) plaintiffs conferred a benefit on the manufacturer in the form of payments for the vehicles; (3) plaintiffs paid the purchase price of the vehicle to the manufacturer directly and/or through intermediaries; and (4) the manufacturer accepted the benefit of the purchase price either directly or through intermediaries. *Id.* The *Shelor* court recommended, and the district court granted, dismissal of the unjust enrichment claim.

Conversely, the *In re Takata Airbag Products Liability Litigation* case found that a plaintiff may confer a direct benefit through indirect contact with a defendant via an intermediary. 462 F. Supp. 3d 1304, 1328 (S.D. Fla. 2020) (quoting *In re Takata Airbag Products Liab. Litig.*, No. 14-24009-CV, 2017 WL 2406711, at \*9 (S.D. Fla. June 1, 2017)). The court characterized defendants' citation to *Kopel* as an "isolated reference . . . to one element of an unjust enrichment claim" and noted that defendants did not cite any authority ruling that a plaintiff could only confer a direct benefit via direct contact. *Takata*, 462 F. Supp. 3d at 1328. The court allowed the Florida plaintiff's unjust enrichment claim to proceed because he alleged that he purchased his vehicle from what seems like an authorized dealer. *See id.* ("O'Connor's unjust enrichment claim can proceed because he purchased his new Volkswagen 'from Kuhn Volkswagen.'").

Finally, in *Maugain v. FCA US LLC*, the court found that plaintiffs alleged sufficient facts to support a plausible unjust enrichment claim where they alleged that: (1) they paid inflated prices for class vehicles to FCA authorized dealers; and (2) FCA entered into agreements with its network of authorized dealers to engage in retail sales with consumers.

No. 22-116, 2023 WL 1796113, at *13 (D. Del. Feb. 7, 2023) (citation omitted). Based on plaintiffs' allegations, the court inferred that "FCA can charge higher prices to dealers if dealers can charge higher prices to consumers." *Id.* The court concluded that plaintiffs could maintain their unjust enrichment claim even under the laws of direct benefit states. *Id.* (citing *Marrache v. Bacardi U.S.A, Inc.*, 17 F.4th 1084, 1102 (11th Cir. 2021) (quoting *Kopel*, 229 So. 3d at 818)).

The through-line in *Shelor*, *Takata*, and *Maugain* seems to be that a plaintiff can confer a direct benefit on a defendant without direct contact. The cases part ways in their assessment of whether the plaintiffs in each case plausibly alleged that they conferred a direct benefit on an automotive manufacturer by purchasing from that manufacturer's authorized or exclusive dealer. Here, Latacki, the Florida plaintiff, alleges that he interacted with an authorized FCA dealer at the point of sale. (ECF No. 1, PageID.71 ¶ 94.) Latacki also alleges that he purchased his Pacifica PHEV from the "Orlando Dodge Chrysler" dealership. (*Id.* at PageID.28 ¶ 31.) Regarding the relationship between FCA and its authorized dealers, Latacki alleges that

> FCA-authorized automobile dealerships act as FCA's agents
> in selling automobiles under the FCA name and

> disseminating vehicle information provided by FCA to customers. At all relevant times, FCA's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacement, and adjustments covered by FCA's manufacturer warranty pursuant to the contracts between FCA and its more than 2,000 authorized dealerships nationwide.

(ECF No. 1, PageID.54 ¶ 73.) Taking the factual allegations as true, the Court can reasonably infer that "FCA can charge higher prices to dealers if dealers can charge higher prices to consumers." *Maugain*, 2023 WL 1796113, at *13. Therefore, FCA, through its dealer, received the benefit of Latacki's overpayment. Taken as a whole, Latacki alleges that he overpaid FCA for his Pacifica because he purchased a defective vehicle, and it is reasonable to infer that FCA had knowledge of the benefit via its authorized dealer. (ECF No. 1, PageID.94 ¶ 158.)

Regarding the other unjust enrichment claim elements, Latacki alleges that FCA knowingly accepted and retained the benefit. (*Id.* at ¶¶ 160, 162.) Further, Latacki alleges that retention of the benefit would be unjust, presumably because the car is worth less than Latacki purchased it for. (*Id.* at ¶¶ 158, 160.) Latacki's allegations are plausible, so the Court declines to dismiss the Florida unjust enrichment claim.

59

### c.    Unclear if Direct Benefit is Required

Third, in some states it is unclear that a plaintiff must confer a direct benefit on a defendant. These states include Kansas, Massachusetts, Michigan, Minnesota, Missouri, New Hampshire, Pennsylvania, Rhode Island, South Carolina, Texas, Virginia, and Washington. The Court addresses each state in turn.

### i.    Kansas

There are three elements of an unjust enrichment claim under Kansas law: "(1) [a] benefit must have been conferred upon the defendant, (2) the defendant must have retained the benefit, and (3) under the circumstances, the defendant's retention of the benefit must be unjust." *Est. of Draper v. Bank of Am., N.A.*, 205 P.3d 698, 715 (Kan. 2009) (citation omitted). Application of the unjust enrichment doctrine "tends to be particularly fact-driven, although the doctrine seems to presume some contact between the party conferring the benefit and the recipient." *Approved Paving, LLC v. Paul Heinen and Assocs., Inc.*, No. 123,222, 2021 WL 5865130, at *3 (Kan. Ct. App. Dec. 10, 2021).

Some federal courts have held that Kansas law requires a direct benefit. *See In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 948 (N.D.

60

Ill. 2009) (citing *Spires v. Hosp. Corp. of Am.*, 289 F. App'x 269, 273 (10th Cir. 2008)) ("These allegations of 'indirect' purchases, and Defendants subsequent alleged 'indirect' enrichment, however, will not support an unjust enrichment claim under . . . Kansas law."). Other federal courts have held that Kansas law does not require a direct benefit. *See Gonzalez v. Pepsico, Inc.*, 489 F. Supp. 2d 1233, 1249 (D. Kan. 2007) (citing *Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.*, 910 P.2d 839, 847 (Kan. 1996)) (holding that Kansas law does not require a direct benefit because an unjust enrichment claim under Kansas law does not depend on privity). *See also In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 929–930 (E.D. Pa. 2012) ("Kansas unjust enrichment law allows claims for the conferral of indirect benefits."). The Court is unaware of any authority from a Kansas court indicating that a plaintiff must confer a direct benefit on a defendant to maintain an unjust enrichment claim. Further, the cases finding that a plaintiff must confer a direct benefit on defendant do not supply said authority. *See Spires*, 289 F. App'x at 273. The Court declines to impose a direct benefit requirement.

Here, Vu, the Kansas plaintiff, alleges that he conferred a benefit upon FCA when he overpaid for his defective Pacifica PHEV. (ECF No.

1, PageID.40–41 ¶ 51, PageID.94 ¶ 158.) Vu alleges that FCA has retained the benefit, and he alleges that retention of the benefit is inequitable. (ECF No. 1, PageID.94 ¶ 160.) Vu also alleges that he purchased his Pacifica PHEV from Park Motors and that he interacted with an authorized-FCA dealer at the point of sale. (*Id.* at PageID.34 ¶ 40, PageID.71 ¶ 94.) Therefore, Vu plausibly alleges that he unjustly enriched FCA, so his unjust enrichment claim may proceed.

### ii. Massachusetts

To state a claim for unjust enrichment under Massachusetts law, "a plaintiff must allege facts indicating 'unjust enrichment of one party and unjust detriment to another party.'" *Meshna v. Scrivanos*, No. 201101849BLS1, 2012 WL 414476, at *4 (Mass. Super. Ct. Dec. 21, 2011) (quoting *Salamon v. Terra*, 477 N.E.2d 1029, 1031 (Mass. 1985)). In other words, a plaintiff must establish both that defendant received a benefit and that such a benefit was unjust, "a quality that turns on the reasonable expectations of the parties." *Metro. Life Ins. Co. v. Cotter*, 984 N.E.2d 835, 850 (Mass. 2013) (internal quotation marks omitted) (quoting *Glob. Invs. Agent Corp. v. Nat. Fire Ins. Co. of Hartford*, 927 N.E.2d 480, 494 (Mass. App. Ct. 2010)). "The injustice of the enrichment

62

or detriment in quasi-contract equates with the defeat of someone's reasonable expectations." *Cotter*, 984 N.E.2d at 850 (internal quotation marks omitted) (quoting *Salamon*, 477 N.E.2d at 1031). The Court is unaware of any Massachusetts authority suggesting that a plaintiff must allege that they conferred a direct benefit on a defendant to maintain an unjust enrichment claim. As this matter is before the Court on FCA's motion to dismiss, the Court declines to impose a requirement that FCA does not show exists.

Here, Alicia and David Maltz, the Massachusetts plaintiffs, allege that they overpaid FCA for a defective Pacifica PHEV. (ECF No. 1, PageID.37–38 ¶ 45.) The Maltzs further allege that FCA benefited from their overpayment and retained the benefit. (*Id.* at PageID.94 ¶¶ 158–160.) The Maltzs also claim that it is inequitable for FCA to retain the benefit, presumably because they reasonably expected to receive: (1) a vehicle that did not contain a defect that affected the vehicle's operability, or (2) a warranty that FCA could honor. (*Id.* at ¶ 160.) Alicia and David Maltz plausibly allege that they unjustly enriched FCA, so their unjust enrichment claim may proceed.

63

### iii. Michigan

To state a claim for unjust enrichment under Michigan law, a plaintiff must "establish (1) the receipt of a benefit by the other party from the complaining party and (2) an inequity resulting to the complaining party because of the retention of the benefit by the other party." *Techstyles, Inc. v. Lear Corp.*, No. 313957, 2014 WL 1614715, at *2 (Mich. Ct. App. Apr. 22, 2014) (quoting *Karaus v. Bank of N.Y. Mellon*, 831 N.W.2d 897, 906 (Mich. Ct. App. 2012)). While not explicitly stated, Michigan law seems to require a direct benefit or some sort of direct interaction between plaintiff and defendant. As the Michigan Court of Appeals found in an unpublished opinion,

> Notably, caselaw does not specifically state that the benefit must be received *directly* from the plaintiff, but [*Kammer Asphalt Paving Co., Inc. v. East China Twp. Schs.*, 504 N.W.2d 635, 641–642 (Mich. 1993), *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 905 (Mich. Ct. App. 2006), and *Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 280 (Mich. Ct. App. 2003)] make it clear that it must.

*Smith v. Glenmark Generics, Inc., USA*, No. 315898, 2014 WL 4087968, at *1 (Mich. Ct. App. Aug. 19, 2014). Other courts in this district agree that a Michigan unjust enrichment claim requires a direct benefit or direct interaction. *Schechner v. Whirlpool Corp.*, 237 F. Supp. 3d 601, 618

64

(E.D. Mich. 2017); *EV Transp. Servs., Inc. v. Mich. Income and Principal-Protected Growth Fund, LP*, No. 22-cv-10950, 2023 WL 2021689, at *4 (E.D. Mich. Feb. 15, 2023).

Here, Huntington, the Michigan plaintiff, alleges that she overpaid FCA for her defective Pacifica PHEV. (ECF No. 1, PageID.38–39 ¶ 47, PageID.94 ¶ 158.) Huntington also alleges that FCA accepted and retained the benefit. (*Id.* at PageID.94 ¶ 160, 162.) Unlike *Smith*, which involved the purchase of a drug from a pharmacy, Huntington claims that she purchased her Pacifica PHEV from "Cole Chrysler" and interacted with an authorized FCA dealer at the point of sale. (ECF No. 1, PageID.38–39 ¶ 47, PageID.71 ¶ 94.) Huntington alleges that the dealership acted as FCA's agent in selling the automobile and providing repairs and warranty service. (*Id.* at PageID.54 ¶ 73.) On these facts, Huntington plausibly alleges that she unjustly enriched FCA and directly interacted with FCA through one of their agent-dealers. Huntington's Michigan unjust enrichment claim may proceed.

### iv.   Minnesota

To state a claim for unjust enrichment under Minnesota law, a plaintiff must show that "defendant was enriched 'illegally or

65

unlawfully'" or "in a manner that is morally wrong." *Herlache v. Rucks*, 990 N.W.2d 443, 450 (Minn. 2023) (quoting *First Nat'l Bank of St. Paul v. Ramier*, 311 N.W.2d 502, 504 (Minn. 1981) and *Klass v. Twin City Fed. Sav. & Loan Ass'n*, 190 N.W.2d 493, 495 (Minn. 1971)). A plaintiff must also show that defendant "knowingly received or obtained something of value for which the defendant 'in equity and good conscience' should pay." *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 306 (Minn. 1996) (quoting *Klass*, 190 N.W.2d at 494–495). The doctrine allows a plaintiff to recover a benefit conferred upon a defendant. *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012). The Court is unaware of any Minnesota authority requiring a direct benefit. On the other hand, courts applying Minnesota law have found either that Minnesota law does not require a direct benefit or that it is not clear that Minnesota law requires a direct benefit. *Minn. by Ellison v. Sanofi-Aventis U.S. LLC*, No. 18-cv-14999 (BRM) (LHG), 2020 WL 2394155, at *20 (D.N.J. Mar. 31, 2020) (citations omitted); *Luckey v. Alside, Inc.*, 245 F. Supp. 3d 1080, 1099 n.26 (D. Minn. 2017). Therefore, the Court declines to impose a direct benefit requirement on the Minnesota unjust enrichment claim.

Here, Niemioja, the Minnesota plaintiff, alleges that she overpaid FCA for her defective Pacifica PHEV. (ECF No. 1, PageID.39–40 ¶ 49, PageID.94 ¶ 158.) Niemioja further alleges that FCA retained and knowingly accepted the overpayment and that such retention is inequitable, presumably because the car was worth less than what Niemioja paid for it at purchase. (*Id.* at ¶¶ 160, 162.) Therefore, Niemioja plausibly alleges that she unjustly enriched FCA, so her unjust enrichment claim may proceed.

### v.   Missouri

To maintain an unjust enrichment claim under Missouri law, a plaintiff must show that: "(1) [the plaintiff] conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under inequitable and/or unjust circumstances." *Hargis v. JLB Corp.*, 357 S.W.3d 574, 586 (Mo. 2011) (quoting *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. Ct. App. 2010)). As with Minnesota, the Court is unaware of any Missouri authority requiring a direct benefit. However, courts applying Missouri law have found either that the law does not require a direct benefit or that there is no brightline rule requiring a direct benefit. *See Dorgan v.*

67

*Ethicon, Inc.*, No. 20-00529-CV, 2020 WL 5372134, at \*4 (W.D. Mo. Sept. 8, 2020) (citing *Federated Mut. Ins. Co. v. Peery's Auto Parts, L.L.C.*, No. 11-00172-CV-W, 2012 WL 3062720, at \*2 (W.D. Mo. July 26, 2012)) ("As to conferring a benefit directly, a cause of action may still exist for unjust enrichment even where the benefit was conferred indirectly."). *See also Cromeans v. Morgan Keegan & Co., Inc.*, No. 12-CV-04269, 2013 WL 12129609, at \*7 (W.D. Mo. Nov. 5, 2013) (citation omitted) ("[T]here does not appear to by any bright line rule regarding how directly the defendant must have received a benefit at the plaintiff's expense. Rather, a claim for unjust enrichment must be considered in light of the totality of the circumstances."). The Court follows these cases and declines to impose a direct benefit requirement on the Missouri unjust enrichment claim.

Here, Perry, the Missouri plaintiff, alleges that he conferred a benefit on FCA when he overpaid FCA for his defective Pacifica PHEV. (ECF No. 1, PageID.40–41 ¶ 51, PageID.94 ¶¶ 158, 159.) Perry further alleges that FCA knowingly accepted and retained the benefit and that such retention is inequitable, presumably because the car was worth less than what Perry paid for it at purchase. (*Id.* at ¶¶ 160, 162.) Perry alleges that he interacted with an authorized FCA dealer at the point of sale. (*Id.*

68

at PageID.71 ¶ 94.) Therefore, Perry plausibly alleges that he unjustly enriched FCA, so his unjust enrichment claim may proceed.

### vi.    New Hampshire

To state a claim for unjust enrichment under New Hampshire law, "a plaintiff must sufficiently allege that the defendant was enriched at the plaintiff's expense through either: (1) wrongful acts; or (2) 'passive acceptance of a benefit that would be unconscionable to retain.'" *Est. of Mortner v. Thompson*, 182 A.3d 1260, 1265 (N.H. 2018) (quoting *Kowalski v. Cedars of Portsmouth Condo. Ass'n*, 769 A.2d 344, 347 (N.H. 2001)). The Court is not aware of any authority indicating that a plaintiff must confer a direct benefit on a defendant. As this matter is before the Court on FCA's motion to dismiss, the Court declines to impose a requirement that FCA does not show exists.

Here, Bergantino and Nicole and Stephen Costa, the New Hampshire plaintiffs, allege that they overpaid FCA for a defective Pacifica PHEV when they purchased their vehicles from an authorized FCA dealer. (ECF No. 1, PageID.42–43 ¶¶ 53–54, PageID.71 ¶ 94, PageID.94 ¶ 158.) Bergantino and the Costas further allege that FCA accepted and retained the benefit. (*Id.* at PageID.94 ¶¶ 160, 162.)

69

Bergantino and the Costas claim that FCA's retention is inequitable, presumably because the vehicles were worth less than plaintiffs paid. (ECF No. 1, PageID.94 ¶ 160.) Thus, the New Hampshire plaintiffs plausibly allege that they unjustly enriched FCA, so their unjust enrichment claims may proceed.

### vii. Pennsylvania

To state a claim for unjust enrichment under Pennsylvania law, a plaintiff "must allege that they conferred a benefit on the defendant, that defendant appreciated the benefit under the circumstances [,] and that defendant accepted and retained the benefit without payment for value." *Stutzle v. Rhone-Poulenc S.A.*, No. 002768OCT.TERM2002, CONTROL 062165, 2003 WL 22250424, at *1 (Pa. C.P. Ct. Sept. 26, 2003) (citing *Burgettstown-Smith Twp. Joint Sewage Auth. v. Langeloth Townsite Co.*, 588 A.2d 43, 45 (Pa. Super. Ct. 1991)).

The Court must determine whether Pennsylvania requires a plaintiff to directly confer a benefit on a defendant. In *Stutzle*, the court held that plaintiffs did not confer a benefit upon defendants, who produced an animal feed additive, because plaintiffs were indirect purchasers and did not deal directly with defendants. 2003 WL

70

22250424, at *1. However, the Pennsylvania Supreme Court has recognized that "a third party is not *unjustly* enriched when it receives a benefit from a contract between two other parties where the party benefitted has not requested the benefit or misled the other parties." *D.A. Hill Co. v. CleveTrust Realty Invs.*, 573 A.2d 1005, 1010 (Pa. 1990) (emphasis in original). Further, in *Commonwealth ex rel. Pappert v. TAP Pharmaceutical Products, Inc.*, the court rejected defendants' direct benefit argument and allowed plaintiff's unjust enrichment claim to proceed where plaintiff alleged that its reimbursements to doctors and pharmacies for defendants' pharmaceutical products increased defendant's market share. 885 A.2d 1127, 1137–1138 (Pa. Commw. Ct. 2005).

Against this backdrop, some federal courts have analyzed Pennsylvania law and concluded that there is no direct benefit requirement. *See Baker v. Fam. Credit Counseling Corp.*, 440 F. Supp. 2d 392, 490 (E.D. Pa. 2006) (citing *TAP Pharm. Prods.*, 885 A.2d at 1137–1138 and *D.A. Hill Co.*, 573 A.2d at 1009) ("Other courts have rejected the requirement that a plaintiff must directly confer a benefit on a defendant in order to allege unjust enrichment."). *See also Sheet Metal*

71

*Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 444 (E.D. Pa. 2010) ("I do not believe *Stutzle* stands for a direct benefit requirement, and . . . the general thrust of relevant cases in Pennsylvania is that unjust enrichment claims require, first and foremost, that the defendant have unjustly retained a benefit."). In the context of defective products, federal courts applying Pennsylvania law have allowed unjust enrichment claims against parts manufacturers to survive a motion to dismiss, even though plaintiffs purchased goods, with the part pre-installed, from a third-party not directly from the manufacturer. *Powers v. Lycoming Engines*, Nos. 06-2993, 06-4228, 2007 WL 2702705, at *1, 3–4 (E.D. Pa. Sept. 12, 2007); *Walton v. Grammer Indus.*, No. 20-CV-12298-TGB-RSW, 2021 WL 4458761, at *8–10 (E.D. Mich. Sept. 29, 2021). As one court put it, "the appropriate inquiry is whether the benefit, if any, that Plaintiff conferred on Defendant was more than remote or incidental." *Century Indem. Co. v. URS Corp.*, No. 08-5006, 2009 WL 2446990, at *8 (E.D. Pa. Aug. 7, 2009). Based on these cases, the Court declines to impose a direct benefit requirement for the Pennsylvania unjust enrichment claim.

Here, Ohodnicki, the Pennsylvania plaintiff, alleges that he overpaid FCA and thus conferred a benefit on FCA when he purchased his Pacifica PHEV from an authorized FCA dealer. (ECF No. 1, PageID.46–47 ¶ 59, PageID.71 ¶ 94, PageID.94 ¶ 158.) He also alleges that the dealer operated as an agent of FCA (*id.* at PageID.54 ¶ 73), which makes the benefit more than remote or incidental. Ohodnicki further alleges that FCA accepted and retained the benefit. (*Id.* at PageID.94 ¶¶ 160, 162.) The Court can reasonably infer that FCA appreciated the benefit and that FCA requested the benefit, considering automotive manufacturers generally set a suggested retail price. Finally, Ohodnicki alleges that FCA's retention of the benefit is inequitable, presumably because the vehicle was worth less than what Ohodnicki paid for it at purchase. (*Id.* at ¶ 160.) Thus, Ohodnicki plausibly alleges that he unjustly enriched FCA, so his unjust enrichment claim may proceed.

### viii.  Rhode Island

To recover for unjust enrichment under Rhode Island law,

(1) a benefit must be conferred upon the defendant by the plaintiff, (2) there must be appreciation by the defendant of such benefit, and (3) there must be an acceptance of such benefit in such circumstances that it would be inequitable for a defendant to retain the benefit without paying the value thereof.

73

*Narragansett Elec. Co. v. Carbone*, 898 A.2d 87, 99 (R.I. 2006) (quoting

*Bouchard v. Price*, 624 A.2d 670, 673 (R.I. 1997)).

The Court must determine whether Rhode Island law requires that

a plaintiff confer a direct benefit to a defendant. Three Rhode Island court

cases guide the Court's analysis.

First, in *Alessi v. Bowen Court Condominium*, Bowen Court

Associates ("BCA") created Bowen Court Condominium ("BCC") and

vested BCC with 6.7 acres of land. No. 03-0235, 2010 WL 897246, at *1

(R.I. Super. Ct. Mar. 10, 2010). BCA retained a ten-year option to

withdraw from BCC a parcel of undeveloped land that abutted BCC's

land. *Id.* BCA conveyed a mortgage deed to the undeveloped parcel to a

credit union, who foreclosed on the mortgage and conveyed the parcel to

itself. *Id.* The credit union then transferred its interest in the property to

a corporation, who then sold the property to plaintiff. *Id.* Neither

plaintiff, the credit union, nor the corporation withdrew the parcel from

BCC or otherwise exercised any development rights before the rights

expired. *Id.* After plaintiff unsuccessfully petitioned BCC to exclude the

parcel from its land, plaintiff filed suit. *Id.* Plaintiff claimed that he

unjustly enriched defendants by purchasing the property and by paying

74

property taxes and costs associated with ownership of the parcel. *Id.* at *2. As to the first theory, the trial court found that plaintiff did not unjustly enrich defendants when he initially purchased the property because defendants did not hold a present interest in the property at the time of plaintiff's purchase. *Id.* at *4. However, having considered the next theory, the court found that plaintiff "clearly" conferred a benefit on defendants because he paid property taxes on the parcel after title to the property reverted back to defendants. *Alessi*, 2010 WL 897246, at *2.

Second, in *R&B Electric Co., Inc. v. Amco Construction Co., Inc.*, an electrical contracting company brought a claim for unjust enrichment against Marteka and Allaire, two individuals, for unpaid work. 471 A.2d 1351, 1352 (R.I. 1984). Marteka and Allaire both operated a real estate business under the partnership name Eagle Realty and co-owned all the capital stock of a construction company named Amco. *Id.* Eagle Realty purchased a house that it intended to renovate and rent and engaged Amco to be the general contractor for the renovation. *Id.* Amco entered into a contract for electrical rewiring with a subcontractor named R&B Electric Co., Inc., and the subcontractor fully performed the work. *Id.* at 1352–1353. Before the subcontractor finished the work on the contract,

75

R&B and Amco entered into a second contract for additional electrical work. *R&B Elec. Co.*, 471 A.2d at 1353. The contracting company completed a third of the work on the second contract and then stopped working because it had not received payment under either contract. *Id.* Amco informed R&B that it was applying for a mortgage and that it would pay R&B upon completion of the work and the closing of the mortgage. *Id.* R&B resumed work under the second contract and received a check from Amco for $500, which R&B credited toward the amount owed on the first contract. *Id.* R&B completed work on the second contract but did not receive any further payment. *Id.* Eagle Realty rented the house out for a brief period of time before a mortgagor foreclosed on the property. *Id.* The trial court found for R&B on its unjust enrichment claim against Marteka and Allaire, doing business as Eagle Realty, but the Rhode Island Supreme Court reversed *Id.* at 1353, 1356. The supreme court seemed to agree with Marteka and Allaire's argument that they could not be personally liable to R&B for unjust enrichment when R&B only dealt with Amco. *See id.* 1355–1356. The court noted that: (1) R&B furnished its materials and services upon the order and credit of Amco; (2) there was no evidence that R&B sold its materials and services to

76

Marteka and Allaire or delivered its materials and services upon their credit; (3) Marteka and Allaire never promised to pay R&B; and (4) Marteka and Allaire never paid Amco—and Amco never requested disbursement of—all monies for R&B's work. *R&B Elec. Co.*, 471 A.2d at 1356. The court also found that any benefit that Marteka and Allaire received was fleeting because the mortgagor foreclosed on and sold the property shortly after Eagle Realty began to rent it. *Id.*

In some cases, defendants have offered *Alessi* and *R&B Elec. Co.* as evidence that Rhode Island law requires a direct benefit. In those same cases, courts have rejected that interpretation. *See In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 383 (D.R.I. 2019) (emphasis in original) (citing *R&B Elec Co.*, 471 A.2d at 1356 and *Alessi*, 2010 WL 897246, at *4) ("In the Rhode Island cases cited by the Defendants, the question was whether <u>any</u> benefit was conferred, not whether it was conferred indirectly."); *Sandee's Catering v. Agri Stats, Inc.*, No. 20 C 2295, 2021 WL 963812, at *5 (N.D. Ill. Mar. 15, 2021) (citing *Loestrin 24 FE*, 410 F. Supp. 3d at 383) ("Defendants here have only cited *Alessi* . . ., but in this case the question was whether any benefit was conferred, not whether it was conferred indirectly."); *In re TFT-LCD (Flat Panel)*

77

*Antitrust Litig.*, No. M 07-1827, 2011 WL 4501223, at *11 (N.D. Cal. Sept. 28, 2011) (discussing *Alessi* and *R&B Elec. Co.* and concluding that the cases do not establish that Rhode Island requires a direct benefit). The Court finds those decisions persuasive. To go a step further, *Alessi* seems to support an indirect benefit theory of unjust enrichment, considering that the court allowed plaintiff to recover for property tax payments that it made on a parcel that plaintiff did not own, even though plaintiff did not make the payments directly to defendants. *Alessi*, 2010 WL 897246, at *2–4.

Third, in *Sousa v. Roy*, plaintiffs brought a claim for unjust enrichment against defendants, seeking recovery for improvements that plaintiffs' mother made to a house that she once occupied but that defendants now occupied. 243 A.3d 775, 777 (R.I. 2021). The trial court found that plaintiffs did not confer a benefit upon defendants, and the Rhode Island Supreme Court agreed. *Id.* at 782. The court held that "[t]he plaintiffs' contention that [their mother's] financial contributions to the construction of an addition onto her parents' home constituted a benefit to the defendant is simply too attenuated to warrant the equitable remedy of unjust enrichment." *Sousa*, 243 A.3d at 782. The Court does

78

not read *Sousa* to require that a plaintiff confer a direct benefit to defendant, but the Court does read *Sousa* to require that the benefit be more than "too attenuated." *Sousa*, 243 A.3d at 782. The Court declines to impose a direct benefit requirement under Rhode Island law.

Here, Bartek, the Rhode Island plaintiff, plausibly alleges that she unjustly enriched FCA. Bartek alleges that she overpaid FCA and thus conferred a benefit on FCA when she purchased her Pacifica PHEV from an authorized FCA dealer. (ECF No. 1, PageID.47–48 ¶ 61, PageID.71 ¶ 94, PageID.94 ¶ 158.) Bartek further alleges that FCA accepted and retained the benefit (*id.* at PageID.94 ¶¶ 160, 162), and it is reasonable to infer that FCA appreciated the benefit. Bartek claims that FCA's retention of the benefit is inequitable, presumably because the vehicle was worth less than she paid for it. (*Id.* at ¶ 160.) Therefore, Bartek's unjust enrichment claim may proceed.

### ix.   South Carolina

To recover for unjust enrichment under South Carolina law, a plaintiff must show: "(1) a benefit conferred by the plaintiff upon the defendant; (2) realization of that benefit by the defendant; and (3) retention of the benefit by the defendant under circumstances that make

it inequitable for him to retain it without paying its value." *Chase Home Fin., LLC v. Risher*, 746 S.E.2d 471, 476–477 (S.C. Ct. App. 2013) (quoting *Myrtle Beach Hosp., Inc. v. City of Myrtle Beach*, 532 S.E.2d 868, 872 (S.C. 2000)). The Court must determine whether South Carolina law requires that a plaintiff confer a direct benefit on a defendant.

In *Myrtle Beach Hosp.*, a hospital provided medical treatment to the city's pretrial detainees. 532 S.E.2d at 869. The hospital claimed that it unjustly enriched the city because it provided treatment that the city refused to pay for. *Id.* at 870. The South Carolina Supreme Court held that the hospital could not prevail on an unjust enrichment theory because the detainees, not the city, received and retained the benefit of medical treatment. *Id.* at 873. The court characterized the benefit to the city as "incidental . . . in the sense that the existence of the Hospital facilitates the City's constitutional duty to ensure the detainee receives necessary medical care." *Id.* at 873 n.12.

In the context of defective components, South Carolina federal courts seem to imply a direct benefit requirement. In *In re MI Windows and Doors, Inc. Products Liability Litigation*, purchasers of new homes that came with allegedly defective windows sued the window

80

manufacturer. No. 12-mn-00001, 2012 WL 5408563, at *1 (D.S.C. Nov. 6, 2012). The home buyers claimed that they unjustly enriched the manufacturer because they "absorbed the cost of the windows paid by the builders and/or contractors." *Id.* at *6 (citation and internal quotation marks omitted). The court disagreed, finding that plaintiffs' alleged absorption did not confer a benefit on the manufacturer because the contractors already paid the manufacturer for the windows. *Id.* at *7. In a similar case, another South Carolina federal court found that plaintiff did not confer a benefit on a window manufacturer where the plaintiff purchased a home with pre-installed windows. *Memari v. Ply Gem Prime Holdings, Inc.*, No. 13-cv-850, 2013 WL 12320410, at *7 (D.S.C. Aug. 6, 2013).

Alternatively, in a separate opinion from the *MI Windows and Doors* litigation, the court allowed a property-developer plaintiff to maintain an unjust enrichment claim against the manufacturer because it purchased the windows from the manufacturer. *In re MI Windows and Doors, Inc. Prods. Liab. Litig.*, No. 12-mn-00001, 2012 WL 5384922, at *1, 5 (D.S.C. Nov. 1, 2012).

81

In the context of defective vehicles, at least one federal district court has found that South Carolina requires a direct benefit. *Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 551 (D. Md. 2011). However, *Doll* does not cite any authority applying South Carolina law to support its finding.

Considering these five opinions, the Court is not convinced that South Carolina law would bar a plaintiff from bringing an unjust enrichment claim against a manufacturer where the plaintiff purchased their vehicle from an authorized dealer. At best, the *MI Windows and Doors* cases as well as *Memari* bar an unjust enrichment claim against a third-party components manufacturer—e.g., the makers of the windows in the Pacifica PHEV. But here, Carbajales-Dale, the South Carolina plaintiff, alleges that he overpaid FCA and thus conferred a benefit on FCA when he purchased his Pacifica PHEV from an authorized FCA dealer. (ECF No. 1, PageID.48–49 ¶ 62, PageID.71 ¶ 94, PageID.94 ¶ 158.) Carbajales-Dale also alleges that the authorized dealer functions as FCA's agent in selling automobiles. (*Id.* at PageID.54 ¶ 73.) Thus, the Court can reasonably infer that Carbajales-Dale, by purchasing from an FCA dealer, conferred more than an incidental benefit on FCA. Carbajales-Dale also alleges that FCA accepted and retained the benefit

and that such retention is inequitable, presumably because the car was worth less than what Carbajales-Dale paid for it. (*Id.* at PageID.94 ¶¶ 160, 162.) Therefore, Carbajales-Dale plausibly alleges that he unjustly enriched FCA, so his unjust enrichment claim may proceed.

### x. Texas

"A party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992) (citations omitted). The Court need not consider whether Texas law requires a direct benefit because Sheehan, the Texas plaintiff, does not plausibly allege that FCA fraudulently omitted or concealed information. Further, Sheehan does not allege, and the Court cannot reasonably infer, that FCA obtained a benefit from him by duress or undue advantage. Accordingly, the Court **DISMISSES** the Texas unjust enrichment claim.[7]

---

[7] Because the Court dismisses the Texas unjust enrichment claim on this basis, the Court does not consider whether unjust enrichment is an independent cause of action under Texas law.

### xi.    Virginia

To state a claim for unjust enrichment under Virginia law, a plaintiff must show the existence of a quasi-contract by alleging that: (1) they conferred a benefit on defendant, (2) defendant knew of the benefit and should reasonably have expected to repay the benefit; and (3) defendant accepted or retained the benefit without paying for its value. *Fid. Nat. Title Ins. Co. v. Wash. Settlement Grp., LLC*, 87 Va. Cir. 77, at *14 (Va. Cir. Ct. 2013) (citing *Schmit v. Household Fin. Corp., II*, 661 S.E.2d 834, 838 (Va. 2008)).

The Court must determine whether Virginia law requires a plaintiff to directly confer a benefit on a defendant. In *Seeman v. Oxfordshire, LLC*, plaintiffs purchased a new home with allegedly defective drywall and brought a claim for unjust enrichment against the company that sold some or all of the drywall materials that builders used in constructing the home. 83 Va. Cir. 442, at *1 (Va. Cir. Ct. 2011). Viewing the allegations in a light most favorable to the plaintiffs, the court found that plaintiffs conferred an indirect benefit on the sales company, even though plaintiffs did not purchase the drywall from the company. *Id.* at *5. The court noted that the indirect benefit could "arguably" give rise to liability

84

for unjust enrichment. *Seeman*, 83 Va. Cir. 442, at \*5 (citing *Schmidt*, 661 S.E.2d at 838). However, the court dismissed the unjust enrichment claim because plaintiffs did not show that they ever dealt directly with the sales company. *Id.*

In *Tao of Systems Integration, Inc. v. Analytical Services & Materials, Inc.*, a government-contractor-plaintiff sued a government-contractor-defendant, alleging that defendant secured a government contract by misrepresenting that it owned plaintiff's technology and trade secrets. 299 F. Supp. 2d 565, 569, 576 (E.D. Va. 2004). The court dismissed the unjust enrichment claim because

> [a] disappointed bidder for a government contract cannot maintain an unjust enrichment cause of action against a successful bidder for the value of the contract. *John C. Holland Enterprises, Inc. v. J.P. Mascaro & Sons, Inc.*, 653 F. Supp. 1242, 1247 (E.D. Va. [1987]), *aff'd without opinion*, 829 F.2d 1120 (4th Cir. 1987). To bring an action to recover monies received by the defendant from a third party, a plaintiff must demonstrate that he had a preexisting right to that fund. *Id.* at 1246; *City of Norfolk v. Norfolk County*, 120 Va. 356, 91 S.E. 820, 826 (1917). As no party has a right to a government contract prior to its award, there can be no cause of action for unjust enrichment on this basis. *Holland Enterprises, Inc.*, 653 F. Supp. at 1246.

*Tao*, 299 F. Supp. 2d at 576.

85

In *Firestone v. Wiley*, plaintiff, a former one-fifth owner of a corporation that operated a horse farm, sued the corporation and its four other owners after she attempted to exercise her appraisal rights.[8] 485 F. Supp. 2d 694, 697–699 (E.D. Va. 2007). Plaintiff sought to exercise her appraisal rights after the corporation's shareholders, over her dissent, voted to sell the corporation's assets. *Id.* Before the sale of assets, plaintiff paid for an appraisal of the corporation's real property, and her complaint included an unjust enrichment claim for the cost of the appraisal.[9] *Id.* at 698, 704. The court dismissed the unjust enrichment claim because plaintiff failed to allege that: (1) she conferred a benefit on defendants by virtue of procuring the appraisal; (2) defendants knew of the benefit; and (3) defendants accepted or retained the benefit. *Id.* at 704. The court also noted that receipt of the appraisal alone would not be enough to state a claim for unjust enrichment. *Id.* at 704 n.12 (citing cases for the propositions that the defendant must use and enjoy, experience, or

---

[8] In this context, "appraisal rights" refers to a dissenting shareholder's right to "require the corporation to repurchase their stock at a price equivalent to its fair market value." Appraisal Rights, Practical Law Glossary Item 4-382-3234.

[9] In this context, "appraisal" refers to the process of seeking a fair market valuation for land.

86

appreciate the benefit and that an unjust enrichment claim cannot rest on voluntary, unmistaken, non-coerced, or non-requested payments).

Against this backdrop, some courts have concluded that Virginia law requires a plaintiff to confer a benefit directly to a defendant. *See Simpson v. Champion Petfoods USA, Inc.*, 397 F. Supp. 3d 952, 973 & n.22 (E.D. Ky. 2019) (citing *Tao*, 299 F. Supp. 2d at 576 and *Firestone*, 485 F. Supp. 2d at 704 n.12) ("Virginia courts seem to follow the same rationale: An indirect benefit or a benefit to a third party is simply insufficient to sustain an unjust enrichment claim."); *Blurton v. Haier US Appliance Sols., Inc.*, No. 24-CV-00225, 2025 WL 938631, at \*15 (W.D. Ky. Mar. 27, 2025) (citing *Tao*, 299 F. Supp. 2d at 576) ("An indirect benefit or a benefit to a third party will not sustain an unjust enrichment claim."). Both *Simpson* and *Blurton* dismissed Virginia unjust enrichment claims brought by consumer plaintiffs against manufacturer defendants because the plaintiffs did not purchase directly from the defendants. *Simpson*, 397 F. Supp. 3d at 974; *Blurton*, 2025 WL 938631, at \*16.

At least one federal court has concluded that Virginia law does not require a direct benefit. *See Burch v. Whirlpool Corp.*, No. 17-cv-18, 2017

87

WL 7370988, at *7 (W.D. Mich. Sept. 28, 2017) (citing *Seeman*, 83 Va. Cir. 442, at *5) ("However, Virginia law does not require a direct benefit. An indirect benefit may give rise to a claim in limited circumstances."). The *Burch* court found that plaintiff plausibly alleged that it conferred a benefit on the manufacturer defendant, even though plaintiff did not buy direct from defendant. *Id.* at *8. To the court, the unjust enrichment came from: (1) a representative of the defendant instructing plaintiff that it made a component; (2) the representative's implicit assertion that the component was not defective; and (3) plaintiff's reliance on that implicit assertion by purchasing the component. *Id.*

Further, one federal court has held that an exception to the direct benefit rule exists where plaintiff alleges a direct relationship between the parties. *Tijerina v. Volkswagen Grp. of Am., Inc.*, No. 21-cv-18755 (BRM) (LDW), 2023 WL 6890996, at *37 n.25 (D.N.J. Oct. 19, 2023) (citing *Tao*, 299 F. Supp. 2d at 576). In *Tijerina*, the court found that the exception applied because plaintiffs alleged that there was a direct relationship between the automotive manufacturer and its dealer-agents. *Id.*

88

With these cases in mind, the Court is not persuaded that Virginia law requires that a plaintiff directly confer a benefit to a defendant. The oft-cited sentence from *Tao* does not negate the possibility that a plaintiff can state a claim for unjust enrichment based on an indirect benefit. Rather, a "plaintiff must demonstrate that he had a preexisting right to that fund." *Tao*, 299 F. Supp. 2d at 576 (citations omitted). Further, *Seeman* strongly suggests that a plaintiff can bring an unjust enrichment claim against a defendant for an indirect benefit where plaintiff shows direct interaction between itself and defendant. *Seeman*, 83 Va. Cir., at *5. Therefore, the Court declines to read a direct benefit requirement into Virginia unjust enrichment law.

Here, Golland, the Virginia plaintiff, plausibly alleges that he unjustly enriched FCA. Golland alleges that he overpaid FCA, and thus conferred a benefit on FCA, when he purchased his Pacifica PHEV from an authorized FCA dealer. (ECF No. 1, PageID.50–51 ¶ 65, PageID.71 ¶ 94, PageID.94 ¶ 158.) Golland also alleges that the authorized dealer functions as FCA's agent in selling automobiles. (*Id.* at PageID.54 ¶ 73.) Thus, Golland plausibly alleges that he dealt directly with FCA. Golland also claims that FCA accepted and retained the benefit and that such

retention is inequitable, presumably because the car was worth less than what Golland paid for it. (*Id.* at PageID.94 ¶¶ 160, 162.) On these facts, Golland's unjust enrichment claim may proceed.

Even if *Tao* is controlling, Golland's claim survives. If Virginia law requires Golland to demonstrate that he had a pre-existing right to monies that FCA received from Golland's dealership of purchase, Golland's allegation of overpaying for a defective vehicle seems to establish his pre-existing right to those funds. Accordingly, Golland's unjust enrichment claim may proceed.

### xii. Washington

To maintain a claim for unjust enrichment under Washington law, a plaintiff must show that: (1) they "conferred a benefit upon the defendant, (2) the defendant had knowledge or appreciation of the benefit, and (3) the defendant's accepting or retaining the benefit without payment of its value is inequitable under the circumstances of the case." *Austin v. Ettl*, 286 P.3d 85, 92 (Wash. Ct. App. 2012) (citing *Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008)). *See also Lavington v. Hillier*, 510 P.3d 373, 379 (Wash. Ct. App. 2022) (emphasis in original) (citations omitted) ("However, *Young* and multiple Court of Appeals cases state

that *a plaintiff must confer a benefit on the defendant* to satisfy the first element of unjust enrichment."). While not explicitly stated, it appears that Washington law requires conferral of direct benefit.

First, some Washington appellate courts emphasize that "a plaintiff must confer a benefit on the defendant" to maintain an unjust enrichment claim. *Lavington*, 510 P.3d at 379. The purpose of this emphasis seems to be to resolve a discrepancy in Washington law about the elements of an unjust enrichment claim. In *Young*, the Washington Supreme Court recited the elements of an unjust enrichment claim as follows:

> Three elements must be established in order to sustain a claim based on unjust enrichment: a benefit conferred upon the defendant by the plaintiff; an appreciation or knowledge by the defendant of the benefit; and the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

*Young*, 191 P.3d at 484 (internal quotation marks omitted) (quoting *Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc.*, 810 P.2d 12, 18 (Wash. Ct. App. 1991)). The Washington Supreme Court then put the elements of an unjust enrichment claim into its own words. *See Young*, 191 P.3d at 1262 ("In other words the elements of a contract implied in law are: (1) the

91

defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment."). This difference in language led Washington courts to state differently the first element of an unjust enrichment claim. *Compare Lavington*, 510 P.3d at 379, *and Austin*, 286 P.3d at 92, *with*, *Royal Caribbean Cruises Ltd. v. Swedish Health Servs.*, No. 76275-3-I, 2018 WL 5259520, at *10 (Wash. Ct. App. Oct. 22, 2018) (citing *Young*, 191 P.3d at 1262) ("To state a claim for unjust enrichment, the plaintiff must show (1) the defendant received a benefit . . . ."), *and, Moberg v. Terraqua, Inc.*, No. 34390-1-III, 2017 WL 3048645, at *10 (Wash. Ct. App. July 18, 2017) (citing *Young*, 191 P.3d at 1262) ("The party must prove three elements: '(1) the defendant receives a benefit . . . .'").

Thus, in *Lavington*, the court held that plaintiff could not maintain an unjust enrichment claim because she did not confer a benefit on defendants. 510 P.3d at 379. There, defendants received a benefit when they used plaintiff's driveway without permission to save on construction costs. *Id.* at 376, 379. However, the court found that defendants simply

92

took the benefit of using the driveway, causing plaintiff's claim to fail. *Lavington*, 510 P.3d at 379.

Second, one Washington appellate court has seemingly read the "plaintiff must confer a benefit on defendant" language to require a direct benefit. *See Allysis, Inc. v. Schroder*, No. 74511-5-I, 2017 WL 751329, at *4 (Wash. Ct. App. Feb. 27, 2017) (concluding that the trial court did not apply the wrong legal standard where it interpreted *Young* to require that a plaintiff directly confer a benefit on defendant for an unjust enrichment claim to succeed).

Third, at least two Washington appellate courts have denied unjust enrichment claims based on indirect benefits. In *Keil v. Scholten*, buyers of commercial real estate sought to recover a commission that the seller paid to its real estate agent under a theory of unjust enrichment. No. 48051-1-I, 2002 WL 988562, at *1, 4 (Wash. Ct. App. 2002). The trial court dismissed the claim at summary judgment on the grounds that the buyer did not confer a benefit upon the real estate agent. *Id.* at *4. The appeals court agreed, even though the buyer paid the seller, who in turn paid the real estate agent, and even though the seller's agreement to pay the real estate agent was referenced in the buyer and seller's purchase

93

and sale agreement. *Keil*, 2002 WL 988562, at *5. The court found that only the seller had an obligation to pay the real estate agent and that the agent's commission came out of proceeds of the sale "that belonged exclusively" to the seller. *Id.*

Similarly, in *Falcon Properties LLC v. Bowfits 1308 LLC*, a buyer of residential property sought to recover a commission that the seller paid to its real estate broker under a theory of unjust enrichment. 478 P.3d 134, 137–138 (Wash. Ct. App. 2020). The trial court ordered disgorgement of the broker's commission based, in part, on the unjust enrichment theory. *Id.* at 139. On appeal, the Washington Court of Appeals found that disgorgement was not appropriate under a theory of unjust enrichment because the seller paid the broker's commission, not the buyer. *Id.* at 140 n.3. Therefore, according to the court, the buyer did not confer the benefit to the broker. *Id.*

Against this backdrop, at least one federal district court applying Washington law has read *Lavington*, *Falcon Properties*, and *Allyis* to require a plaintiff to directly confer a benefit on a defendant. *Patrick v. Ramsey*, No. C23-0630, 2023 WL 6680913, at *4 (W.D. Wash. Oct. 12, 2023). However, in the context of defective vehicles, a different federal

94

district court concluded that plaintiffs who allege that they purchased a vehicle from a manufacturer's dealership can maintain a Washington unjust enrichment claim. *See Maadanian v. Mercedes-Benz USA, LLC*, No. 22-cv-00665, 2024 WL 1579658, at \*9 (W.D. Wash. Apr. 11, 2024) ("Neither [*Young*'s] statement of the elements of a claim for unjust enrichment nor the equitable considerations which underlie it supports defendants' argument that the benefit must be conferred on them directly, rather than through the intermediary of a Mercedes-Benz dealership.").

The Court agrees with *Maadanian*. Washington law seems to require a direct benefit, but the Court is unaware of any authority indicating that the benefit cannot go through an agent of, or entity affiliated with, defendant. Here, Benzur, the Washington plaintiff, alleges that she overpaid FCA and thus conferred a benefit on FCA when she purchased her defective Pacifica PHEV from an authorized FCA dealer. (ECF No. 1, PageID.52–53 ¶ 69, PageID.71 ¶ 94, PageID.94 ¶ 158.) Benzur also alleges that the authorized dealer functions as FCA's agent in selling automobiles (*id.* at PageID.54 ¶ 73), so Benzur's alleged overpayment to FCA is more direct than the broker commissions in *Keil*

95

and *Falcon Properties*. Benzur further alleges that FCA accepted and retained the benefit (ECF No. 1, PageID.94 ¶¶ 160, 162), and it is reasonable to infer that FCA appreciated the benefit. Finally, Benzur claims that FCA's retention is inequitable, presumably because the vehicle was worth less than she paid for it. (*Id.* at ¶ 160.) Benzur plausibly alleges that she unjustly enriched FCA, so her unjust enrichment claim may proceed.

### 4.   Cause of Action

Finally, FCA argues that California, Massachusetts, New Hampshire, and Pennsylvania do not recognize unjust enrichment as an independent cause of action. (ECF No. 15, PageID.589.) The Court largely agrees with FCA regarding California and Massachusetts law, but the Court still allows plaintiffs bringing unjust enrichment claims under the laws of those states to seek recovery under a theory of unjust enrichment. The Court address each state in turn.

#### a.   California

"There is no cause of action in California labeled 'unjust enrichment,'" but California courts recognize an equitable remedy of restitution for instances where a party receives a benefit and retention of

the benefit would unjustly enrich the recipient. *City of Oakland v. Oakland Raiders*, 299 Cal. Rptr. 3d 463, 477–478 (Cal. Ct. App. 2022). In *City of Oakland*, the court acknowledged that unjust enrichment is not a cause of action in California, but the court dismissed the theory of recovery because plaintiff did not meet its pleading burden. *Id.* at 477–479.

Similarly, in *De Havilland v. FX Networks, LLC*, the court recognized that unjust enrichment is a restitution claim, not a cause of action, and held that the theory could not proceed because defendant did not commit an actionable wrong. 230 Cal. Rptr. 3d 625, 646–647 (Cal. Ct. App. 2018). In *Levine v. Blue Shield of California*, the court concluded that plaintiffs' unjust enrichment claim did not properly state a cause of action because unjust enrichment is not a cause of action in California. 117 Cal. Rptr. 3d 262, 278–279 (Cal. Ct. App. 2010). The court also noted that unjust enrichment is synonymous with restitution and held that the claim could not proceed because plaintiffs did not demonstrate a basis on which they were entitled to restitution. *Id.* at 278–279.

In line with *City of Oakland*, *De Havilland*, and *Levine*, the Court **DISMISSES** the unjust enrichment "claim" under California law to the

97

extent that the California plaintiffs bring an independent cause of action for unjust enrichment. However, the California plaintiffs may seek the equitable remedy of restitution under a theory of unjust enrichment.

### b.    Massachusetts

Under Massachusetts law, unjust enrichment seems to be a theory of recovery rather than an independent cause of action. *See Lopes v. Commonwealth*, 811 N.E.2d 501, 509 (Mass. 2004) (citing *J.A. Sullivan Corp. v. Commonwealth*, 494 N.E.2d 374, 377 (Mass. 1986)) ("Here, the plaintiffs' claim of unjust enrichment does not state a separate cause of action, but a theory of recovery."); *J.A. Sullivan Corp.*, 494 N.E.2d at 374 (emphasis in original) ("Quantum meruit is a theory of *recovery*, not a cause of action.").[10] Federal district courts applying Massachusetts law have also found that unjust enrichment is not an independent cause of action. *See Flores v. OneWest Bank, F.S.B*, 172 F. Supp. 3d 391, 396 (D. Mass. 2016) (citing *Mass. Eye and Ear Infirmary v. QLT*

---

[10] Massachusetts courts generally construe "unjust enrichment" and "quantum meruit" as synonyms and consider them closely related. *See Fin. Freedom Acquisition, LLC v. Laroche*, No. 15-P-772, 2016 WL 4528464, at *4 (Mass. App. Ct. Aug. 30, 2016) (citation omitted) ("The terms 'unjust enrichment' and 'quantum meruit' are generally construed as synonyms."); *Salamon*, 477 N.E.2d at 1031 ("The underlying basis for awarding quantum meruit damages in a quasi-contract case is unjust enrichment of one party and unjust detriment to the other party.").

*Phototherapeutics, Inc.*, 412 F.3d 215, 234 (1st Cir. 2005) and *Lopes*, 811 N.E.2d at 509) ("However, unjust enrichment is a theory of equitable recovery, not an independent cause of action."); *In re Bos. Univ. COVID-19 Refund Litig.*, No. 20-10827, 2022 WL 3154670, at *5 (D. Mass. Aug. 8, 2022) (citing *Lopes*, 811 N.E.2d at 509) ("Unjust enrichment, however, is a theory of equitable recovery, not a separate cause of action."). However, neither *Flores* nor *Boston University COVID-19* dismissed the unjust enrichment claims on the basis that they are only theories of recovery. In each case, the court dismissed the unjust enrichment claim after determining that plaintiffs had an adequate remedy at law. *Flores*, 172 F. Supp. 3d at 396; *In re Bos. Univ.*, 2022 WL 3154670, at *5. FCA does not supply, and the Court is not aware, of any Massachusetts authority that would support barring Alicia and David Maltz from seeking recovery on a theory of unjust enrichment solely because it is not an independent cause of action.

Therefore, the Court **DISMISSES** the unjust enrichment "claim" under Massachusetts law to the extent that David and Alicia Maltz bring an independent cause of action for unjust enrichment. However, David

99

and Alicia Maltz may seek equitable recovery under a theory of unjust enrichment.

### c.   New Hampshire

The Court must determine whether unjust enrichment is an independent cause of action or just a theory of recovery under New Hampshire law. In *General Insulation Co. v. Eckman Construction*, the New Hampshire Supreme Court noted that "unjust enrichment generally does not form an independent basis for a cause of action." 159 N.H. 601, 621 (N.H. 2010) (internal quotation marks omitted) (quoting 42 C.J.S. *Implied Contracts* § 10, at 17 (2007)). In *Clapp v. Goffstown School District*, the New Hampshire Supreme Court stated that "[u]njust enrichment is an equitable remedy." 977 A.2d 1021, 1024 (N.H. 2009). Yet, in *Estate of Mortner*, a 2018 case, the New Hampshire Supreme Court outlined the pleading requirements for a plaintiff to "state a claim" for unjust enrichment. 182 A.3d at 631.

FCA's citation to *K.B. v. Inter-Continental Hotels Corp.*, No. 19-cv-1213, 2020 WL 8674188, at *7 (D.N.H. Sept. 28, 2020) is not helpful. (ECF No. 15, PageID.589 n.7.) First, *K.B.* relies on *General Insulation* for the proposition that unjust enrichment is not an independent basis for a

100

cause of action under New Hampshire law, and the order does not seem to consider the court's language in *Estate of Mortner*. *K.B.*, 2020 WL 8674188, at *7. Second, the court did not dismiss the unjust enrichment count based on its conclusion that unjust enrichment is not an independent cause of action. Instead, the court dismissed the count because plaintiff did not allege that she had a contract with defendant, and the allegations in the complaint were insufficient for the court to imply a contract under a quasi-contract theory. *Id.*

FCA does not cite any New Hampshire authority that would support barring Bergantino or Nicole and Stephen Costa from bringing a cause of action for unjust enrichment. *Estate of Mortner* clearly delineates the elements that a plaintiff must allege to state a claim for unjust enrichment. 182 A.3d at 631. Therefore, applying *Estate of Mortner*, the Court declines to dismiss the unjust enrichment claim under New Hampshire law on this ground. 182 A.3d at 631.

### d.    Pennsylvania

Pennsylvania courts seem to recognize that unjust enrichment is a cause of action. *See KEM Res., LP v. Deer Park Lumber, Inc.*, Nos. 619 MDA 2021, 645 MDA 2021, 2022 WL 2717774, at *3 (Pa. Super. Ct. July

13, 2022) (emphasis added) (citation omitted) ("Ryvamat is correct that common law unjust enrichment <u>actions</u> are subject to the four-year statute of limitations for contracts implied in law."); *Lugo v. Farmers Pride, Inc.*, 967 A.2d 963, 970 (Pa. Super. Ct. 2009) (emphasis added) ("We find that appellants may, indeed, plead causes of action under the [Pennsylvania Minimum Wage Act], the [Wage Payment and Collection Law], and breach of contract, in the alternative with a <u>cause of action under a theory of unjust enrichment</u>.").

FCA cites no authority for the proposition that unjust enrichment is not an independent cause of action under Pennsylvania law. The two cases that FCA cites are not helpful. (ECF No. 15, PageID.589 n.7 (citing *Zafarana v. Pfizer, Inc.*, 724 F. Supp. 2d 545, 560 (E.D. Pa. 2010)); ECF No. 21, PageID.829 (citing *Pompa v. St. Luke's Hosp.*, No. 21-1378, 2023 WL 2332250, at \*6 (M.D. Pa. Mar. 2, 2023)).) In *Zafarana*, the court recognized that unjust enrichment is not a substitute for a failed tort claim. 724 F. Supp. 2d at 560 (citation omitted). The court dismissed the Pennsylvania unjust enrichment count based on a finding that plaintiffs attempted to bring tort actions for unjust enrichment, which was impermissible, and that the circumstances did not warrant implying a

quasi-contract. *Id.* at 561. In *Pompa*, the court similarly noted that a plaintiff cannot maintain an unjust enrichment claim that is based on the same wrongful conduct as a failed tort claim. 2023 WL 2332250, at *6 (citation omitted). The *Pompa* court dismissed the unjust enrichment claim because it was based on the same underlying conduct as some of the claimant's other failed claims. *Id.* at *6.

Therefore, the court declines to dismiss the Pennsylvania unjust enrichment claim on this ground.

### D.    Implied Warranty of Merchantability

#### 1.    Merchantability

FCA argues that plaintiffs fail to plead facts showing that their vehicles are not merchantable. (ECF No. 15, PageID.589.) The crux of FCA's argument seems to be that no plaintiff alleges that the alleged defect manifested in their Pacifica PHEV. (ECF No. 21, PageID.829.) Plaintiffs disagree, arguing that their vehicles are dangerous, unsafe, and unreliable because of the alleged defect. (ECF No. 19, PageID.742.) The Court agrees with FCA with respect to the implied warranty claims under California, Connecticut, New Hampshire, Pennsylvania, South Carolina, and Texas law. The Court disagrees with FCA with respect to

103

the claims under Iowa, Kansas, Massachusetts, Michigan, Ohio, Minnesota, Rhode Island, and Virginia law. The Court addresses each state in turn, starting with the first group of states.[11] [12]

### a.  California

Carney and Clancy bring their implied warranty of merchantability claims pursuant to the Song-Beverly Consumer Warranty Act. (ECF No. 1, PageID.110.) Under the act, a good is merchantable if it is fit for the ordinary purposes for which such goods are used. Cal. Civ. Code § 1791.1(a) (West 2025). To establish a breach of implied warranty, a California plaintiff must show that their product contains "an inherent defect which is substantially certain to result in malfunction during the useful life of the product." *Hicks v. Kaufman and Broad Home Corp.*, 107 Cal. Rptr. 2d 761, 768 (Cal. Ct. App. 2001). *See also Cardinal Health 301, Inc. v. Tyco Elecs. Corp.*, 87 Cal. Rptr. 3d 5, 30 (Cal. Ct. App. 2008) ("We agree that *Hicks* articulated the correct test under California law.").

---

[11] The parties do not brief this issue state-by-state even though the implied warranty claims are state law claims. The Court, however, conducts a state-by-state analysis.
[12] The Court does not address this argument with respect to the Florida, Washington, and Illinois implied warranty claims because, as discussed below, the Court dismisses those claims for lack of privity.

Here, the California plaintiffs do not allege that the defect manifested in their vehicles nor do they allege that the defect is substantially certain to result in malfunction during the useful life of the vehicles. The Court cannot reasonably infer that manifestation is substantially certain, considering that (1) "[a]n internal transmission wiring connector short <u>could</u> result in an unexpected engine shutdown <u>under certain conditions</u>", and (2) there is no indication that the transmission wiring connector is substantially certain to short. (ECF No. 1-2, PageID.331 (emphasis added).) Accordingly, the Court **DISMISSES** Carney and Clancy's implied warranty claims.

### b.   Connecticut

Kelsey and Peter Keefe bring their implied warranty of merchantability claim under the Connecticut Uniform Commercial Code ("UCC"). (ECF No. 1, PageID.130 (citing Conn. Gen. Stat. § 42a-2-314).) Under Connecticut law, "the implied warranty of merchantability requires that a product be reasonably 'fit for the ordinary purposes for which such goods are used.'" *Cavanaugh v. Subaru of Am., Inc.*, No. MMXCV1660015243, 2017 WL 2293124, at *4 (Conn. Super. Ct. May 4, 2017) (quoting Conn. Gen. Stat. § 42a-2-314(c)). A vehicle is generally

considered merchantable if it can provide safe and reliable transportation. *Id.* (quoting *Hornberger v. Gen. Motors Corp.*, 929 F. Supp. 884, 888 (E.D. Pa. 1996)).

Connecticut trial courts seem to deem vehicles not merchantable where a defect manifests and impedes the operation of the vehicle. *See Mastrandrea v. Whaling City Auto Grp., LLC*, No. KNL-CV21-6053239S, 2023 WL 4446606, at *6 (Conn. Super. Ct. July 5, 2023) (finding that a vehicle with a defective transmission was not merchantable, despite plaintiff's decision to drive the car in its defective condition, where plaintiff testified that the vehicle bucked and slipped in and out of gears at various speeds one week after plaintiff purchased the vehicle); *Earls v. Condor Cap. Corp.*, No. CV980491748S, 2001 WL 11882498, at *3 (Conn. Super. Ct. Aug. 30, 2001) (finding that a vehicle was not merchantable where its suspension problems prevented plaintiff from driving the vehicle and where plaintiff had to disconnect and reconnect the battery to start the vehicle). *See also Tirado v. Ofstein*, No. HHDCV054014648S, 2008 WL 902506, at *6 (Conn. Super. Ct. Mar. 14, 2008) (finding that a vehicle was not merchantable at the time of sale where it broke down within a few days after purchase and needed a new

engine). Further, at least one Connecticut trial court held that plaintiffs failed to state an implied warranty of merchantability claim where they: (1) only alleged that their vehicles consumed more oil than expected; (2) drove their vehicles successfully for at least two years; and (3) did not allege engine failure or any other condition preventing safe or reliable transportation. *Cavanaugh*, 2017 WL 2293124, at *4.

Here, the Keefes allege that they purchased their Pacifica PHEV in April 2019, almost four years before they filed their complaint. (ECF No. 1, PageID.27 ¶ 30.) They do not allege that the shutdown defect manifested in their vehicle, or do they allege that the experienced any other condition preventing safe or reliable transportation. Therefore, the Court **DISMISSES** Kelsey and Peter Keefe's implied warranty claim.

### c.    New Hampshire

Bergantino and Nicole and Stephen Costa bring their implied warranty of merchantability claims under the New Hampshire UCC. (ECF No. 1, PageID.248 (citing N.H. Rev. Stat. § 382-A:2-314).) Under the statute, a good must be fit for the ordinary purposes for which such goods are used. N.H. Rev. Stat. Ann. § 382-A:2-314(2)(c) (2025). The New Hampshire Supreme Court recognizes that a vehicle is merchantable if a

107

driver can use it on a public highway. *Roy v. Quality Pro Auto, LLC*, 132 A.3d 418, 421 (N.H. 2016) (quoting *Kimpel v. Del. Pub. Auto Auction*, No. CIV.A.2000-02-224, 2001 WL 1555932, at *3 (Del. C.P. Ct. Mar. 6, 2001)). *See also Trombly v. City Cars, LLC*, No. 2023-0398, 2025 WL 1583831, at *2 (N.H. June 5, 2025) ("Thus, for a used vehicle to be merchantable, it should be able to be used on a public highway at the time of sale."). Further, "[t]he requirement of a manifestation of the defective condition applies to causes of action for defective and unsafe products in . . . Breach of Implied Warranty of Merchantability." *Nichols v. Gen. Motors Corp.*, No. 99-C-566, 1999 WL 33292839, at *3 (N.H. Super. Ct. Dec. 13, 1999) (citations omitted).

Here, Bergantino and the Costas allege that they purchased their vehicles with a defect that could cause the vehicle to lose motive power and stop abruptly. (ECF No. 1, PageID.14 ¶ 3, PageID.42–43 ¶¶ 53–54, PageID.59 ¶¶ 86–87.) However, none of them have alleged that the defect has manifested in their vehicles nor have they alleged that they were unable to use their vehicles on a public highway. Therefore, "[b]ecause the alleged unsafe condition has not manifested itself in terms of an actual malfunction" in their vehicles, the New Hampshire plaintiffs

108

cannot maintain a cause of action for breach of the implied warranty of merchantability. *Nichols*, 1999 WL 33292839, at *3. Accordingly, the Court **DISMISSES** Bergantino's and Nicole and Stephen Costa's implied warranty claims.

### d. Pennsylvania

Ohodnicki brings his implied warranty of merchantability claim under the Pennsylvania Commercial Code. (ECF No. 1, PageID.273 (citing 13 Pa. Cons. Stat. Ann. § 2314).) Under the statute, a good must be fit for the ordinary purposes for which such goods are used. 13 Pa. Cons. Stat. § 2314(b)(3) (2025). A vehicle's ordinary purpose is to provide safe and/or reliable transportation. *See Solarz v. DaimlerChrysler Corp.*, No. 2033 APRILTERM 2001, CONTROL 112087, 2002 WL 452218, at *8 (Pa. C.P. Ct. Mar. 13, 2002) (rejecting defendant's argument that a vehicle's ordinary purpose is to just provide transportation as opposed to safe and reliable transportation). In the context of defective vehicles, a plaintiff must allege a manifest defect to maintain an implied warranty of merchantability claim. *See Grant v. Bridgestone Firestone, Inc.*, 57 Pa. D. & C.4th 72, at *5 (Pa. C.P. Ct. 2002) (quoting *Thomas v. Carter-Wallace Inc.*, 27 Pa. D. & C.4th 146, 149 (Pa. C.P. Ct. 1994)) ("Unlike the

case law of states that require only that a breach occurs, a breach of implied warranty of merchantability theory in Pennsylvania states that a merchant is 'only liable for harm caused by a defect in their product.'"); *Zwiercan v. Gen. Motors Corp.*, No. 3235 JUNE TERM 1999, 2002 WL 1472335, at *4 (Pa. C.P. Ct. May 22, 2002) ("As such, the fact that no defect in the Plaintiff's Vehicle has manifested itself precludes the Plaintiff from proceeding on her breach of warranty claim.").

Here, Ohodnicki alleges that he purchased a vehicle with a defect that could can cause the vehicle to lose motive power and stop abruptly. (ECF No. 1, PageID.14 ¶ 3, PageID.46–47 ¶ 59, PageID.59 ¶¶ 86–87.) However, Ohodnicki does not allege that the defect manifested in his vehicle or caused harm. Accordingly, the Court **DISMISSES** Ohodnicki's implied warranty of merchantability claim.

### e. South Carolina

Carbajales-Dale brings his implied warranty of merchantability claim under the South Carolina Commercial Code. (ECF No. 1, PageID.293 (citing S.C. Code § 36-2-314).) To be merchantable, a good must be fit for the ordinary purposes for which such goods are used. S.C. Code § 36-2-314(2)(c) (2025). A vehicle is not merchantable if it will not

run. *Soaper v. Hope Indus., Inc.*, 424 S.E.2d 493, 495 (S.C. 1992) (quoting

Hawkland, <u>A Transactional Guide to the Uniform Commercial Code,</u> §

1.19020702 at p.68 (1964)). However, a plaintiff cannot maintain a

breach of implied warranty of merchantability claim if they do not allege

that they suffered an "actual injury to person or property." *Wilson v. Style*

*Crest Prods. Inc.*, 627 S.E.2d 733, 736 (S.C. 2006). *See also Walters v.*

*Maytag Corp.*, No. 07-CV-03669, 2008 WL 11349737, at *3 (D.S.C. June

17, 2008) (dismissing a South Carolina breach of implied warranty claim

because plaintiff did not allege facts showing that his washing machine

malfunctioned or that the defect otherwise manifested in his machine).

In *Wilson*, plaintiffs only alleged that they suffered an economic loss by

purchasing defective home anchors; plaintiffs did not allege that they

suffered personal injuries or physical damage to their homes. 627 S.E.2d

at 735–736. The court held that the home anchors were merchantable

because there was evidence that plaintiffs received anchor systems that

were effective in high winds, and there was no evidence that the anchor

systems had not been exactly what plaintiffs bargained for. *Id.* at 736.

Here, Carbajales-Dale alleges that he purchased a vehicle with a

defect that could cause the vehicle to lose motive power and stop

111

abruptly. (ECF No. 1, PageID.14 ¶ 3, PageID.48 ¶ 62, PageID.59 ¶¶ 86–87.) However, he does not allege that the defect has manifested in his vehicle, causing him to suffer personal injury or property damage. Accordingly, the Court **DISMISSES** Carbajales-Dale's implied warranty of merchantability claim.

### f.    Texas

Sheehan brings his implied warranty of merchantability claim under the Texas UCC. (ECF No. 1, PageID.300 (citing Tex. Bus. & Com. Code § 2.314).) Under Texas law, a good must be fit for the ordinary purposes for which such goods are used to be merchantable. Tex. Bus. & Com. Code § 2.314(b)(3) (West 2025). "The ordinary purpose of an automobile is to provide transportation." *Chandler v. Gene Messer Ford, Inc.*, 81 S.W.3d 493, 503 (Tex. 2002) (citations omitted). To maintain an implied warranty of merchantability claim, a plaintiff must allege that the defect "will inevitably manifest itself in the ordinary use of the product and that the defect renders the product unfit for the ordinary purposes for which the product is used." *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 856 (Tex. App. 2005) (citation omitted). "An actual

manifestation of the product or good is not required to establish an injury.

. . ." *Id.*[13]

Here, Sheehan alleges that he purchased a vehicle with a defect that can cause the vehicle to lose motive power and stop abruptly. (ECF No. 1, PageID.14 ¶ 3, PageID.49 ¶ 63, PageID.59 ¶¶ 86–87.) However, Sheehan does not allege that he experienced the defect, nor does he allege that the defect will inevitably manifest itself in the ordinary use of the product. The Court cannot reasonably infer that manifestation is inevitable, considering that (1) "[a]n internal transmission wiring connector short <u>could</u> result in an unexpected engine shutdown <u>under certain conditions</u>", and (2) there is no indication that the transmission wiring connector will inevitably short. (ECF No. 1-2, PageID.331 (emphasis added).) Accordingly, the Court **DISMISSES** Sheehan's implied warranty of merchantability claim.

---

[13] While *Evertt*'s language seems to conflict with the Court's standing analysis, the *Everett* court was discussing statutory standing—"whether 'a particular plaintiff has established that he has been injured or wronged within the parameters of the statutory language.'" *Speerly v. Gen. Motors, LLC*, 143 F.4th 306, 329 (6th Cir. 2025) (quoting *Nephrology Leaders & Assocs. v. Am. Renal Assocs. LLC*, 573 S.W.3d 912, 916 (Tex. App. 2019)). As the Sixth Circuit recognized, "this matter of statutory interpretation has nothing to do with 'the Texas Constitution's standing requirements.'" *Speerly*, 143 F.4th at 329 (quoting *Nephrology Leaders*, 573 S.W.3d at 917).

### g. Iowa

Banas brings his implied warranty of merchantability claim under the Iowa UCC. (ECF No. 1, PageID.177 (citing Iowa Code § 554.2314).) To be merchantable, a good must be fit for the ordinary purposes for which such goods are used. Iowa Code § 554.2314(2)(c) (2025). The Iowa Supreme Court has recognized that automobiles are ordinarily used for transportation on public highways. *See Jacobson v. Benson Motors, Inc.*, 216 N.W.2d 396, 404 (Iowa 1974) ([The Chevelle Super Sport 396] is an automobile, albeit a sports car, ordinarily used for transportation on the public highways.").

"[W]arranty liability under Section 554.2314(2)(c) requires proof of a product defect as defined in Products Restatement section 2." *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 182 (Iowa 2002). "Therefore, a breach of warranty claim will require proof of the standard for either a manufacturing defect, a design defect, or a failure to warn." *Scott v. Dutton-Lainson Co.*, 774 N.W.2d 501, 505 n.2 (Iowa 2009). Under the Restatement, a product contains a manufacturing defect "when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product."

114

Restatement (Third) of Torts: Prod. Liab. § 2(a) (A.L.I. 1998). Further, a product contains a design defect "when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor . . . and the omission of the alternative design renders the product not reasonably safe." *Id.* at § 2(b).

Here, Banas alleges that he purchased a vehicle with a defect that could cause the vehicle to lose motive power and stop abruptly. (ECF No. 1, PageID.14 ¶ 3, PageID.33 ¶ 39, PageID.59 ¶¶ 86–87.) The source of the alleged defect is an internal transmission wiring connector that could short. (ECF No. 1-2, PageID.331.) The parties dispute whether the alleged defect is a manufacturing defect or a design defect (ECF No. 15, PageID.591; ECF No. 19, PageID.745–746), and the Court lacks sufficient information to decide one way or another. Regardless, Banas plausibly alleges that there is a manufacturing defect or a design defect such that he can maintain an implied warranty claim under Iowa law. Though Banas does not allege that the defect manifested in his vehicle, allegations in the complaint support a reasonable inference that the defect could prevent Banas' vehicle from providing transportation on

115

public highways, if the defect manifests. Further, FCA does not provide any Iowa authority requiring a plaintiff to allege a manifest defect to maintain an implied warranty of merchantability claim. Therefore, Banas plausibly alleges that his vehicle was not merchantable, and the Court declines to dismiss his implied warranty claim for lack of a manifest defect.

### h. Kansas

Vu brings his implied warranty of merchantability claim under the Kansas UCC. (ECF No. 1, PageID.181 (citing Kan. Stat. Ann. § 84-2-314).) To be merchantable, a good must be fit for the ordinary purposes for which such goods are used. Kan. Stat. Ann § 84-2-314(2)(c) (West 2025). To prove that a good is not fit for its ordinary purpose, "a plaintiff must show that the purchased goods were defective, that the defect was present when the goods left the seller's control, and that the defect caused the injury sustained by the plaintiff." *Hodges v. Johnson*, 199 P.3d 1251, 1261 (Kan. 2009) (citing *Dieker v. Case Corp.*, 73 P.3d 133, 146–147 (Kan. 2003)). *See also Stair v. Gaylord*, 659 P.2d 178, 184 (Kan. 1983) (citation omitted) ("[A] buyer can show a product is unmerchantable if it is defective when it leaves the manufacturer's control.").

116

Here, Vu plausibly alleges that his Pacifica PHEV contains a defect that could cause the vehicle to lose motive power and stop abruptly. (ECF No. 1, PageID.14 ¶ 3, PageID.34 ¶ 40, PageID.59 ¶¶ 86–87.) Vu also plausibly alleges that the vehicle was defective when it left FCA's control. (*See* ECF No. 1-2, PageID.331 ("An internal transmission wiring connector short could result in an unexpected engine shutdown under certain conditions.").) Finally, Vu plausibly alleges that the defect caused an economic injury because he alleges that he purchased and overpaid for a defective vehicle. (ECF No. 1, PageID.34–35 ¶ 40.) FCA provides no Kansas authority requiring a plaintiff to allege a manifest defect to maintain an implied warranty of merchantability claim. Therefore, Vu plausibly alleges that his vehicle was not merchantable, and the Court declines to dismiss his implied warranty claim for lack of a manifest defect.

### i.     Massachusetts

Alicia and David Maltz bring their implied warranty of merchantability claim under the Massachusetts UCC. (ECF No. 1, PageID.200 (citing Mass. Gen. Laws ch. 106, § 2-314).) To be merchantable, a good must be fit for the ordinary purposes for which such

goods are used. Mass. Gen. Laws ch. 106, § 2-314(2)(c) (2025). "As to automobiles, it has generally been held that a breach of the implied warranty of merchantability occurs only where a defect is so basic as to render the vehicle unfit for its ordinary purpose of providing safe, reliable transportation." *Finigan-Mirisola v. DaimlerChrysler Corp.*, No. 06-P-1168, 2007 WL 1977505, at *1 (Mass. App. Ct. July 9, 2007) (citation omitted). The Court must determine whether a defect must manifest for a plaintiff to maintain an implied warranty of merchantability claim under Massachusetts law.

Two cases from Massachusetts federal courts favor imposing a manifest defect requirement. *See Awalt v. Gen. Motors, LLC*, No. 21-cv-10111, 2023 WL 2743294, at *3 (D. Mass. Mar. 31, 2023) (dismissing an implied warranty of merchantability claim where plaintiff continued to drive his allegedly defective vehicle, and did not allege that he experienced any potential safety problems related to the defect or that the defect otherwise interfered with his safe operation of the vehicle); *Garick v. Mercedes-Benz USA, LLC*, No. 17-cv-12042, 2019 WL 3815178, at *4 (D. Mass. Mar. 29, 2019) (dismissing plaintiff's implied warranty of

118

merchantability claim because plaintiff's car operated for approximately a decade without issue).

However, one Massachusetts Superior Court allowed an implied warranty of merchantability claim to proceed even though none of the plaintiffs' goods failed. In *Holtzman v. General Motors Corp.*, plaintiffs complained that the tire jacks that came with their vehicles were subject to failure during normal use and were unreasonably dangerous. No. 021368, 2002 WL 1923883, at *1 (Mass. Super. Ct. July 2, 2002). However, none of the plaintiffs alleged that their tire jacks failed or that they used the jacks. *Id.* Despite the lack of actual jack failure, the court found that plaintiffs sufficiently alleged a breach of the implied warranty of merchantability because they alleged that: (1) the jacks were defective and unreasonably dangerous; (2) the jacks violated industry standards; and (3) the jacks' propensity to fail left users in great danger of death, injury, or being stranded with an inoperable vehicle. *Holtzman*, 2002 WL 1923883, at *2.

Yet, two Massachusetts federal courts have distinguished *Holtzman*. In *Rule v. Fort Dodge Animal Health, Inc.*, plaintiff alleged that a preventative heartworm medication for her animal caused an

119

economic injury following a recall by the manufacturer. 604 F. Supp. 2d 288, 291 (D. Mass. 2009). There, plaintiff gave her animal the prescribed two injections of the medication, her animal did not develop heartworm during the warranted protection period, and neither plaintiff nor her animal suffered adverse effects. *Id.* at 295. The court dismissed plaintiff's implied warranty of merchantability claim after concluding that she did not suffer a cognizable injury. *Id.* at 296. Addressing plaintiff's reliance on *Holtzman*, the court distinguished the case on the ground that the *Holtzman* plaintiffs "still possessed and had a justifiable expectation of being able to continue using car jacks that were unreasonably unsafe" whereas the *Rule* plaintiff "fully completed the intended usage of the medication." *Id.* at 295.

In *Watkins v. Omni Life Science, Inc.*, plaintiffs alleged that their hip implants were defective though they had not failed. 692 F. Supp. 2d 170, 173 (D. Mass. 2010). The court dismissed plaintiffs' tort claims for failure to plead a cognizable injury. *Watkins*, 692 F. Supp. 2d at 177. In doing so, the court distinguished *Holtzman* on two grounds. First, the court found that the case would likely be decided differently following Massachusetts' adoption of the *Twombly* pleading standard. *Id.* (citing

*Iannacchino v. Ford Motor Co.*, 888 N.E.2d 879, 890 (Mass. 2008)). Second, the court noted that, unlike in *Holtzman*, the hip implants functioned properly for 5–11 years, and hip implant failure would not expose plaintiffs or innocent bystanders to the possibility of injury or death. *Id.*

Despite the similarities between Alicia and David Maltz and the plaintiffs in *Awalt*, *Garick*, *Rule*, and *Watkins*, the Court is inclined to follow *Holtzman*. Like the other implied warranty of merchantability claims, state law governs Alicia and David Maltz's implied warranty claim. *Holtzman*, a Massachusetts trial court decision, leaves open the possibility that a plaintiff can maintain an implied warranty claim, even if their product does not manifest a defect. Like the defective tire jacks in *Holtzman*, the alleged defect can leave Alicia and David Maltz stranded with an inoperable vehicle. (ECF No. 1, PageID.14 ¶ 3, PageID.37 ¶ 45, PageID.59 ¶¶ 86–87.)

Further, *Garick* and *Awalt* did not consider *Holtzman*, and the product involved in this case is different than the products in *Watkins* and *Rule*. Unlike those cases, this case does not involve hip implants or a two-dose medication with a six-month protection period. These factual

121

distinctions are important because, unlike *Watkins*, the failure of the Maltz's vehicle could expose them and others to the possibility of death via a car accident. Further, for the *Rule* court, *Holtzman* was inapposite because the tire jacks had remaining useful lives whereas the medication did not. *See Rule*, 604 F. Supp. 2d at 295–296 (noting that the heartworm medication fulfilled its "anticipated useful life" and recognizing that other courts concluded that a plaintiff received the benefit of their bargain and did not suffer any "injury" where a product fulfilled its useful life "without any manifestation of defect"). But here, FCA does not argue, and the Court does not find, that the Maltz's vehicle fulfilled its useful life by the time they filed their complaint.

Notably, FCA provides no Massachusetts authority requiring a plaintiff to allege a manifest defect to maintain an implied warranty of merchantability claim. Therefore, despite the holdings of Massachusetts federal court, the Court follows *Holtzman*. Alicia and David Maltz have plausibly alleged that their vehicle was not merchantable, and the Court declines to dismiss their implied warranty claim for lack of a manifest defect.

### j.      Michigan

Huntington brings an implied warranty of merchantability claim under the Michigan UCC. (ECF No. 1, PageID.209 (citing Mich. Comp. Laws § 440.2314).) To be merchantable, a good must be fit for the ordinary purposes for which such goods are used. Mich. Comp. Laws § 440.2314(2)(c) (2025). This Court has recognized that the implied warranty of merchantability requires that a standard road vehicle be able to provide safe and reliable transportation. *Miller*, 773 F. Supp. 3d at 529 (quoting *Matanky v. Gen. Motors, LLC*, 370 F. Supp. 3d 772, 785 (E.D. Mich. 2019)).

"To establish a prima facie case of breach of implied warranty, a plaintiff must show that goods were defective when they left the possession of the manufacturer. . . ." *Guaranteed Const. Co. v. Gold Bond Prods.*, 395 N.W.2d 332, 336 (Mich. Ct. App. 1986) (citing *Kupkowski v. Avis Ford, Inc.*, 235 N.W.2d 324, 330 (Mich. 1975)).

Here, Huntington alleges that she purchased a vehicle with a defect that could cause the vehicle to lose motive power and stop abruptly. (ECF No. 1, PageID.14 ¶ 3, PageID.38–39 ¶ 47, PageID.59 ¶¶ 86–87.) It is reasonable to infer that if the defect manifests, the vehicle would be unfit

to provide safe and reliable transportation. Huntington also plausibly alleges that the defect existed when FCA originally sold her vehicle. (ECF No. 1, PageID.209 ¶ 653; ECF No. 1-2, PageID.331.) FCA does not provide any Michigan authority requiring a plaintiff to allege a manifest defect to maintain an implied warranty of merchantability claim. Therefore, Huntington plausibly alleges that her vehicle was not merchantable, and the Court declines to dismiss her implied warranty claim for lack of a manifest defect.

### k.   Ohio

Gadomski Littleton and Huntington bring implied warranty of merchantability claims in tort under Ohio common law. (ECF No. 1, PageID.255.) A tort claim for breach of the implied warranty of merchantability requires showing: "(1) 'the existence of a defect;' (2) 'the defect was present at the time the product left the hands of the manufacturer; and' (3) 'the plaintiff's injury was directly and proximately caused by the defect.'" *Caterpillar Fin. Servs.*, 50 N.E.3d at 963 (quoting *Johnson v. Monsanto Co.*, No. 11-02-02, 2002 WL 2030889, at *6 (Ohio Ct. App. Sept. 6, 2002)). "[A] defect is considered to exist in a product which is not 'of good and merchantable quality, fit and safe for * * * (its)

124

ordinary intended use.'" *Temple v. Wean United, Inc.*, 364 N.E.2d 267, 270 (Ohio 1977) (quoting *Lonzrick v. Republic Steel Corp.*, 218 N.E.2d 185, 191 (Ohio 1966)). Implied warranty of merchantability claims in tort are "within an entirely separate body of law from that applied under the UCC." *Caterpillar Fin. Servs.*, 50 N.E.3d at 963 (internal quotation marks omitted) (quoting *Monsanto*, 2002 WL 2030889, at *6).

At least one Ohio federal court has held that plaintiffs failed to state an implied warranty of merchantability in tort claim where: (1) plaintiffs drove their vehicles for years and for tens of thousands of miles without issue; and (2) plaintiffs received one or two repairs related to the defect which remedied any defect-related issue for at least six months and possibly permanently. *See Mooradian v. FCA US LLC*, No. 17-cv-1132, 2017 WL 4869060, at *7 (N.D. Ohio Oct. 27, 2017). Another Ohio federal court dismissed plaintiff's implied warranty in tort claim where plaintiff did not allege that: (1) the defect manifested in his vehicle; (2) his vehicle required defect-related repairs during his eight years of ownership; or (3) the defect caused sudden engine damage or engine failure. *See Szep v. Gen. Motors LLC*, 491 F. Supp. 3d 280, 292–293 (N.D. Ohio 2020). In the context of a contract-based implied warranty claim, an Ohio appellate

court held that a vehicle was merchantable where plaintiff drove the vehicle over 36,000 miles in three-plus years before the crankshaft broke. *Reyant v. Daimler-Benz A.G. Aktiengesellschaft*, No. C.A. NO. 8972, 1978 WL 215552, at \*3 (Ohio Ct. App. Dec. 29, 1978).

Here, Gadomski Littleton and Huntington allege that they purchased vehicles in 2021 and 2019, respectively, with a defect that could cause the vehicle to lose motive power and stop abruptly. (ECF No. 1, PageID.14 ¶ 3, PageID.38–39 ¶ 47, PageID.44–45 ¶ 56, PageID.59 ¶¶ 86–87.) They also allege that the defect was present when FCA originally sold their vehicles. (*Id.* at PageID.209 ¶ 653; ECF No. 1-2, PageID.331.) Finally, they allege that they suffered damages as a direct and proximate result of the defect. (ECF No. 1, PageID.257 ¶ 845.) The Ohio plaintiffs allege that they purchased and/or overpaid for defective vehicles for which they would not have otherwise purchased and/or overpaid. (*Id.* at PageID.38–39 ¶ 47, PageID.44–45 ¶ 56.) The defect, if it manifests, would render the vehicle unfit and unsafe for the purpose of providing transportation. (*See* ECF No. 1-2, PageID.331.) Therefore, the Ohio plaintiffs have plausibly alleged that their vehicles were not merchantable.

126

While *Mooradian* and *Szep* suggest that manifestation of a defect within a limited period of time after obtaining a vehicle is a requirement of implied warranty in tort claims, the Court does not find that requirement within Ohio law. Further, the Court is hesitant to apply *Reyant* because *Reyant* involved a contract-based implied warranty claim and Ohio appellate courts recognize that contract-based and tort-based implied warranty claims are within "entirely separate" bodies of law. *Caterpillar Fin. Servs.*, 50 N.E.3d at 963 (quoting *Monsanto*, 2002 WL 2030889, at *6). FCA does not provide any Ohio authority requiring a plaintiff to allege a manifest defect to maintain an implied warranty of merchantability in tort claim. Therefore, the Court declines to dismiss the Ohio plaintiffs' implied warranty of merchantability claims for lack of a manifest defect.

### l. Minnesota

Niemioja brings her implied warranty of merchantability claim under the Minnesota UCC. (ECF No. 1, PageID.226 (citing Minn. Stat. § 336.2-314).) To be merchantable, a good must be fit for the ordinary purposes for which such goods are used. Minn. Stat. § 336.2-314(2)(c) (2025). At least one Minnesota appellate court has applied the "safe-and-

127

reliable" transportation standard for determining the merchantability of vehicles. *See Tellinghuisen v. Chrysler Grp., LLC*, No. A13-2194, 2014 WL 4289014, at *3–4 (Minn. Ct. App. Sept. 2, 2014) (recognizing that other courts have held that a vehicle is merchantable if it provides safe and reliable transportation, discussing considerations under the standard, and applying those considerations to the facts of the case).

The Court must determine whether Minnesota law requires a defect to manifest for a plaintiff to maintain an implied warranty of merchantability claim. In *Tellinghuisen*, the court concluded that the trial court did not err in dismissing plaintiff's implied warranty claim where plaintiff drove her car nearly 31,000 miles over more than a year before the alleged defect—shaking in the steering wheel, a "droning" sound, and heat in the front braking area—manifested itself. 2014 WL 4289014, at *4 (internal quotation marks omitted). The *Tellinghuisen* court distinguished its facts from the facts of other cases allowing implied warranty claims that, according to the court, generally implicate minor defects that manifest early on or catastrophic defects that manifest within the reasonably expected life of a vehicle. *Id.*

128

Here, Niemioja alleges that she purchased a vehicle with a defect that could cause the vehicle to lose motive power and stop abruptly. (ECF No. 1, PageID.14 ¶ 3, PageID.39–40 ¶ 49, PageID.59 ¶¶ 86–87.) It is reasonable to infer that the alleged defect, if it manifests, could prevent the vehicle from providing safe and reliable transportation. Granted, Niemioja does not allege when she purchased her vehicle or that she ever experienced the alleged defect. However, unlike *Tellinghuisen*, the defect could cause an unexpected engine shutdown (ECF No. 1-2, PageID.331), and it could manifest during the useful life of the vehicle. (*See, e.g.,* ECF No. 1, PageID.69 (noting that a non-party Class Vehicle owner experienced a stall and abrupt loss of motive power with only 3,100 miles on the vehicle).) FCA does not provide any Minnesota authority requiring a plaintiff to allege a manifest defect to maintain an implied warranty of merchantability claim. Therefore, Niemioja plausibly alleges that her vehicle was not merchantable, and the Court declines to dismiss her implied warranty claim for lack of a manifest defect.

### m.   Rhode Island

Bartek brings her implied warranty of merchantability claim under the Rhode Island UCC. (ECF No. 1, PageID.286 (citing R.I. Gen. Laws §

6A-2-314).) To be merchantable, a good must be fit for the ordinary purposes for which such goods are used. 6a R.I. Gen. Laws Ann. § 6A-2-314(2)(c) (West 2025). To establish a breach of the implied warranty of merchantability, a plaintiff must "prove that the product is defective, that it was in a defective condition at the time it left the hands of the seller, and that said defect is the proximate cause of the injury." *Oberlander v. Gen. Motors Corp.*, 798 A.2d 376, 379 (R.I. 2002) (internal quotation marks omitted) (quoting *Lariviere v. Dayton Safety Ladder Co.*, 525 A.2d 892, 896 (R.I. 1987)).

Here, Bartek plausibly alleges that she purchased a vehicle with a defect that could cause the vehicle to lose motive power and stop abruptly. (ECF No. 1, PageID.14 ¶ 3, PageID.47–48 ¶ 61, PageID.59 ¶¶ 86–87.) Bartek also plausibly alleges that her vehicle was defective at the time it left FCA's possession. (ECF No. 1, PageID.286–287 ¶ 964.) Finally, Bartek plausibly alleges that the defect was the proximate cause of an economic loss injury; Bartek alleges that she purchased and overpaid for a vehicle for which she otherwise would not have purchased or overpaid. (*Id.* at PageID.47–48 ¶ 61.) The Court recognizes that "Rhode Island recognizes a cause of action for personal injuries based on breach

130

of the implied warranty of merchantability." *Castrignano v. E.R. Squibb & Sons, Inc.*, 546 A.2d 775, 783 (R.I. 1988). However, the Court is unaware of, and FCA does not cite, any Rhode Island authority indicating or suggesting that plaintiffs cannot maintain an implied warranty claim for economic injuries. FCA also provides no Rhode Island authority requiring a plaintiff to allege a manifest defect to maintain an implied warranty of merchantability claim. Therefore, Bartek plausibly alleges that her vehicle was not merchantable, and the Court declines to dismiss her implied warranty claim for lack of a manifest defect.

### n. Virginia

Golland brings his implied warranty of merchantability claim under the Virginia Commercial Code. (ECF No. 1, PageID.313 (citing Va. Code Ann. § 8.2-314).) To be merchantable, a good must be fit for the ordinary purposes for which such goods are used. Va. Code Ann. § 8.2-314(2)(c) (West 2025). To maintain a claim for breach of the implied warranty of merchantability, a plaintiff must show that: (1) "the goods were unreasonably dangerous either for the use to which they would ordinarily be put or for some other reasonably foreseeable purpose;" and (2) "that the unreasonably dangerous condition existed when the goods

131

left the defendant's hands." *Logan v. Montgomery Ward & Co., Inc.*, 219 S.E.2d 685, 687 (Va. 1975) (citations omitted). *See also Hyundai Motor Co., Ltd. v. Duncan*, 766 S.E.2d 893, 898 n.8 (Va. 2015) (noting that plaintiffs needed to prove that their vehicle "was unreasonably dangerous for the use to which it would ordinarily be put or some other foreseeable purpose and that such condition existed when the vehicle left" the manufacturer's hands to establish an implied warranty of merchantability claim). "A product is unreasonably dangerous if it is defective in assembly or manufacture, unreasonably dangerous in design, or unaccompanied by adequate warnings concerning its hazardous properties." *Morgen Indus., Inc. v. Vaughan*, 471 S.E.2d 489, 492 (Va. 1996) (citations omitted).

Here, Golland alleges that he purchased a vehicle with a defect that could cause the vehicle to lose motive power and stop abruptly. (ECF No. 1, PageID.14 ¶ 3, PageID.50–51 ¶ 65, PageID.59 ¶¶ 86–87.) It is reasonable for the Court to infer that the ordinary purpose of a vehicle is, at least, to provide transportation. While the parties dispute whether the defect is one of manufacturing or design (ECF No. 15, PageID.591; ECF No. 19, PageID.745–746), Golland plausibly alleges that a design or

manufacturing defect exists, rendering the vehicle unreasonably dangerous to provide transportation. (ECF No. 1, PageID.313–314 ¶ 1076.) Finally, Golland plausibly alleges that the defect existed when the vehicle left FCA's control. (*Id.*) FCA does not provide any Virginia authority requiring a plaintiff to allege a manifest defect to maintain an implied warranty of merchantability claim. Therefore, Golland plausibly alleges that his vehicle was not merchantable, and the Court declines to dismiss his implied warranty claim for lack of a manifest defect..

### 2.    Privity

FCA argues that the implied warranty claims under Florida, Illinois, Kansas, Missouri, and Washington law as well as under the California UCC require privity. (ECF No. 15, PageID.590.) Plaintiffs do not argue that they are in privity with FCA. Rather, they argue that those states either do not require privity or recognize an exception to the privity requirement for which plaintiffs qualify. (ECF No. 19, PageID.743–744.) The Court disagrees with plaintiffs regarding the Florida, Illinois, and Washington claims. However, the Court agrees with

133

plaintiffs regarding the Kansas claim.[14][15] The Court addresses each state in turn.

### a.    Florida

"Under Florida law, privity of contract is required to maintain an action for breach of an implied warranty." *Ocana v. Ford Motor Co.*, 992 So.2d 319, 325 (Fla. Dist. Ct. App. 2009) (citing *Kramer v. Piper Aircraft Corp.*, 520 So.2d 37 (Fla. 1988), *Weiss v. Johansen*, 898 So.2d 1009 (Fla. Dist. Ct. App. 2005), and *Spolski Gen. Contractor, Inc. v. Jett-Aire Corp. Aviation Mgmt. of Cent. Fla., Inc.*, 637 So.2d 968 (Fla. Dist. Ct. App. 1994)). The parties dispute whether a third-party beneficiary exception to the privity requirement exists under Florida law.[16] (ECF No. 19,

---

[14] The Court does not address this argument with respect to Missouri because there is no Missouri implied warranty of merchantability claim in the complaint. The Court is confused as to why the parties debated Missouri privity requirements in each brief. The Court **DENIES AS MOOT** FCA's motion to dismiss the non-existent Missouri implied warranty claim.

[15] The Court also does not address this argument as to California because the Court already dismissed the California implied warranty claim.

[16] To be sure, Latacki alleges that he is in privity with FCA based on "sufficient direct dealings with either FCA or its agents (dealerships)." (ECF No. 1, PageID.85 ¶ 125, PageID.139 ¶ 357.) Indeed, direct contacts between a manufacturer and remote buyer may give rise to an implied warranty of merchantability claim. *See Cedars of Lebanon Hosp. Corp. v. European X-Ray Distribs. of Am., Inc.*, 444 So.2d 1068, 1072 n.4 (Fla. Dist. Ct. App. 1984) ("Had there been no direct contact between the two parties, appellee's contention that there was no privity, and thus no liability for breach of warranties, would be correct. It is the direct contacts which create the express and implied warranties under sections 672.313 and 672.315, Florida Statutes (1981)."). However, Latacki does not argue this point in his brief, and the Court declines to make the argument for him. *See Brenay v. Schartow*, 709 F. App'x 331, 337 (6th Cir.

PageID.743–744 & n.16 (citing *Weiss v. Gen. Motors LLC*, 418 F. Supp. 3d 1173, 1183 (S.D. Fla. 2019)); ECF No. 21, PageID.830 (citing *Droesser v. Ford Motor Co.*, No. 19-cv-12365, 2023 WL 2746792, at \*15 (E.D. Mich. Mar. 31, 2023)).) An exception exists under Florida law, but the Court does not find that the exception applies.

The Florida UCC identifies three scenarios in which a seller's warranty to a buyer extends to third parties:

> A seller's warranty whether express or implied extends to any natural person who is in the family or household of his or her buyer, who is a guest in his or her home or who is an employee, servant or agent of his or her buyer if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty.

Fla. Stat. § 672.318 (2025). *See also Kramer*, 520 So.2d at 39 n.4 ("The implied warranty cause of action remains unaltered where privity of contract exists and in those cases which fall within the scope § 672.318, Fla.Stat. (1985), of the Florida Commercial Code.").[17]

---

2017) ("[I]t is not for the court to search the record and construct arguments. Parties must do that for themselves.").

[17] Some courts applying Florida law have considered a possible third-party beneficiary exception outside of these three circumstances. *See, e.g., Gonzalez v. Mazda Motor Corp.*, No. 16-cv-02087, 2017 WL 3283957, at \*6 (N.D. Cal. Aug. 1, 2017). To be sure, the third-party beneficiary provision of the statute "is neutral and is not intended to enlarge or restrict the developing case law on whether the seller's warranties, given to his buyer who resells, extend to other persons in the distributive chain." Fla. Stat. § 672.318 cmt. 3 (2025). Further, breach of implied warranty claims are "purely contract remedies." *Affiliates for Evaluation and Therapy, Inc. v. Viasyn*

135

Here, Latacki does not plausibly allege third-party beneficiary status. Latacki alleges that he was the third-party beneficiary of FCA's contracts with its authorized retailers. (ECF No. 1, PageID.137 ¶ 347) (citing Fla. Stat. § 672.318).) Latacki further alleges that "[t]he dealers were not intended to be the ultimate consumers of the Shutdown Risk Vehicles and have no rights under the warranty agreements provided with the Shutdown Risk Vehicles; the warranty agreements were designed for and intended to benefit consumers." (*Id.* at PageID.85 ¶ 125.) However, Latacki does not allege that he is in the family or household of the dealership from which he purchased his vehicle, that he is a guest in the home of the dealership, or that he is a servant or agent of the dealership. Latacki is neither in privity with FCA, nor a third-party

---

*Corp.*, 500 So.2d 688, 693 (Fla. Dist. Ct. App. 1987). Under Florida law, a non-party to a contract can maintain a suit for breach of contract if they "establish that the contract either expressly creates rights for them as a third party or that the provisions of the contract primarily and directly benefit the third party or a class of persons of which the third party is a member." *Greenacre Props. Inc. v. Rao*, 933 So.2d 19, 23 (Fla. Dist. Ct. App. 2006). However, the need for privity to maintain an implied warranty claim seems to be a hard rule for Florida courts. *See Mesa v. BMW of N. Am., LLC*, 904 So.2d 450, 458 (Fla. Dist. Ct. App. 2005) (rejecting an argument that the manufacturer's issuance of an express warranty created privity between the manufacturer and remote purchaser because the manufacturer issued the warranty to the intermediate dealer); *Ocana*, 992 So.2d at 326–327 (finding that insufficient allegations of an agency relationship between the manufacturer and dealer could not overcome "Florida's historic privity requirement"). Therefore, the Court declines to consider Florida third-party beneficiary law that is not specific to implied warranty of merchantability claims.

beneficiary to the contract between FCA and his dealership of purchase within the "three limited circumstances set out" in Section 672.318. *Rife v. Newell Brands, Inc.*, 632 F. Supp. 3d 1276, 1304 (S.D. Fla. 2022). Accordingly, Latacki cannot maintain an implied warranty of merchantability claim under Florida law. *See Rife*, 632 F. Supp. 3d at 1305 (holding that plaintiffs could not assert an implied warranty claim against manufacturer defendants as they were neither in privity with defendants nor third-party beneficiaries under § 672.318).

Latacki's citation to *Weiss v. General Motors LLC* does not save his claim. In *Weiss v. General Motors LLC*, the court reviewed the Southern District of Florida's conflicting case law on whether a third-party beneficiary exception exists and concluded that it does. 418 F. Supp. 3d at 1182–1183. However, three of the four cases that *Weiss* cites favorably—*Sanchez-Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1234 (S.D. Fla. 2014), *Ohio State Troopers Association v. Point Blank Enterprises*, No. 17-62051, 2018 WL 3109632, at *1 (S.D. Fla. Apr. 5, 2018), and *Feldman v. BRP US, Inc.*, No. 17-CIV-61150, 2018 WL 8300534, at *8 (S.D. Fla. Mar. 28, 2018)—ultimately rely on *Warren v. Monahan Beaches Jewelry Center, Inc.*, 548 So.2d 870 (Fla. Dist. Ct. App.

137

1989), either by citing *Warren* directly or citing cases that cite *Warren*. *See Weiss v. Gen. Motors LLC*, 418 F. Supp. 3d at 1183. *Warren* is distinguishable.

In *Warren*, the Florida appeals court considered whether plaintiff-appellant, the then-cohabitating-fiancé of the buyer of an engagement ring, could maintain a claim against defendant-appellee, the seller of the ring. 548 So.2d at 871–872. The trial court dismissed plaintiff's breach of implied warranty of merchantability claim, presumably because "the complaint failed to show plaintiff was an intended third-party beneficiary and therefore was not able to maintain an action based on the contract between" the buyer and seller. *Id.* at 872. The appeals court reversed and held that plaintiff was an intended third-party beneficiary of the contract between the buyer and seller. *Id.* The court's conclusion was based on the pre-contract dealings between the buyer and seller, which included: (1) discussions about the size, type, and style of the ring for the plaintiff; and (2) suggestions by the seller to the buyer about what plaintiff might like or dislike in the ring. *Id.* at 871–872. The appeals court also looked to the post-contract dealings between plaintiff and the seller, which included an agreement that the seller would replace the chipped stone in plaintiff's

138

ring at no cost with a stone of equal or greater value. *Id.* To the court, these dealings "clearly" established plaintiff-appellant "as an intended third party beneficiary of the contract at issue." *Id.* at 872.

Here, Latacki does not allege that a similar set of pre- and post-contract dealings occurred that "clearly express the parties' intent to create a right primarily and directly benefiting" Latacki. *Warren*, 548 So.2d at 872. Further, as one Florida federal court recognized, the plaintiff in *Warren* fell into the "in the family or household of" the buyer exception to the privity requirement in § 672.318. *Rife*, 632 F. Supp. 3d at 1304. As discussed, Latacki does not allege that he falls into any of the three exceptions to the privity requirement in § 672.318. Therefore, *Warren* is insufficient to save Latacki's claim.

The last case that *Weiss v. General Motors LLC* cites—"dicta" from *Varner v. Domestic Corporation*, No. 16-22482-Civ, 2017 WL 3730618, at *12 (S.D. Fla. 2017)—is also unpersuasive. *Weiss v. Gen. Motors LLC*, 418 F. Supp. 3d at 1183. *Varner* cites two Florida cases that discuss the third-party beneficiary exception to general breach of contract claims, not breach of implied warranty of merchantability claims. *Varner*, 2017 WL 3730618, at *12. As Latacki brings his implied warranty of

139

merchantability claim under the Florida UCC (ECF No. 1, PageID.136 (citing Fla. Stat. § 672.314)), the Court finds that § 672.318 controls over cases that discuss the third-party beneficiary exception to general breach of contract claims. Thus, *Varner* is not persuasive.

Accordingly, the court **DISMISSES** the Florida implied warranty of merchantability claim because Latacki is not in privity with FCA and the third-party beneficiary exception does not apply.

### b.      Illinois

Under Illinois law, a plaintiff cannot recover purely economic losses for a breach of the UCC implied warranty of merchantability unless there is vertical privity between the buyer and the seller. *Rothe v. Maloney Cadillac, Inc.*, 518 N.E.2d 1028, 1029–1030 (Ill. 1988). "[G]enerally[,] privity only extends to the parties to the sale and implied warranties are not applicable between the buyer and a remote manufacturer." *Frank's Maint. & Eng'g, Inc. v. C.A. Roberts Co.*, 408 N.E.2d 403, 412 (Ill. App. Ct. 1980). *Frank's* recognized four exceptions to this general rule: (1) a case falls within the scope of section 2-318 of the UCC; (2) a case falls within the scope of *Berry v. G.D. Searle & Co.*, 309 N.E.2d 550 (Ill. 1974); (3) there is a direct relationship between the manufacturer and the

buyer; and (4) "the manufacturer knew the identity, purpose and requirements of the dealer's customer and manufactured or delivered the goods specifically to meet those requirements." *Frank's*, 408 N.E.2d at 412.[18]

Su does not argue that exception one, two, or four applies, and the Court does not find that they apply. First, section 2-318 of the UCC, codified in Illinois at 810 Ill. Comp. Stat. 5/2-318 (2025), indicates that a seller's express or implied warranty extends to any natural purpose in the family or household of the buyer or who is a guest in the buyer's home. Like Latacki, Su neither alleges that that they are in the family or household of the dealership from which they purchased their vehicle nor that that they are a guest in the dealership's home. Second, *Berry* held that privity is not required for buyers seeking to hold manufacturers liable for personal injuries arising from the breach of an implied

---

[18] Regarding the third exception, *Frank's* uses the following language: "where there is a direct relationship between the manufacturer and the seller." 408 N.E.2d at 412. However, the case that *Frank's* cites for this exception—*Richards v. Goerg Boat and Motors, Inc.*, 384 N.E.2d 1084 (Ind. Ct. App. 1979)—analyzed the relationship between the manufacturer and the buyer. *See Richards*, 384 N.E.2d at 1092. Further, federal district courts applying the direct relationship exception have also analyzed the relationship between the manufacturer and the buyer. *See Abco Metals Corp. v. J.W. Imports Co., Inc.*, 560 F. Supp. 125, 128 (N.D. Ill. 1982); *Miller v. Emerson Elec. Co.*, No. 23-CV-03797, 2025 WL 964905, at *5 (N.D. Ill. Mar. 31, 2025). The Court finds that *Frank's* likely meant to say, "where there is a direct relationship between the manufacturer and the buyer."

warranty under the UCC. 309 N.E.2d at 558. Su only seeks recovery for economic losses (ECF No. 1, PageID.31–32 ¶ 37); Su does not allege suffering any personal injuries. Finally, Su does not allege that FCA knew Su's identity, purpose, or requirements, or that FCA manufactured or delivered the Pacifica PHEV specifically to meet Su's requirements. Therefore, exceptions one, two, and four do not apply to Su.

Su indirectly argues that the third exception applies; Su contends that "privity may be established where the defendant issues a warranty." (ECF No. 19, PageID.774.) Su cites *In re Rust-Oleum Restore Marketing, Sales Practices & Products Liability Litigation*, 155 F. Supp. 3d 772, 806–807 (N.D. Ill. 2016) in support, but Su's argument falls short. (ECF No. 19, PageID.774 n.17.) First, *Rust-Oleum* held that plaintiffs sufficiently alleged that they had direct dealings with a manufacturer —and thus were excused from the privity requirement—where they detailed the manufacturer's direct marketing campaign to consumers and alleged that consumers relied upon the manufacturer's misrepresentations and advertisements. *Rust-Oleum*, 155 F. Supp. 3d at 807. Plaintiffs also alleged specific instances where they viewed the manufacturer's advertisements and purchased a product in reliance on those

advertisements. *Id. Rust-Oleum* does not stand for the proposition that the act of a manufacturer issuing a warranty to a remote buyer is sufficient to establish a direct relationship between the manufacturer and remote buyer.

Second, Su does not argue that the direct relationship exception applies based on FCA's marketing of the Pacifica PHEV. Su certainly alleges that they were "aware of Chrysler's uniform and pervasive marketing messages of dependability and safety" of the Pacifica PHEV and that the messages were one of the "primary reasons" they purchased the vehicle. (ECF No. 1, PageID.31–32 ¶ 37.) However, the Court declines to turn Su's allegations into an argument. Even if Su did make that argument, the Court is not persuaded that FCA's generic marketing triggers the direct relationship exception. *See Miller*, 2025 WL 964905, at *5 (finding that manufacturer-to-buyer communications via website content, a warranty, an owner's manual, labeling, and marketing were "just the ordinary general communications between manufacturers and consumers, not specific, direct communications" between the manufacturer and remote buyer "when she made the purchase").

Further, Su's allegations stand in stark contrast to the facts in *Richards*, the case that *Frank's* cited favorably for the direct relationship exception. *See Frank's*, 408 N.E.2d at 412. In *Richards*, plaintiffs talked with a houseboat manufacturer's agents at a boat show, partook in a "demonstration and inspection ride" at manufacturer's plant, "dealt directly with the manufacturer concerning problems with the boat and the corrective measures to be taken," received direct assurances from manufacturer's salesperson before the sale, and "received the carpenter's certificate and warranty upon final payment to" the manufacturer. 384 N.E.2d at 1092. On those facts, the court concluded that the buyer and manufacturer "had a direct relationship involving the contract of sale," even though the buyer purchased the houseboat from a dealer. *Id.* Su does not allege a similar level of interaction with FCA.

Accordingly, the court **DISMISSES** Su's Illinois implied warranty of merchantability claim because Su is not in privity with FCA and no exception applies.[19]

---

[19] Su also cites *Bolt*, 2022 WL 4686974, at *37, *Elward v. Electrolux Home Prods., Inc.*, 214 F. Supp. 3d 701, 704–705 (N.D. Ill. 2016), and *Milisits v. FCA US LCC*, No. 20-cv-11578, 2021 WL 3145704, at *3 (E.D. Mich. July 26, 2021) for the proposition that privity is a fact-intensive inquiry better suited for summary judgment. (ECF No. 19, PageID.744.) While that may be true, Su does not give the Court a reason to think that the allegations in the complaint regarding privity are sufficient to allow the

### c.     Washington

Generally, a buyer who did not purchase a good directly from a manufacturer cannot recover from the manufacturer for breach of implied warranty. *Tex Enters., Inc. v. Brockway Standard, Inc.*, 66 P.3d 625, 628 (Wash. 2003). Washington recognizes an exception to this general rule where a buyer is the intended third-party beneficiary of the implied warranty that the manufacturer gave to the intermediate dealer. *Id.* (citing *Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Const., Inc.*, 831 P.2d 724, 729–731 (Wash. 1992)). Washington courts look to the "sum of the interaction and expectations between the purchaser and the manufacturer" to determine if the purchaser is an intended third-party beneficiary. *Touchet Valley*, 831 P.2d at 730 (discussing *Kadiak Fisheries Co. v. Murphy Diesel Co.*, 422 P.2d 496 (1967)). *See also Babb v. Regal Marine Indus., Inc.*, No. 43934-4-II, 2015 WL 786857, at *3 (Wash. Ct. App. Feb. 24, 2015) (citing *Touchet Valley*, 831 P.2d at 729–731) ("Our courts apply the 'sum of the interaction' test essentially to determine whether the manufacturer was sufficiently

---

implied warranty claim to advance past this stage. Again, with respect to this claim, Su only argues that "[u]nder Illinois law, privity may be established where the defendant issues a warranty, as FCA did here." (*Id.*) Su could have, but chose not to, identify other allegations in the complaint to support their privity argument.

involved in the transaction (including post-sale) with the remote purchaser to warrant enforcement of an implied warranty.").

In *Kadiak*, the court concluded that a remote purchaser of a marine diesel motor was an intended third-party beneficiary of the sale of the motor from a manufacturer to a dealer. 422 P.2d at 498, 503. There, the manufacturer: (1) knew the "identity, the purpose, and requirements" of the remote purchaser; (2) "engineered and constructed the motor to meet certain specifications . . . furnished to it" by the dealer and one of the manufacturer's regional sales representatives; (3) shipped the motor directly to the remote purchaser; (4) communicated directly with the remote purchaser before and after shipment; (5) sent a company official, regional sales representative, and factory service man to visit the purchaser's boat "on various occasions before and during installation of the motor;" and (6) had the service man participate in adjustments and corrections to the motor for the final trial run. *Kadiak*, 422 P.2d at 503. After the boat caught fire, purportedly due to a defect in the motor, and the motor developed other mechanical issues, the manufacturer "furnished new parts and dispatched factory service men to correct the

146

situation, at the behest of [the dealer] as well as [the remote purchaser]."
*Id.*

In *Touchet Valley*, the court similarly held that a remote purchaser
of a grain storage building was the intended-third party beneficiary of
the implied warranties that the building's designer and component
supplier gave to the building's constructor. 831 P.2d at 726, 730–731.
Like in *Kadiak*, the designer and component supplier in *Touchet Valley*:
(1) knew the purchaser's "identity, its purpose and its requirements for
the grain storage building;" (2) designed the building knowing that the
specifications belonged to the purchaser; (3) delivered the components
directly to the purchaser's construction site; and (4) attempted repairs
alongside the construction company when the building's frame first
buckled at the roof. *Id.* at 726, 730.

Alternatively, in *Babb*, the court found that the remote purchaser
of a boat was not the intended third-party beneficiary between the
manufacturer and a dealer where the manufacturer: (1) did not know the
purchaser's identity or purpose; (2) did not build the boat specifically with
the purchaser's requirements in mind; and (3) "built a version of one of
its ostensibly ordinary models" and then sold and shipped the boat to one

147

of its dealers. 2015 WL 786857, at *5. After the boat experienced engine issues, the manufacturer and the purchaser talked over the phone, and the manufacturer sent the purchaser a new wake board tower. *Babb*, 2015 WL 786857, at *5. However, the manufacturer refused to cover any repair costs because the engine had a separate warranty through its own manufacturer. *Id.*

Here, looking to the sum of the interactions between Benzur and FCA, Benzur does not plausibly allege third-party beneficiary status. Benzur does not allege that FCA knew her, her purpose, or the things she required in a vehicle. Like in *Babb*, it appears that FCA built one of its off-the-shelf Pacifica PHEVs and sold it a dealership, who then sold it to Benzur. The only pre-sale interaction that Benzur alleges she had with FCA is general awareness "of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode and in gas mode." (ECF No. 1, PageID.52–53 ¶ 69.) Benzur does not allege that she had any post-sale interaction with FCA. Benzur's allegations show significantly less interaction with FCA compared to the interaction between the purchasers and manufacturers in *Kadiak*, *Touchet Valley*, and *Babb*.

148

Therefore, Benzur does not plausibly allege that she was the intended third-party beneficiary of the contract between FCA and its dealer. Accordingly, the Court **DISMISSES** the Washington implied warranty of merchantability claim.

### d. Kansas

Kansas law generally requires privity between a buyer and manufacturer for the buyer to recover for pure economic losses under the implied warranty of merchantability. *Pro. Lens Plan, Inc. v. Polaris Leasing Corp.*, 675 P.2d 887, 898–899 (Kan. 1984). However, under Kansas statute, "[n]otwithstanding any provision of law, no action for breach of warranty with respect to property subject to a consumer transaction shall fail because of a lack of privity between the claimant and the party against whom the claim is made." Kan. Stat. Ann. § 50-639(b) (West 2025). In an unpublished opinion, the Kansas Court of Appeals concluded that § 50-639(b) evinces an intent by the state legislature to remove the privity requirement for warranty claims respecting property, including implied warranty claims sounding in contract. *Raskin v. Altamira, L.L.C.*, No. 101,444, 2010 WL 2852577, at *4 (Kan. Ct. App. July 16, 2010). Further, one Kansas federal court

extensively discussed this issue and concluded that § 50-639(b) "has abolished any privity requirement in an action for breach of the implied warranty of merchantability involving a consumer transaction under Kansas law." *Pepsico, Inc.*, 489 F. Supp. 2d at 1246.

The Court is persuaded that Kansas law does not require that Vu and FCA be in privity for Vu to maintain an implied warranty claim against FCA. FCA resists this conclusion by arguing that *Pepsico, Inc.* indicates that privity is waived only where there is personal injury. (ECF No. 21, PageID.830.) *Pepsico, Inc.* does not stand for that proposition. Further, the *Pepsico, Inc.* plaintiffs only suffered economic losses, not personal injuries, and the court allowed the implied warranty claims to proceed. *Pepsico, Inc.*, 489 F. Supp. 2d at 1239, 1246–1247. Accordingly, the Court declines to dismiss the Kansas implied warranty claim for lack of privity.

### 3.   Presentment

FCA argues that plaintiffs cannot maintain their implied warranty claims without pleading facts showing that they requested and did not receive a repair during the warranty period. (ECF No. 15, PageID.589.) Plaintiffs contend that FCA breached the implied warranty of

150

merchantability at the time of purchase. (ECF No. 19, PageID.743.) Plaintiffs have the better argument.

For the remaining implied warranty claims, a breach of the implied warranty of merchantability occurs at tender of delivery and/or is based on the condition of the good at the time of sale. *See Kapp v. Am. Builders & Contractors Supply Co., Inc.*, No. 14-1868, 2015 WL 4936309, at *1 (Iowa Ct. App. Aug. 19, 2015) (quoting *Speight v. Walters Dev. Co., Ltd.*, 744 N.W.2d 108, 116 (Iowa 2008)) ("Our Supreme Court has made clear that under [Iowa Code] section 554.2725(2), 'all actions for breach of implied warranty accrue at the time of delivery, not at the time the damage is discovered.'"); *Limestone Farms, Inc. v. Deere & Co.*, 29 P.3d 457, 461 (Kan. Ct. App. 2001) (citing *Black v. Don Schmid Motor, Inc.*, 657 P.2d 517, 520 (Kan. 1983)) ("To establish a breach of [the implied warranty of merchantability], a buyer must show the goods were defective and the defect existed at the time of the sale."); *Geary v. OE Plus, LTD*, Nos. 041135, 0401028, 2005 WL 3670415, at *4 (Mass. Super. Ct. Nov. 8, 2005) (citing *Fernandes v. Union Bookbinding Co.*, 507 N.E.2d 728, 734 (Mass. 1987)) ("An essential element of the plaintiffs' claim for breach of the implied warranty of merchantability is that the defective

151

condition which existed at the time of the sale of the product was a cause of the plaintiffs' injury."); *Hensley v. Colonial Dodge, Inc.*, 245 N.W.2d 142, 144 (Mich. Ct. App. 1976) (citing Mich. Comp. Laws § 440.2725(2)) ("It should also be noted that an implied warranty, as here, is breached when tender of delivery is made and does not extend to later performance of the goods unless this is expressly provided for."); *Caterpillar Fin. Servs.*, 50 N.E.3d at 963 (quoting *Monsanto*, 2002 WL 2030889, at *6) (noting that an Ohio claim for breach of implied warranty in tort requires plaintiff to show that the defect was present at the time the product left the hands of the manufacturer); *Nelson v. Int'l Harvester Corp.*, 394 N.W.2d 578, 581–582 (Minn. Ct. App. 1986) (affirming that the breach of the implied warranty of merchantability occurs when tender of delivery is made), *overruled on other grounds by, Lloyd F. Smith Co. v. Den-Tal-Ez, Inc.*, 491 N.W.2d 11, 17 (Minn. 1992); *Dent v. PRRC, Inc.*, 184 A.3d 649, 656 (R.I. 2018) (quoting *Lariviere*, 525 A.2d at 896) (noting that a claim for breach of the implied warranty of merchantability requires a plaintiff to prove that a product was defective when it left the hands of the seller); *Logan*, 219 S.E.2d at 687 (noting that a Virginia plaintiff must show that "the unreasonably dangerous condition existed when the goods

152

left the defendant's hands" to establish a breach of implied warranty claim). Therefore, the Court does not find that plaintiffs need to allege that they requested and did not receive repairs to their Pacifica PHEVs.

FCA resists this conclusion by citing two cases from courts in this district. (ECF No. 15, PageID.589 (citing *Hall*, 2020 WL 1285636, at *11 and *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 759, 762 (E.D. Mich. 2017)).) Neither case is persuasive.

In *Hall*, the court cited *In re Ford Motor Co. Speed Control Deactivation Switch Products Liability Litigation*, No. 1718, 2007 WL 2421480, at *7 (E.D. Mich. Aug. 24, 2007) for the proposition that a plaintiff must seek warranty service within the warranty period to maintain an implied warranty of merchantability claim. *Hall*, 2020 WL 1285636, at *11. In *Speed Control*, the manufacturer's limited warranty ran for three years or 36,000 miles, whichever occurred first, and the warranty period explicitly applied to warranty claims made pursuant to implied warranties. *Speed Control*, 2007 WL 2421480, at *7. The *Speed Control* court found that the warranty period expired before any plaintiff asserted a warranty claim. *Id. Hall* applied *Speed Control* and dismissed plaintiffs' implied warranty claims, in part, because plaintiffs sought

153

repairs "long after their implied warranties expired." *Hall*, 2020 WL 1285636, at *11.

Here, FCA does not: (1) identify an applicable warranty period; (2) identify whether a warranty period temporally limits plaintiffs' implied warranty of merchantability claims; or (3) argue that the warranty period expired before plaintiffs could have sought repairs or brought their implied warranty claims. Thus, *Hall* and *Speed Control* are not persuasive. Additionally, as discussed below, plaintiffs plausibly allege that it would have been futile to seek repairs for the alleged defect.

In *Beck*, the court declined to dismiss plaintiff's implied warranty claim on the ground that the implied warranty was not in effect when plaintiff encountered a problem with his vehicle. 273 F. Supp. 2d at 759–761. The Court applied California law to plaintiff's California implied warranty of merchantability claim and found that the defect in plaintiff's vehicle was latent, existed at the time of sale, and thus was not limited by a California law that limits the duration of an implied warranty to one year. *Beck*, 273 F. Supp. 2d at 760–761. The Court does not find that *Beck* stands for the proposition that a plaintiff must present their vehicle for repair to maintain an implied warranty of merchantability claim.

154

Accordingly, the Court declines to dismiss the remaining implied warranty claims for lack of presentment.[20]

### E. Express Warranty

#### 1. Manufacturing or Design Defect

FCA argues that the express warranty claims fail because the Basic Limited Warranty "only covers defects in material, workmanship, or factory preparation," and the alleged defect is a design defect. (ECF No. 15, PageID.591.) Plaintiffs contend that the alleged defect is not strictly a design defect. (ECF No. 19, PageID.745.) Plaintiffs also contend that courts have rejected efforts by automobile manufacturers to distinguish between manufacturing and design defects at the motion to dismiss stage. (*Id.*) The Court declines to dismiss the express warranty claims on this ground.

The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on the Class Vehicles when it left FCA's plant "that is defective in material, workmanship, or factory preparation."

---

[20] FCA also argues that the California, Florida, Illinois, Missouri, and Texas implied warranty claims fail for lack of pre-suit notice. (ECF No. 15, PageID.590.) The Court need not address this argument. The Court has already dismissed the California, Florida, Illinois, and Texas implied warranty claims. As mentioned, there is no Missouri implied warranty claim in the complaint.

(ECF No. 15-2, PageID.603; ECF No. 15-3, PageID.640.) According to the recall report, "[a]n internal transmission wiring connector short" can cause the Class Vehicles to unexpectedly shutdown under certain conditions. (ECF No. 1-2, PageID.331.)

Plaintiffs attribute the alleged defect to poor design. (*See* ECF No. 1, PageID.102 ¶ 202 ("In the course of its business, FCA concealed . . . its failure to adequately design and test the vehicles to ensure their safety . . . .").) However, plaintiffs also attribute the alleged defect to non-design issues. (*See id.* at PageID.60 ¶ 89 ("FCA failed to adequately research, design, test, and manufacture the Shutdown Risk vehicles . . . ."); PageID.102 ¶ 201 ("FCA knew the Shutdown Risk Vehicles were defectively designed and/or manufactured, were prone to spontaneous shutdown and loss of motive power and were not suitable for their intended use."). The Court does not find that plaintiffs commit to one theory of a defect.

Further, neither side adequately briefs the issue of whether the alleged defect is a design defect or a defect in material, workmanship, or factory preparation. The closest the parties come is in citing cases on whether the existence of a defect in multiple vehicles is evidence of a

156

design defect. (*Compare,* ECF No. 15, PageID.591, *with,* ECF No. 19, PageID.745–746.) Even these cases do not persuade the Court one way or another. Three of the four cases that FCA cites analyze New Jersey, California, and United States Court of Appeals for the Second Circuit understandings of what constitutes a manufacturing defect versus a design defect. *See Coba v. Ford Motor Co.*, 932 F. 3d 114, 123 (3d Cir. 2019) ("[W]e conclude that, under New Jersey law, a warranty that limits its coverage to defects in 'materials' and 'workmanship' does not, without more, apply to defects in 'design.'"); *Woo v. Am Honda Motor Co., Inc.*, 462 F. Supp. 3d 1009, 1017 (N.D. Cal. 2020) (quoting *McCabe v. Am. Honda Motor Co.*, 123 Cal. Rptr. 2d 303, 310 (Cal. Ct. App. 2002)) ("A 'design defect' exists 'when the product is built in accordance with its intended specifications, but the design itself is inherently defective.'"); *Garcia v. Chrysler Grp. LLC*, 127 F. Supp. 3d 212, 226–227 (S.D.N.Y. 2015) (alterations and omissions in original) (quoting *McCarthy v. Olin Corp.*, 119 F.3d 148, 154–155 (2d Cir. 1997) ("'[A] manufacturing defect . . . results when a mistake in manufacturing renders a product that is ordinarily safe dangerous so that it causes harm' and 'a design defect . . . results when the product as designed is unreasonably dangerous for its

157

intended use.'"). However, plaintiffs do not bring express warranty claims under the laws of California, New Jersey, New York, Vermont, or Connecticut. The fourth case that FCA cites—*Szep*, 491 F. Supp. 3d at 292—is distinguishable because, unlike here, the *Szep* plaintiff attributed the defect solely to a design flaw.

Equally unpersuasive on the question of whether the alleged defect is one of manufacturing or design are plaintiffs' cases, *Francis* and *Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 288 (E.D. Mich. 2021). In both cases, the court essentially drew all reasonable inferences in plaintiffs' favor and concluded that allegations of a defect in a class of vehicles does not preclude the possibility of a manufacturing defect. *See Francis*, 504 F. Supp. 3d at 672–674; *Gregorio*, 522 F. Supp. 3d at 287–288. Further, neither case analyzed the difference between manufacturing and design defects under the laws of the states from which plaintiffs brought their claims. *See Francis*, 504 F. Supp. 3d at 673–674; *Gregorio*, 522 F. Supp. 3d at 287–288.

The Court follows the *Gregorio* approach and leaves the issue of what type of defect plaintiffs allege "for another day." 522 F. Supp. 3d at 288. Using definitions from *Coba*, a case that FCA cites, it is plausible

158

that the internal wiring connector short in the Class Vehicles could be a defect in workmanship: "a deficiency in the execution of a product's assembly or construction." *Coba*, 932 F.3d at 121 (citation omitted). It is equally plausible that the internal wiring connector short could be a defect in materials: "a failing in the quality of the actual substances used to make a product." *Id.* (citation omitted). After all, the safety recall report indicates that the two "involved components" related to the alleged defect are harness assemblies. (ECF No. 1-2, PageID.332.) Further, it is equally plausible that the internal wiring connector short is a design defect: "a flaw inherent in the product's intended operation and construction." *Id.* (citation omitted). The Court lacks sufficient information to decide whether plaintiffs have plausibly alleged one type of defect over another. As the *Monostable* court observed,

> At this early stage of the case, without the benefit of any factual development as to the cause and origin of the alleged defect, dismissal of the express warranty claims is not justified by a premature and uninformed classification of the alleged defect as being categorically in the realm of "design" or "manufacturing."

*Monostable*, 280 F. Supp. 3d at 1011. Accordingly, the Court declines to dismiss the express warranty claims on this ground.

159

### 2.    Presentment and Futility

FCA argues that plaintiffs' express warranty claims fail because plaintiffs fail to allege a breach of warranty. (ECF No. 15, PageID.592–593.) FCA contends that: (1) it does not warrant a defect-free vehicle; (2) its warranties provide notice that a vehicle may have defects; and (3) no plaintiff presented their vehicle for repair. (*Id.*) Plaintiffs contend that several of them presented their vehicles for repair and that FCA breached the express warranty by not offering plaintiffs a remedy for the alleged defect. (ECF No. 19, PageID.746.) Plaintiffs also contend that presenting their vehicles for repair would have been futile. (*Id.* at PageID.746–747.) The Court ultimately agrees with plaintiffs.

As mentioned, the Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on the Class Vehicles when it left FCA's plant "that is defective in material, workmanship, or factory preparation." (ECF No. 15-2, PageID.603; ECF No. 15-3, PageID.640.) A breach of this warranty would arise from FCA's failure to repair a covered defective item at no cost to the customer. Thus, FCA's arguments about not warranting a defect-free vehicle and mentioning to customers that a

160

vehicle may exhibit defects do not implicate whether or not it breached its warranty.

Though, FCA's argument that plaintiffs needed to present their vehicles for repair to take advantage of the Basic Limited Warranty seems persuasive. Plaintiffs do not allege that they presented their vehicles to FCA for a repair related to the alleged shutdown defect; they only allege that they presented their vehicles for a repair related to a separate defect that involved a fire risk. (*See* ECF No. 1, PageID.29 ¶ 32, PageID.38 ¶ 46, PageID.39 ¶ 48, PageID.40 ¶ 50, PageID.41 ¶ 52, PageID.47 ¶ 60, PageID.50 ¶ 64, PageID.51 ¶ 66.) Further, the Court cannot reasonably infer that plaintiffs presented their vehicles for a repair related to both defects because none of the plaintiffs allege: (1) the date that FCA recalled their vehicles for the fire risk; (2) the date that they presented their vehicles for the fire risk repair; or (3) that their vehicles were still in the shop for the fire risk repair when FCA issued the recall for the alleged shutdown defect.

However, the Court finds that this is one of the rare cases where plaintiffs plausibly allege that presenting their vehicles for repair would have been futile. Courts in this district and around the country recognize

161

a possible futility exception to the presentment requirement. *See McCabe v. Ford Motor Co.*, 720 F. Supp. 3d 14, 24 (D. Mass. 2024) (citations omitted) ("Some courts, however, have excused a failure to present a product to a dealer for repair or replacement under an express warranty on the ground of futility."); *Bolt*, 633 F. Supp. 3d at 976 ("The Court is persuaded that Plaintiffs have alleged enough to establish that it would have been futile to present their vehicles for repair."); *In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 706 F. Supp. 3d 746, 783 (E.D. Mich. 2023) ("[I]t has been held widely that presentment should be excused where . . . it is allegedly plausible that presentment would be futile, based on a manufacturer's demonstrated inability or refusal to make effective repairs."); *Benkle v. Ford Motor Co.*, No. SA CV 16-1569-DOC (JCGx), 2017 WL 9486154, at *12 (C.D. Cal. Dec. 22, 2017) ("Further, because Plaintiffs have alleged that a repair would have been inadequate, California Plaintiffs' [sic] were not required to allege that they presented their vehicles for repair."); *Gertz v. Toyota Motor Corp.*, No. CV 10-1089 PSG (VBKx), 2011 WL 3681647, at *3 (C.D. Cal. Aug. 22, 2011) (finding that plaintiffs express warranty claims did not fail for lack of presentment where plaintiffs alleged that they complained to a dealer

about an issue with their vehicle and learned from the dealer that there was no fix to the issue). *But see Tershakovec v. Ford Motor Co.*, 546 F. Supp. 3d 1348. 1367 (S.D. Fla. 2021) ("Unfortunately for Plaintiffs, the dealers' performance of their obligation means turning customers away without a solution, but the Court will not excuse Plaintiffs' presentment under the warranty merely because that presentment would be futile."), *aff'd on other grounds and rev'd on other grounds*, 79 F.4th 1299, 1316 (11th Cir. 2023).

To establish futility, based on the above cited case law, a plaintiff must plausibly allege that "there is a defect common to all class vehicles; that [manufacturer] was consistently unable to fix the defect; and that any repairs or mitigation that [manufacturer] offered were insufficient." *Bolt*, 633 F. Supp. 3d at 976 (citing *Gregorio*, 522 F. Supp. 3d at 289). Futility cannot be based on "the purely subject belief of the owner" or allegations that "some other owners had similar problems, or that the manufacturer sometimes struggled to fix" the defective good. *McCabe*, 720 F. Supp. 3d at 24. Futility "must be based on an objectively reasonable belief arising out of the manufacturer's own conduct or statements." *Id.* Conclusory allegations of futility are insufficient. *Id.*

163

Here, plaintiffs allege that the alleged shutdown defect can appear in all Class Vehicles. (ECF No. 1-2, PageID.331.) Plaintiffs also plausibly allege that FCA was unable to fix the defect and that any offered repairs were insufficient. According to an FCA recall advanced communication to dealers, issued eight days before plaintiffs filed their complaint, a remedy for the shutdown risk condition was "not currently available." (ECF No. 1, PageID.18 ¶ 13 n.5; ECF No. 1-3, PageID.335.) Instead, according to the safety recall report, FCA planned to offer a software update to all class vehicles "providing messaging to the customer and sufficient drive time to exit traffic." (ECF No. 1-2 PageID.333.) Notably, the software update was the result of a four-and-a-half-month investigation into the defect. (*Id.* at PageID.332.) Further, as plaintiffs point out, the safety recall report indicates that FCA did not plan on notifying dealers or owners of the recall until March 8, 2023, over a month after plaintiffs filed their complaint. (ECF No. 1-2, PageID.333.) Thus, plaintiffs' futility fears appear objectively reasonable and rooted in FCA's communications to NHTSA and to dealers.

On similar facts, courts in this district have accepted the futility argument. *See Chrysler Pacifica Fire Recall*, 706 F. Supp. 3d at 783

(discussing the futility exception to presentment where plaintiffs alleged that they presented their vehicles to receive the recall remedy, but the manufacturer's software update repair did not fix the issue); *Bolt*, 633 F. Supp. 3d at 976 (declining to dismiss plaintiffs' warranty claims for lack of presentment where plaintiffs alleged that: (1) there was a defect common to all vehicles; (2) the manufacturer was consistently unable to repair or replace the faulty component; and (3) the manufacturer instructed plaintiffs that no replacements for the faulty component were yet available). Accordingly, the Court declines to dismiss the express warranty claims for lack of presentment.

### 3.    Pre-Suit Notice

FCA argues that plaintiffs' express warranty claims fail for lack of adequate pre-suit notice of their claims. (ECF No. 15, PageID.593.) Plaintiffs disagree, contending that they provided FCA written notice of alleged wrongdoing in a letter dated January 30, 2023, two days before plaintiffs filed their complaint. (ECF No. 19, PageID.744.) Plaintiffs also generally contend that FCA had notice of the defect via consumer complaints, FCA's own testing, the filing of this complaint, and the filing of predecessor actions. (*Id.* at PageID.744–745.) FCA does not respond to

165

these arguments in their reply brief. The Court ultimately agrees with plaintiffs and declines to dismiss the express warranty claims for lack of pre-suit notice

Plaintiffs bring their claims under their respective state's UCC. (*See* ECF No. 1, PageID.137, 203, 211, 226, 237, 276, 302, 315.) Under each state's UCC, if a buyer accepts nonconforming goods, they must notify the seller of any breach within a reasonable time after they discover or should have discovered the breach. Fla. Stat. § 672.607(3)(a) (2025); *U.S. Fid. & Guar. Co. v. N. Am. Steel Corp.*, 335 So.2d 18, 22 (Fla. Dist. Ct. App. 1976); Mass. Gen. Laws ch. 106, § 2-607(3)(a) (2025); *P & F Const. Corp. v. Friend Lumber Corp. of Medford*, 575 N.E.2d 61, 63 (Mass. App. Ct. 1991); Mich. Comp. Laws § 440.2607(3)(a) (2025); *Bev Smith, Inc. v. Atwell*, 836 N.W.2d 872, 881 (Mich. Ct. App. 2013); Minn. Stat. § 336.2-607(3)(a) (2025); *Tellinghuisen*, 2014 WL 4289014, at *2; Mo. Rev. Stat. § 400.2-607(3)(a) (2025); 13 Pa. Cons. Stat. § 2607(c)(1) (2025); *Rad Servs., Inc. v. Am. Refin. Grp., Inc.*, 479 A.2d 565, 566–567 (Pa. Super. Ct. 1984); Tex. Bus. & Com. Code Ann. § 2.607(c)(1) (West 2025); Va. Code Ann. § 8.2-607(3)(a) (West 2025); *Clarendon Nat. Ins. v. M&F of Richmond*, 62 Va. Cir. 305, at *1 (Va. Cir. Ct. 2003). Each state

166

recognizes that whether a plaintiff provided notice within a reasonable time turns on the nature, purpose, and circumstances of the notice. *See* Fla. Stat. § 671.204(a) (2025); Mass. Gen. Laws ch. 106, § 1-205(a) (2025); Mich. Comp. Laws § 440.1205(1) (2025); Minn. Stat. § 336.1-205(a) (2025); Mo. Rev. Stat. § 400.1-205(a) (2025); 13 Pa. Cons. Stat. § 1205(a) (2025); Tex. Bus. & Com. Code Ann. § 1.205(a) (West 2025); Va. Code Ann. § 8.1A-205(a) (West 2025). The states acknowledge that the notice requirement serves one or multiple purposes, including: (1) opening the way for settlement through negotiation (*P & F Const.*, 575 N.E.2d at 63; *Am. Bumper & Mfg. Co. v. Transtechnology Corp.*, 652 N.W.2d 252, 256 (Mich. Ct. App. 2002) (citations omitted); *Beneficial Comm. Corp. v. Brueck*, 23 Pa. D. & C.3d 34, 37 (Pa. C.P. Ct. 1982) (citations omitted); *Bd. of Dirs. of Bay Point Condo. Ass'n, Inc. v. RML Corp.*, No. L 99-475, 2002 WL 31236310, at *19 (Va. Cir. Ct. 2002) (citations omitted)), and (2) minimizing the possibility of prejudice to the seller by giving them ample time to cure the defect, inspect the goods, investigate the claim, or do whatever else is necessary to defend against the claim or minimize damages—while the facts are fresh in the parties' minds (*See Gen. Matters, Inc. v. Paramount Canning Co.*, 382 So.2d 1262, 1264 (Fla. Dist.

167

Ct. App. 1980) (citations omitted); *Am. Bumper & Mfg.*, 652 N.W.2d at 256; *Valspar Refinish, Inc. v. Gaylord's, Inc.*, No. A06-2227, 2007 WL 4237504, at *3 (Minn. Ct. App. Dec. 4, 2007) (citing *Church of the Nativity of Our Lord v. WatPro, Inc.*, 491 N.W.2d 1, 5 (Minn. 1992)); *Ragland Mills, Inc. v. Gen. Motors Corp.*, 763 S.W.2d 357, 361 (Mo. Ct. App. 1989) (citation omitted); *Brueck*, 23 Pa. D. & C.3d at 37; *Wilcox v. Hillcrest Mem'l Park of Dallas*, 696 S.W.2d 423, 424 (Tex. App. 1985) (citations omitted); *RML Corp.*, 2002 WL 31236310, at *19).

Here, plaintiffs plausibly allege that they provided FCA with pre-suit notice within a reasonable time after they discovered or should have discovered FCA's breach of express warranty. FCA submitted the safety recall report on January 17, 2023, wherein it discussed the defect and stated that it would notify owners and dealers of a recall on March 8, 2023. (ECF No. 1-2, PageID.331–333.) FCA circulated an advanced safety recall notification to dealers on January 24, 2023. (ECF No. 1-3, PageID.335.) Plaintiffs allege that they sent FCA a notice of breach letter on January 30, 2023 in accordance with various state statutes requiring some form of pre-suit notice. (ECF No. 1, PageID.104 ¶ 207, PageID.112 ¶ 238, PageID.147 ¶ 388, PageID.299 ¶ 1019.) Though the complaint is

168

light on the details of the letters' contents, FCA does not argue that the letter was insufficient for purposes of the express warranty claims.

The letter did not give FCA adequate time to engage in settlement negotiations nor did it give FCA time to cure the defect, inspect the goods, investigate the claim, or do what it needed to properly defend itself. However, the Court is not convinced that the timing of the letter needed to fulfill those purposes. Plaintiffs allegedly sent their letter: (1) 13 days after FCA submitted the recall report, which detailed its months long investigation into the defect; (2) 6 days after FCA circulated an advanced safety recall notification to dealers; and (3) over a month before FCA planned on notifying dealers and owners of the recall. Plaintiffs essentially pre-empted learning about a recall with no remedy by sending FCA a letter regarding their claims and then filing suit. On these facts, the Court finds that plaintiffs plausibly allege that they notified FCA of breach within a reasonable time after they discovered or should have discovered the breach.

### 4.  Essential Purpose

Finally, FCA argues that plaintiffs' allegations of the warranty failing its essential purpose are "bald" and "cannot save the express

warranty claims." (ECF No. 15, PageID.593.) In response, plaintiffs point to the allegations in the complaint and argue that the Court should not dismiss the warranty claims on this basis. (ECF No. 19, PageID.747.) FCA rebuts, contending that failure of essential purpose is only relevant when a manufacturer is unable to repair a product after several tries. (ECF No. 21, PageID.831.) The Court finds that plaintiffs plausibly allege that the express warranty fails its essential purpose.

At the outset, the Court clarifies why it is addressing this issue now as it is not obvious from the briefing. FCA does not frame its argument on failure of essential purpose as a reason to dismiss the express warranty claims. (*See* ECF No. 15, PageID.593.) However, plaintiffs seem to suggest that a warranty's failure of its essential purpose is an alternative basis for breach of express warranty liability. Plaintiffs allege,

> In the alternative, should Defendant claim that the Spontaneous Shutdown Risk is covered under the warranties, the warranties now fail in their essential purpose because the contractual remedy is insufficient to make Plaintiffs . . . whole because . . . Defendant has failed and/or refused to adequately provide the promised remedies within a reasonable time.

(ECF No. 1, PageID.125 ¶ 291.)

170

To be clear, the states under which plaintiffs bring their express warranty claims recognize that a buyer may pursue general remedies under that state's UCC for breach of warranty where an exclusive or limited remedy for breach of warranty fails its essential purpose. Fla. Stat. § 672.719(2) (2025); *Parsons v. Motor Homes of Am., Inc.*, 465 So.2d 1285, 1292 (Fla. Dist. Ct. App. 1985); *S. Aluminum Finishing Co. v. K&G Entrances, Inc.*, No. 20073013, 2008 WL 4058346, at *1 (Mass. Sup. Ct. Aug. 14, 2008) (citing Mass. Gen. Laws ch. 106, § 2-719 and *Bos. Helicopter Charter, Inc. v. Agusta Aviation Corp.*, 767 F. Supp. 363, 374 (D. Mass. 1991)); Mich. Comp. Laws § 440.2719(2) (2025); *Comput. Network, Inc. v. AM Gen. Corp.*, 696 N.W.2d 49, 54–55 (Mich. Ct. App. 2005); Minn. Stat. § 336.2-719(2) (2025); *Phythian v. BMW of N. Am., LLC*, No. A11-40, 2011 WL 4435403, at *3 (Minn. Ct. App. Sept. 26, 2011); *McCutcheon v. Cape Mobile Home Mart, Inc.*, 796 S.W.2d 901, 905 (Mo. Ct. App. 1990) (citing *Givan v. Mack Truck, Inc.*, 569 S.W.2d 243, 247 (Mo. Ct. App. 1978) and Mo. Rev. Stat. § 400.2-719(2)); 13 Pa. Cons. Stat. § 2719(b) (2025); *Honey Creek Stone Co. v. Telsmith, Inc.*, 11 Pa. D. & C. 5th 33, 44 (Pa. C.P. Ct. 2009); *Lujan v. Navistar, Inc.*, No. 14-14-00345-CV, 2021 WL 56184, at *3 (Tex. App. 2021) (citing Tex. Bus. &

171

Com. Code Ann. § 2.719(b)); *Envirotech Corp. v. Halco Eng'g, Inc.*, 364 S.E.2d 215, 219 (Va. 1988) (quoting Va. Code Ann. § 8.2-719(2)). In other words, this doctrine implicates whether a buyer is limited to a certain remedy or whether they can pursue other remedies under a state's UCC. Plaintiffs fail to cite any authority indicating that a limited remedy's failure of its essential purpose creates an independent basis for a breach of express warranty claim.

At this stage, FCA does not argue that the Basic Limited Warranty supplies an exclusive or limited remedy. However, the Basic Limited Warranty arguably limits plaintiffs' remedies to the repair of a defective component. (*See* ECF No. 15-2, PageID.603 ("The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship, or factory preparation."); ECF No. 15-3, PageID.640 (same).) Whether, at a later stage, plaintiffs can pursue other remedies for breach of express warranty may turn on whether the repair remedy in the warranty fails its essential purpose. Therefore, the Court must decide, at this stage, whether plaintiffs have plausibly alleged that the repair remedy in the warranty fails its essential purpose.

172

Plaintiffs have met their burden. The repair remedy in the Basic Limited Warranty is akin to a repair and replace remedy. A repair and replace remedy fail its essential purpose where the seller cannot repair a defective good or repair within a reasonable time, depriving the buyer of their minimum adequate remedy. *See Parsons*, 465 So.2d at 1292; *Shelor*, 2025 WL 1580834, at *19; *Sosik v. Albin Marine, Inc.*, No. 020539B, 2003 WL 21500516, at *6 (Mass. Sup. Ct. May 28, 2003) (quoting *Hadar v. Concordia Yacht Builders, Inc.*, 886 F. Supp. 1082, 1099 (S.D.N.Y. 1995)); *Bos. Helicopter*, 767 F. Supp. at 374; *Stone Transp., Inc. v. Volvo Trucks N. Am. Inc.*, 129 F. App'x 205, 206 (6th Cir. 2005) (quoting *Forster v. Navistar Int'l Transp. Corp.*, No. 233048, 234995, 2002 WL 1998571, at *4–5 (Mich. Ct. App. Aug. 27, 2002)); *Durfee v. Rod Baxter Imps., Inc.*, 262 N.W.2d 349, 356 (Minn. 1977)); *McCutcheon*, 796 S.W.2d at 905; *Honey Creek*, 11 Pa. D. & C.5th at 44 (quoting *Chatlos Sys. Inc. v. Nat'l Cash Reg. Corp.*, 635 F.2d 1081, 1085 (3d Cir. 1980)); *Lujan*, 2021 WL 56184, at *3 (citing *Mercedes-Benz of N. Am., Inc. v. Dickenson*, 720 S.W.2d 844, 854 (Tex. App. 1986)); *Beausoleil v. Peterbilt Motors Co.*, No. 10CV222, 2010 WL 2365567, at *3 (E.D. Va. June 11, 2010).

173

Here, FCA conducted a months-long investigation into the alleged shutdown defect, issued a recall, and prescribed a software update that would give drivers notice before their vehicle shuts down. (ECF No. 1-2, PageID.331–333.) The software update does not prevent the cars from shutting down. Thus, at the time plaintiffs filed their complaint, FCA did not have a true fix for the shutdown defect. FCA alludes to a more permanent remedy in their motion to dismiss, but they present nothing indicating that it could repair the defect at the time plaintiffs filed their complaint. (*See* ECF No. 15, PageID.570 ("Just two weeks after the recall was announced, while the final remedy was being developed, Plaintiffs filed their Complaint.").) On these facts, plaintiffs have adequately alleged that the repair and replace remedy in the Basic Limited Warranty fails its essential purpose.

FCA resists this conclusion, arguing that multiple repair attempts are a condition precedent to a remedy failing its essential purpose. (ECF No. 21, PageID.831.) The Court disagrees. The presentment analysis from above applies with equal force to this argument. Further, the *Bolt* court rejected a similar argument on similar facts.

> [T]he Court finds those cases [suggesting that a warranty has only failed its essential purpose when a manufacturer makes

174

several failed attempts at repair] unpersuasive and inapplicable in a situation where the manufacturer has acknowledged—at least at the time this suit was filed—that it is unable to fix the allegedly defective cars. GM issued the software updates as explicitly temporary remedies, and issued notices to each customer in August 2021 stating that "parts to repair your vehicle are not currently available." It would be senseless to require a plaintiff to present their vehicle for repair multiple times to a manufacturer who has already said that it is currently unable to provide a lasting, permanent fix.

*Bolt*, 633 F. Supp. 3d at 976–977 (internal citation omitted). The Court finds *Bolt* persuasive. Accordingly, plaintiffs have plausibly alleged that the repair remedy in the Basic Limited Warranty fails its essential purpose.[21]

---

[21] Because there are remaining express and implied warranty claims, the Court declines to dismiss the MMWA claim. *See Kuns v. Ford Motor Co.*, 543 F. App'x 572, 575 (6th Cir. 2013) (quoting *Temple v. Fleetwood Enters., Inc.*, 133 F. App'x 254, 268 (6th Cir. 2005)) ("To state a claim under the MMWA, a plaintiff must present a 'sustainable claim for breach of warranty.'"). However, only those plaintiffs with state law warranty claims may maintain MMWA claims.

## VI. CONCLUSION

Accordingly, FCA's motion to dismiss (ECF No. 15) is **GRANTED IN PART**, **DENIED IN PART**, and **DENIED AS MOOT IN PART**. For convenience, the Court inserts a Table of Claims containing a breakdown of the claims that survive in whole, survive in part, and do not survive at all. The Table of Claims is hereby incorporated in this Opinion and Order by reference and specifies claims according to the count names and numbers in the complaint. (ECF No. 1.)

**TABLE OF CLAIMS**

| Count | Claim | Status |
|-------|-------|--------|
| I | Magnuson-Moss Warranty Act | Partially dismissed. Survives only as to any plaintiff and respective sub-class with valid express warranty and/or implied warranty of merchantability claims.<br><br>Stayed pending arbitration with respect to James and Alicia Kappes (AZ), Shusta (CA), Berzanskis and Wilensky (CO), Spruance (GA), Keeth (ID), Voss (IL), Dorn (KY), Hoffman (MD), Fong (NC), Christie (OR), and Ventura (VA).<br><br>Plaintiffs may only pursue this claim on behalf of themselves and their state sub-classes. |
| II | Fraudulent Concealment (Common Law) | Partially dismissed. Dismissed with respect to Plaintiffs Carney and Clancy (CA), Kelsey and Peter Keefe (CT), Latacki (FL), Su (IL), Banas (IA), Vu (KS), Alicia and David Maltz (MA), Huntington (MI/OH), Niemioja (MN), Perry (MO), Bergantino and Nicole and Stephen Costa (NH), Gadomski Littleton (OH), Ohodnicki (PA), Bartek (RI), Carbajales-Dale (SC), Sheehan (TX), Golland (VA), and Benzur (WA) for failure to allege pre-sale knowledge and failure to satisfy Rule 9(b).<br><br>Stayed pending arbitration with respect to James and Alicia Kappes (AZ), Shusta (CA), Berzanskis and Wilensky (CO), Spruance (GA), Keeth (ID), Voss (IL), Dorn (KY), Hoffman (MD), Fong (NC), Christie (OR), and Ventura (VA).<br><br>Plaintiffs may only pursue this claim on behalf of themselves and their state sub-classes. |

177

| Count | Claim | Status |
|---|---|---|
| III | Fraudulent Omission (Common Law) | Partially dismissed. Dismissed with respect to Plaintiffs Carney and Clancy (CA), Kelsey and Peter Keefe (CT), Latacki (FL), Su (IL), Banas (IA), Vu (KS), Alicia and David Maltz (MA), Huntington (MI/OH), Niemioja (MN), Perry (MO), Bergantino and Nicole and Stephen Costa (NH), Gadomski Littleton (OH), Ohodnicki (PA), Bartek (RI), Carbajales-Dale (SC), Sheehan (TX), Golland (VA), and Benzur (WA) for failure to allege pre-sale knowledge and failure to satisfy Rule 9(b). <br><br> Stayed pending arbitration with respect to James and Alicia Kappes (AZ), Shusta (CA), Berzanskis and Wilensky (CO), Spruance (GA), Keeth (ID), Voss (IL), Dorn (KY), Hoffman (MD), Fong (NC), Christie (OR), and Ventura (VA). <br><br> Plaintiffs may only pursue this claim on behalf of themselves and their state sub-classes. |

| Count | Claim | Status |
|---|---|---|
| IV | Unjust Enrichment (Common Law) | Partially dismissed. Dismissed as to Huntington and Gadomski Littleton (OH) and Sheehan (TX).<br><br>Dismissed as an independent cause of action as to Carney and Clancy (CA) and David and Alicia Maltz (MA), but they may pursue equitable remedies under a theory of unjust enrichment.<br><br>Remains with respect to Kelsey and Peter Keefe (CT), Su (IL), Banas (IA), Latacki (FL), Vu (KS), Huntington (MI), Niemioja (MN), Perry (MO), Bergantino and Nicole and Stephen Costa (NH), Ohodnicki (PA), Bartek (RI), Carbajales-Dale (SC), Golland (VA), Benzur (WA).<br><br>Stayed pending arbitration with respect to James and Alicia Kappes (AZ), Shusta (CA), Berzanskis and Wilensky (CO), Spruance (GA), Keeth (ID), Voss (IL), Dorn (KY), Hoffman (MD), Fong (NC), Christie (OR), and Ventura (VA).<br><br>Plaintiffs may only pursue this claim on behalf of themselves and their state sub-classes. |
| V | Arizona Consumer Fraud Act | Stayed pending arbitration (James and Alicia Kappes). |
| VI | Breach of Implied Warranty of Merchantability under Arizona Law | Stayed pending arbitration (James and Alicia Kappes). |
| VII | California Consumer Legal Remedies Act | Dismissed as to Carney and Clancy for failure to satisfy Rule 9(b). Stayed pending arbitration with respect to Shusta. |
| VIII | California Unfair Competition Law | Dismissed as to Carney and Clancy for failure to satisfy Rule 9(b). Stayed pending arbitration with respect to Shusta. |

179

| Count | Claim | Status |
|-------|-------|--------|
| IX | California False Advertising Law | Dismissed as to Carney and Clancy for failure to satisfy Rule 9(b). Stayed pending arbitration with respect to Shusta. |
| X | Song-Beverly Consumer Warranty Act for Breach of Implied Warranty of Merchantability under California Law | Dismissed as to Carney and Clancy for failure to allege unmerchantable vehicle. Stayed pending arbitration with respect to Shusta. |
| XI | Colorado Consumer Protection Act | Stayed pending arbitration (Berzanskis and Wilensky). |
| XII | Breach of Implied Warranty of Merchantability under Colorado Law | Stayed pending arbitration (Berzanskis and Wilensky). |
| XIII | Breach of Express Warranties under Colorado Law | Stayed pending arbitration (Berzanskis and Wilensky). |
| XIV | Connecticut Unlawful Trade Practices Act | Dismissed for failure to allege presale knowledge. |
| XV | Breach of Implied Warranty of Merchantability under Connecticut Law | Dismissed for failure to allege unmerchantable vehicle. |
| XVI | Florida Deceptive and Unfair Trade Practices Act | Dismissed for failure to allege presale knowledge. |
| XVII | Breach of Implied Warranty of Merchantability under Florida Law | Dismissed for lack of privity. |
| XVIII | Breach of Express Warranty under Florida Law | Remains. |

180

| Count | Claim | Status |
|---|---|---|
| XIX | Georgia Fair Business Practices Act | Stayed pending arbitration (Spruance). |
| XX | Breach of Implied Warranty of Merchantability under Georgia Law | Stayed pending arbitration (Spruance). |
| XXI | Breach of Express Warranty under Georgia Law | Stayed pending arbitration (Spruance). |
| XXII | Idaho Consumer Protection Act | Stayed pending arbitration (Keeth). |
| XXIII | Breach of Implied Warranty of Merchantability under Idaho Law | Stayed pending arbitration (Keeth). |
| XXIV | Breach of Express Warranty under Idaho Law | Stayed pending arbitration (Keeth). |
| XXV | Illinois Consumer Fraud and Deceptive Business Practices Act | Dismissed as to Su for failure to satisfy Rule 9(b). Stayed pending arbitration as to Voss. |
| XXVI | Breach of Implied Warranty of Merchantability under Illinois Law | Dismissed as to Su for lack of privity. Stayed pending arbitration as to Voss. |
| XXVII | Iowa Private Right of Action for Consumers Frauds Act | Dismissed for failure to satisfy Rule 9(b). |
| XXVIII | Breach of Implied Warranty of Merchantability under Iowa Law | Remains. |

181

| Count | Claim | Status |
|---|---|---|
| XXIX | Kansas Consumer Protection Act | Dismissed for failure to satisfy Rule 9(b). |
| XXX | Breach of Implied Warranty of Merchantability under Kansas Law | Remains. |
| XXXI | Kentucky Consumer Protection Act | Stayed pending arbitration (Dorn). |
| XXXII | Breach of Implied Warranty of Merchantability under Kentucky Law | Stayed pending arbitration (Dorn). |
| XXXIII | Maryland Consumer Protection Act | Stayed pending arbitration (Hoffman). |
| XXXIV | Breach of Implied Warranty of Merchantability under Maryland Law | Stayed pending arbitration (Hoffman). |
| XXXV | Deceptive Acts or Practices Prohibited by Massachusetts Law | Dismissed for failure to satisfy Rule 9(b). |
| XXXVI | Breach of Implied Warranty of Merchantability under Massachusetts Law | Remains. |
| XXXVII | Breach of Express Warranty under Massachusetts Law | Remains. |
| XXXVIII | Breach of Implied Warranty of Merchantability under Michigan Law | Remains. |
| XXXIX | Breach of Express Warranty under Michigan Law | Remains. |

182

| Count | Claim | Status |
|---|---|---|
| XL | Minnesota Consumer Fraud Act | Dismissed for failure to satisfy Rule 9(b). |
| XLI | Minnesota Uniform Deceptive Trade Practices Act | Dismissed for failure to satisfy Rule 9(b). |
| XLII | Breach of Implied Warranty under Minnesota Law | Remains. |
| XLIII | Breach of Express Warranty under Minnesota Law | Remains. |
| XLIV | Missouri Merchandising Practices Act | Dismissed for failure to satisfy Rule 9(b). |
| XLV | Breach of Express Warranty under Missouri Law | Remains. |
| XLVI | New Hampshire Consumer Protection Act | Dismissed for failure to allege pre-sale knowledge. |
| XLVII | Breach of Implied Warranty of Merchantability under New Hampshire Law | Dismissed for failure to allege unmerchantable vehicle. |
| XLVIII | North Carolina Unfair and Deceptive Acts and Practices Act | Stayed pending arbitration (Fong). |
| XLIX | Breach of Implied Warranty of Merchantability under North Carolina Law | Stayed pending arbitration (Fong). |

183

| Count | Claim | Status |
|---|---|---|
| L | Breach of Implied Warranty of Merchantability under Ohio Tort Law | Remains. |
| LI | Oregon Unlawful Trade Practices Act | Stayed pending arbitration (Christie). |
| LII | Breach of Implied Warranty of Merchantability under Oregon Law | Stayed pending arbitration (Christie). |
| LIII | Breach of Express Warranty under Oregon Law | Stayed pending arbitration (Christie). |
| LIV | Pennsylvania Unfair Trade Practices and Consumer Protection Law | Dismissed for failure to satisfy Rule 9(b). |
| LV | Breach of Implied Warranty of Merchantability under Pennsylvania Law | Dismissed for failure to allege unmerchantable vehicle. |
| LVI | Breach of Express Warranty under Pennsylvania Law | Remains. |
| LVII | Rhode Island Deceptive Trade Practices Act | Dismissed for failure to satisfy Rule 9(b). |
| LVIII | Breach of Implied Warranty under Rhode Island Law | Remains. |

184

| Count | Claim | Status |
|---|---|---|
| LIX | South Carolina Regulation of Manufacturers, Distributors, and Dealers Act | Dismissed for failure to allege presale knowledge. |
| LX | Breach of Implied Warranty of Merchantability under South Carolina Law | Dismissed for failure to allege unmerchantable vehicle. |
| LXI | Texas Deceptive Trade Practices Act | Dismissed for failure to satisfy Rule 9(b). |
| LXII | Breach of Implied Warranty of Merchantability under Texas Law | Dismissed for failure to allege unmerchantable vehicle. |
| LXIII | Breach of Express Warranty under Texas Law | Remains. |
| LXIV | Virginia Consumer Protection Act | Dismissed as to Golland for failure to satisfy Rule 9(b). Stayed pending arbitration as to Ventura. |
| LXV | Breach of Implied Warranty of Merchantability under Virginia Law | Remains as to Golland. Stayed pending arbitration as to Ventura. |
| LXVI | Breach of Express Warranty under Virginia Law | Remains as to Golland. Stayed pending arbitration as to Ventura. |
| LXVII | Washington Consumer Protection Act | Dismissed for failure to satisfy Rule 9(b). |
| LXVIII | Breach of Implied Warranty of Merchantability under Washington Law | Dismissed for lack of privity. |

185

Additionally, this matter remains **STAYED** only with respect to Berzanskis, Wilensky, Christie, Dorn, Fong, Hoffman, James and Alicia Kappes, Keeth, Shusta, Spruance, Ventura, and Voss pending arbitration.

**SO ORDERED.**

<u>**s/Jonathan J.C. Grey**</u>
Jonathan J.C. Grey

Date: March 3, 2026
United States District Judge

## <u>Certificate of Service</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 3, 2026.

<u>s/ **S. Osorio**</u>
Sandra Osorio
Case Manager

187